```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3      *  *  *  *  *  *  *  *  *  *  *  *  *
        EVERYSCAPE, INC.,            *
 4            Plaintiff              *      CIVIL ACTION
                  vs.                *      No. 10-11597-RGS
 5                                   *
        ADOBE SYSTEMS, INC.          *
 6            Defendant              *
        *  *  *  *  *  *  *  *  *  *  *  *  *
 7

 8

 9             BEFORE THE HONORABLE RICHARD G. STEARNS
                UNITED STATES DISTRICT JUDGE and a JURY
10                     Jury Trial Day 1
                        January 12, 2015
11

12      APPEARANCES:

13               LEYDIG, VOIT & MAYER, LTD, (By Wesley O. Mueller,
        Esq., David M. Airan, Esq., Aaron R. Feigelson, Esq.),
14      Two Prudential Plaza, Suite 4900, 180 North Stetson
        Avenue, Chicago, Illinois  60601-6731, on behalf of
15      Plaintiff

16               FISH & RICHARDSON, P.C., (By Frank Scherkenbach,
        Esq., Adam J. Kessel Esq., and Betty H. Chen, Esq.), One
17      Marina Park Drive, Boston, Massachusetts  02210, on behalf
        of Defendant
18

19                                    Courtroom No. 21
                                      1 Courthouse Way
20                                    Boston, Massachusetts  02210

21

22                     Debra M. Joyce, RMR, CRR
                       Lisa Valdario, RMR, CRR
23                     Official Court Reporters
                     1 Courthouse Way, Suite 5204
24                        Boston, MA  02210
                        Joycedebra@gmail.com
25
```

P R O C E E D I N G S

1

2          (The following proceedings were held in open

3   court before the Honorable Richard G. Stearns, United States

4   District Judge, United States District Court, District of

5   Massachusetts, at the John J. Moakley United States Courthouse,

6   1 Courthouse Way, Boston, Massachusetts, on January 12, 2015.)

7          (Jury impanelment has been omitted from this

8   transcript.)

9                    *   *   *   *   *   *   *   *   *

11:46 10        THE COURT:  All right, jurors, as I promised, I have a

11   few words by way of orientation.  Also during the course of

12   these instructions, there is a video that is not long in

13   duration that will play for you, not produced by the parties,

14   it was actually done by the Federal Judicial Center for jurors

15   as a way of orienting jurors who are new to patent law into the

16   basics of the patent system.  I think you'll find that helpful

17   as well.

18          As I explained during the impanelment, it is the

19   jury's duty to find the facts of the case from the evidence

11:47 20   that will be presented during the trial, and you, and you

21   alone, are the judges of those facts.  You will then have to

22   apply to the facts as you find them the law as I will describe

23   it to you, and you must follow the law as I explain it, whether

24   you personally agree with the wisdom of the law or not.

25          The evidence from which you will find the facts will

1    consist of the testimony of witnesses, documents, things

2    admitted as exhibits, and any facts that the lawyers agree to

3    or, they would say, stipulate to as true.

4         Some of the testimony during this trial will be

5    received in the form of a deposition.  Depositions are sworn

6    testimony taken from witnesses prior to the trial.  In a

7    deposition, lawyers for both sides are present and permitted to

8    ask questions.  The witness is under oath when he or she

9    testifies, and is permitted after the fact to make clerical

11:48  10    corrections if any mistake is made in transcribing the

11    testimony.  We are confident in the accuracy of deposition

12    transcripts to admit deposition testimony in a civil trial on

13    the same footing as we do live testimony.

14         The lawyers may also refer from time to time to

15    something called an interrogatory.  In a civil case, each side

16    is permitted to ask a limited number of written questions of

17    the other.  These are the interrogatories, and the answers

18    given become binding on the party giving the answer.

19         Certain things are not evidence and should not be

11:49  20    considered by you in reaching your verdict, and let me briefly

21    list them now.  Statements, arguments, and questions by lawyers

22    are not evidence.  What the lawyers have to say will be helpful

23    in setting the context of the testimony and the evidence

24    admitted as exhibits, but their statements should not be taken

25    as evidence.

1          Objections to questions are not evidence.  Lawyers

2   have an obligation to their clients to object when they believe

3   that evidence being offered is improper under the rules of

4   evidence.  You should not be influenced by an objection or by

5   the way I rule on it.  If I sustain an objection, ignore the

6   lawyer's question and any assertion of fact the question might

7   contain.  If I overrule the objection, treat the witness'

8   answer as you would any other.

9          Testimony that I exclude or that I instruct you to

11:50 10   disregard is not evidence and must not be considered by you in

11   formulating a verdict.  If I instruct you that an item of

12   evidence is received for a limited purpose, you may only

13   consider it for the purpose that I define for you.

14          Now, occasionally items during the course of a trial

15   are marked for identification and are given a letter like "A"

16   for identification.  We do that so there will be some reference

17   to the item in the official trial record.  If an item marked

18   for identification, however, is not eventually received as an

19   exhibit and given an exhibit number in lieu of a letter, that

11:50 20   item is not evidence, will not be with you in the jury room

21   during your deliberations, and is not to be considered by you

22   in reaching a verdict.

23          Anything that you may see or hear outside the

24   courtroom during the course of the trial is not evidence and

25   must be disregarded.  You must decide the case based solely on

1    the evidence that is presented here in open court.

2         Now, there are two types of evidence that are offered

3    in a trial.  There is direct evidence and then there is

4    so-called circumstantial evidence, a term that all of you have

5    heard but may not have a ready definition for.  Let me explain

6    the difference.

7         Direct evidence is direct proof of a fact usually

8    presented through the testimony of a person who claims to have

9    been an eyewitness to an event or a participant in a

11:51 10   conversation.  When you evaluate direct testimony, your task is

11   fairly straightforward:  Do you believe that what the witness

12   has told you is accurate?  Circumstantial evidence, on the

13   other hand, is the proof of a chain of circumstances or a set

14   of facts from which you could infer or conclude that another

15   fact is true, even though you have no direct evidence of that

16   fact.  Let me give you a simple example.

17        Assume that Ms. Seelye, the court clerk, arrived for

18   work this morning.  She did not find me in my office,

19   nonetheless, she found the lights in the office on, my coat

11:52 20   hanging in the closet, the work I had taken home for the

21   weekend spread out on the desk with a cup of steaming hot

22   coffee, and a copy of this morning's newspaper.  From those

23   facts, Ms. Seelye would properly infer or conclude that even

24   though she had not seen me, I had already arrived for work and

25   was simply somewhere else in the courthouse.

         1              Despite what courtroom television drama likes to

         2      teach, the law does not draw a distinction between these two

         3      types of evidence in deeming one superior or inferior to the

         4      other.  You may consider both direct evidence and

         5      circumstantial evidence in reaching your verdict and, as the

         6      judges of the facts, may give either type of evidence whatever

         7      weight you deem it to be worth.

         8              Now, as I said, my practice after each trial and after

         9      a verdict is to meet with and speak with the jurors who

11:53   10      participated in the case, and from those conversations I

        11      learned early that there are questions to answer at the outset.

        12      Will we have witness testimony available for use in our

        13      deliberations?  Ordinarily the answer would be no, not because

        14      anyone would keep it from the jury, but usually we don't have

        15      the ability to produce it quickly enough for your inspection.

        16              But, counsel, my understanding is that we're doing

        17      daily copy; is that correct?

        18              MR. MUELLER:  Yes, your Honor.

        19              THE COURT:  That being the case, there will be, then,

11:53   20      transcripts, that the lawyers have arranged for an extra set of

        21      court reporters to be available, so you will have, if you want

        22      to examine it later, deposition testimony -- I'm sorry,

        23      testimony both in deposition form and what is actually given

        24      here live in the case.

        25              Can we keep notes?  Well, good example of

1    circumstantial evidence is that I think Terri gave you a

2    notebook and a pen, so the answer, of course, is yes.  Let me

3    stress that you do not have to keep notes if you do not want

4    to.  Some jurors I know find note-taking distracting and prefer

5    simply to concentrate on what the witnesses have to say.  Most

6    jurors, in my experience, find notes to be a useful memory aid

7    for deliberations.  I keep notes, the lawyers will keep notes.

8    It's up to you to decide how much note-taking you want to do.

9    The one thing I promise you is that if you do take notes, no

11:54 10  one will ever examine what you write in the notebook, unless

11    you choose to share your observations with the other jurors

12    during deliberations.  At the end of the trial, either take the

13    notebook with you or Terri will shred any notes that you've

14    kept.

15           Now, those of you who are old enough to remember the

16    O.J. Simpson trial might remember a phenomenon called the

17    sidebar conference.  During that trial -- some of you are too

18    young to remember it -- but Judge Ito, who was the presiding

19    judge, seemed to spend most of the trial at the side of the

11:55 20  bench huddling privately with the lawyers where the jury would

21    sit sometimes for an hour trying to perceive what could

22    possibly be kept from them during that period of time.  That

23    will not be an issue in this case.  I do not permit sidebar

24    conferences, except on the two occasions when under law during

25    the trial I'm required to convene them, but I try to be certain

1    that those get scheduled during a break or after the trial.

2    Your time is the most important thing, the most important

3    commodity we have at our disposal, and we're not going to waste

4    any of it.

5            My sense of what a juror's task is, is essentially

6    that of judging the credibility of witnesses especially but

7    also of the evidence generally.  In sizing up a witness, it's

8    really up to you to decide which witness to believe, which

9    witness not to believe or how much of any witness' testimony to

11:56 10   accept or reject.  This will be true of what we would call lay

11   witnesses, that is, ordinary witnesses to things or

12   conversations, but you're going to hear a fair amount of expert

13   testimony in this case, and we judge expert testimony the same

14   way we do any other testimony.  Again, it's a question of

15   credibility.  In the case of an expert, do you believe that he

16   or she has the sufficient training and experience and expertise

17   to offer an opinion?  And if he or she does, do you think the

18   opinion makes sense in light of all the other evidence in the

19   case and in light of the reasons the expert may give for his or

11:56 20   her opinion?

21           What we're going to do at this time is now introduce

22   you to the patent system through a video, which, again, as I

23   said, is prepared for us by the Federal Judicial Center, and

24   this is a brief descriptive video that will introduce you --

25   some of you may know something about the patent system already,

but this is a pretty straightforward view of what you'll want
to know; and as soon as the video finishes, I'll turn to some
of the substantive law in the case.

So if we can cue up the video.

(Played video.)

THE COURT:  That's the first time I've seen that.
Actually, Judge Fogel is a friend.  I didn't realize he was
that polished an actor.  He did a very good job, actually, of
putting that together.

Well, we know now, as I advised you during the
selection process, that this is a civil action for patent
infringement.

The parties in the case, again, were introduced to
you, EveryScape and Adobe Systems, which probably will be
referred to as Adobe for shorthand purposes during the trial.
EveryScape is the plaintiff in the case, that is, it is
asserting claims against Adobe, which, as I explained, is the
defendant.

The underlying dispute and the technology that is at
issue relates to software that edits or manipulates digital
photographic images.  This is going to be explained to you in
more detail by the lawyers in the opening statements.  It also
will be significantly the subject of expert testimony.  In
order to decide the case, you will have to come to an
understanding, which I think you may have acquired already

1    through the videotape, of the role that patent claims play.

2    Again, to summarize what was said in the video, the patent

3    claims are the numbered sentences at the end of the patent and

4    it is the words of the claims that define what the patent

5    covers and each claim is required to set forth its requirements

6    in a single, sometimes convoluted, but a single sentence.

7         EveryScape contends that Adobe infringes Claims -- no

8    reason to remember this now, this will be available to you -- 1

9    through 17 and 18 of U.S. Patent No. 7,327,374.  All patents

12:15  10  get one of these million-numbered sequences.  Since nobody can

11    ever remember the numbers, we always use the last three to

12    describe the patents.  So this would be the '374 Patent.  The

13    second set of claims involve 1, 2, 12, 13, 24, and 25 of what

14    will be referred to as the '022 patent.

15         The issue that you will decide is not Adobe's

16    infringement, but whether or not the '374 and the '022 patents

17    are valid.

18         If the patents are valid, there is no dispute but that

19    the Clone Stamp tool in Photoshop infringes them.  If they are

12:16  20  invalid because of prior art, there is no infringement issue to

21    decide.

22         Now, EveryScape also asserts that Adobe has induced

23    others to infringe its claims in the patents.  Inducement

24    infringement occurs when a party, without a right to use a

25    valid patent, deliberately sets out to cause or encourage a

1    third party to do so, either directly or by turning a blind eye

2    to what it knew was likely to happen by virtue of its actions.

3         In general, you're to give the ordinary plain language

4    meaning to the words contained in the claims of the patent as

5    they would be understood by a person of skill in the relevant

6    art, except for certain special terms, which were used in the

7    patent which required definition.  As the judge in the case,

8    one of the things I'm required to do is provide you with a

9    binding definition of terms that otherwise would be in dispute

12:17 10  in the patent, and there are two that I'm going to provide you

11   with now that have been the subject of a prior definition

12   construed by the Court.  The term "homography," which is used

13   in EveryScape's patents, is defined by the Court to mean a

14   two-dimensional projective transformation that determines a

15   linear mapping between an image and a world plane.  I don't

16   expect that to make a lot of sense to you now, it will after

17   you hear the expert testimony in the case.

18        The second term of dispute will be "source position."

19   That I've defined to mean a position different from the

12:17 20  destination position relevant to which the information is

21   copied.  That's a little simpler, but again, that will be the

22   subject of expert testimony.

23        When a patent, as you heard or may have heard in the

24   video, is awarded by the PTO, it is presumed to have been

25   properly granted.  Because of that presumption, a person who

1   contends that a patent is invalid must meet a higher level of

2   proof than the usual burden in a civil trial, which is a

3   preponderance of the evidence or a more likely than not

4   standard.  Rather, the party seeking to prove invalidity must

5   prove it by evidence that convinces you that it is highly

6   probable that the asserted claims are, in fact, invalid.

7           Now, I think maybe one of you may have sat on a

8   criminal case previously.  If you have, there you were

9   introduced to a burden called proof beyond a reasonable doubt.

12:18  10   That has no relevance in a civil case.  We have two burdens:

11   One, more likely than not, preponderance of the evidence, or

12   clear and convincing, that is, highly probable proof that

13   something is or is not true.

14           I have a few special words about your conduct as

15   jurors.  The first one is a hard one; that is, you are not to

16   discuss the resolution of any material issue in the case with

17   each other or anyone else until you begin your formal

18   deliberations at the conclusion of the evidence.  Until then,

19   you're not to express an opinion as to the outcome of the case.

12:19  20   Now, I'm not saying you shouldn't talk to one another, of

21   course you will, and of course you'll talk about things that

22   happen during the course of the trial that are interesting or

23   noteworthy, but what I want you to do is not jump to any

24   conclusions about a resolution of the case until you've heard

25   all of the evidence and both sides have had a fair opportunity

1   to be heard.

2          Second, I ask that you not read or listen to anything

3   touching upon the case in any way.  If the case does become the

4   subject of media reporting, I ask you to turn away and just

5   simply not read or listen.

6          Third, especially important in this case because it

7   does involve technology, I ask that you not attempt any

8   research or any investigation into the facts of the case, say,

9   through the internet or any other kind of media.  It's

12:20 10  important that we all deliberate and come to a decision with

11   the same fund of facts at our disposal.

12          Now, most of you know an American jury usually

13   consists of 12 persons.  The federal rule in civil trials,

14   however, permits a jury of as few as six.  The reason I seat

15   eight is simply to ensure, in the event of a family or medical

16   emergency, at least six of you will be here at the end of the

17   trial to deliberate.  I have to say, though, in 20 years, I've

18   only once had a juror in a civil case not make it to the end,

19   and I think that was during a flu season.

12:20 20          The good news is that there's no alternate jurors in

21   federal civil trials, so jurors seven and eight, you are full

22   participating, deliberating jurors.  You are members of the

23   jury.

24          Also, unlike for those of you who may have sat on a

25   state civil case, in the state, a civil jury need not be

1    unanimous.  Different in federal court, you will be required to

2    come to a unanimous decision in terms of answering the special

3    questions I'll give you which will constitute the verdict in

4    the case.

5         The schedule I explained during impanelment.  We will

6    go until 4:00 today, this will be the unusual full day, and

7    then we'll start at 9:00 promptly tomorrow, I'll have you out

8    promptly at 1:00.  We take a 25-minute break mid-morning around

9    ten of 11, we'll have refreshments for you, we'll do our best

12:21 10   to mix up the carbohydrates with something that's a little bit

11   more suitable to a modern diet, although it's sometimes hard to

12   convince the cafeteria downstairs that everybody doesn't eat

13   pastry all the time, but we'll do our best in that regard.  We

14   will also, to make things easy for you, particularly given the

15   fact there will be some congestion in the court as the Tsarnaev

16   trial gets under way, we will have breakfast for you around

17   8:00 waiting.  So you can come directly to the courthouse, you

18   don't have to worry about stopping, take time for breakfast on

19   the way.  To the extent there are any dietary needs that any of

12:22 20   you have, let Terri know, and we'll do our best to accommodate

21   them.

22        If you want to bring a bottle of water into the jury

23   box with you during the court session, that's fine, but it can

24   only be water, not my rule, but the General Services

25   Administration, which is the landlord of the building, is very

1  jealous about the carpet, and so they only allow water in the

2  courtroom itself.

3       I think Marsha explained the cell phone provisions and

4  how you can bring a cell phone in to have during the breaks at

5  your disposal.

6       This -- you are going to be here for eight or nine

7  days, and I do hope that you'll take some time to take a look

8  at the courthouse.  You own it.

9       I sat for a number of years on the federal judicial

12:23  10  committee that oversees all courthouse construction for the

11  federal courts in the U.S., so I've seen lots of courthouses,

12  and of modern courthouses, I think this is easily the most

13  beautiful, and it is also, perhaps, the most functional of the

14  courthouses.  I was a state judge before I became a federal

15  judge, and the state has some beautiful courthouses as well,

16  but they don't do a very good job of maintaining them, in my

17  experience.  So some of them don't have the functionality that

18  this court has.

19       This is -- this court goes back to the beginning of

12:23  20  the Constitution.  We are one of the oldest courts of the

21  modern constitutional era; that is, we were founded in 1789,

22  the same year the Judiciary Act was passed and the Constitution

23  took effect.  Of course, we weren't -- this building didn't

24  exist in 1789, and when the court was originally founded, it

25  only had one judge, John Lowell, a name that some you, if

1   you're Massachusetts long-time residents, would recognize.  And

2   actually, the court, when it originally sat, did not sit in a

3   courthouse, it sat at the Bunch of Grapes Tavern, which, as

4   best I can tell, was probably on the corner of State Street and

5   Congress, where the old stock exchange used to be.

6           The following year, the court moved to a real

7   courthouse, but it was in Salem, Massachusetts, where the court

8   sat for the next 14 or 15 years, until the War of 1812 broke

9   out.  And the reason the court moved to Salem was that at the

12:24 10   time, most of the revenue of the United States Treasury came

11   from customs, and the richest seaport in the world was Salem.

12   Not much manufacturing then was done in the U.S., so a number

13   of goods were imported from Europe, most of them came through

14   Salem.  If I remember, Nathaniel Hawthorne was a customs

15   collector in Salem when he was writing the Scarlet Letter.

16           The court left in 1812 because they were afraid of

17   being captured by the British, who were marauding the seacoast

18   areas, came to Boston, but never went back to Salem, and the

19   reason that the court never went back to Salem -- I don't know

12:25 20   if some of you are historians, you might know this -- was

21   because of the Erie Canal.  The Erie Canal began construction

22   in 1817.  Salem lost its value as a harbor at that point,

23   because now you could bring goods a day closer to the Great

24   Lakes and move them by water through the canal system to the

25   Great Lakes from the port of New York.

1    So Salem began a process of decline, although you can

2    still see in Salem what a rich city -- I still think it's a

3    beautiful city -- what a rich city it was at the beginning of

4    the 19th century, particularly the McIntire treasures and

5    buildings that were left as part of the architecture of the

6    city.

7    The old courthouse in Salem was lost in a

8    reconstruction -- one of those -- we've done it here -- city

9    reconstruction projects.  Actually, in 1839, they were building

12:26 10   a railway and tore down the old courthouse then.  Nobody's

11   quite sure where it was, it was probably on Federal Street in

12   Salem, which is why, I assume, it had the name Federal Street.

13   But we came basically here.

14   The court re-established itself eventually at Post

15   Office Square, which is where I started as a federal judge.  It

16   was a building we somewhat outgrew, so this building was built

17   in 1998.  The architect of the building was Henry Cobb, who was

18   a partner of I.M. Pei's.  You would know I.M. Pei Associates

19   because they've left their mark all over Boston in the

12:27 20   Christian Science Center, the John Hancock Tower, the Kennedy

21   Library.  They also built the -- if you've been to Europe, the

22   glass pyramid at the Louvre is an I.M. Pei project, as is the

23   Holocaust Museum in Washington, the East Wing of the National

24   Art Gallery.  More contemporary, the Rock 'n' Roll Hall of Fame

25   in Cleveland is an I.M. Pei project.

1          Cobb, whom I've met, and obviously we all got to know

2     because he was very involved in overseeing the construction of

3     the courthouse, tried to blend as many colonial influences into

4     the architecture as he could.  I think of particular interest,

5     this beehive brick entrance that you came through is copied

6     from a courthouse in Wiscasset, Maine, and it was something

7     that Cobb had seen and he thought it would make a nice

8     signature piece for the entry to each courthouse.  And

9     interesting enough, when he designed it, the builder, I think

12:28 10   it was Jackson Construction, counseled that there was only one

11    person still living in the U.S. that knew how do that kind of

12    masonry and he happened to be a retired mason in Maine.  He

13    came over, he was brought to Boston, and taught a whole group

14    of apprentice masons on how to do that kind of work.  So we not

15    only have the benefit of the pattern, but also we've saved a

16    form of craft through the construction of the building itself.

17         The signature feature of the building is that conoid

18    glass window that you saw when you came into the courtroom.

19    Conoid, because if you imagined an ice cream cone sliced in

12:29 20   half and stuck into the ground, you would get roughly the same

21    shape.  It the largest conoid wall of glass ever constructed.

22    It is ten stories high.  Glass is a actually a very heavy

23    medium, and they tend to fall down, but what Cobb came up with

24    is that unique trussing system that looks very maritime.  I

25    wouldn't be surprised in the next few weeks if you don't see

1    visiting architects and engineers, they come to study exactly

2    how he did that, and it's now imitated and copied in a number

3    of other buildings around the world, actually.

4         I think the other feature that I'll draw your

5    attention to, and then we'll get on with the trial, are the

6    installations, the Ellsworth Kellys.  Those are the large

7    colored -- I want to say placard, but that's not really quite

8    the right word -- at the end of each hallway and in the

9    rotunda.  Under building rules the Congress enacted, a certain

12:30 10   percentage of a federal building's budget has to go into art,

11   and when the Ellsworth Kelly art was selected, it was pretty

12   controversial, expensive and controversial.  Kelly is still

13   alive.  His studios are in upstate New York now, but he was --

14   basically shaped his school of art, which is call the

15   minimalist school in Paris, and you'll find Ellsworth Kellys in

16   the MOMA in New York and Museum of Contemporary Art in San

17   Francisco and a number of Paris museums.  His school is

18   inspired by almost a worship of geometrical shapes and vivid

19   colors.  I will say when I first saw them, I was one of those

12:30 20   people who said, This can't be art because I can do it.  And

21   over the years, the more I've thought about it, the more I

22   realize that I couldn't have done it, in this sense:  That if

23   you had asked me to go select art for this building, I would

24   have come back with some stale old paintings of ships, which

25   nobody would have been interested in after a month or so,

1    whereas I find these installations just always catch my eye,

2    and I think they provide an interesting contrast between the

3    modernity that you see through the glass looking out and then

4    the very colonial impact or effect that I think the courtrooms

5    themselves have.

6            Actually, I said I would stop here, but I'll add two

7    more things, then we'll get on with business.

8            There are two plaques that I draw your attention to,

9    one is you come in through the main entrance is a plaque that

10   lists every judge ever to sit as a judge in this court since

11   1789, beginning with John Lowell, and if you ever count, I'm

12   number 36.  And I only say that -- yeah, I'm kind of proud that

13   my name is on the plaque, but, more significantly, I think it

14   gets across the point of just how small the federal court is as

15   an institution.  People think that the federal court is this

16   giant imperial bureaucracy because you read about federal

17   courts as much as you do, but, in fact, the entire federal

18   court, Supreme Court, courts of appeal, court of taxation, all

19   of the trial courts, take all the judges, add them up, it's

20   only about 50 percent larger than the state court of

21   Massachusetts in total.  So the fact that there have been more

22   presidents of the United States than me, gives you an idea --

23   not that I'm as important as the president -- gives you an idea

24   of just how small the court is and how select your job is as

25   jurors.

1          More moving, however, is right at the base of the

2     elevator is a large plaque with roughly a thousand names on it.

3     Those are the names of every work person who helped build this

4     building, and I will guarantee you in the next two weeks you'll

5     see one of them with grandchildren or children pointing out

6     their names on the plaque.

7          So it's your courthouse, make good use of it, and so

8     not just the trial, but as you walk around, take a look,

9     because it is a building worth, I think, enjoying.

12:33 10          All right.  What I'm going to propose we do now is

11     start with the -- well, let me ask this:  Does anyone feel like

12     lunch now?  We're going to hear opening statements from the

13     attorneys.  These will each be about 30 to 35 minutes long.  We

14     could do one now and then come back from lunch and hear the

15     defendant's opening or do both in tandem.  If you feel like

16     lunch now -- what is the consensus?

17          Well, you don't have to be unanimous on this.

18          Juror number one, you speak for the group.

19          JUROR:  Lunch now.  I'd rather hear them together.

12:33 20          THE COURT:  Okay.  I think that's a good decision.

21     She's going to be foreperson, I can tell.

22          All right.  Let's take then -- we'll reconvene at

23     1:30.  The law clerks can explain how to get to the cafeteria.

24     There are some good places nearby, but the weather is pretty

25     miserable outside, and again, having been around so many

1    courthouses, this courthouse has one of the only federal

2    cafeterias worth eating at.  It's actually pretty good.  It

3    used to be Sebastian's, it was the in-house catering group for

4    Fidelity, went into private business, but they have the

5    concession, and I think you'll find it pretty good, and one

6    advantage of having lunch now is we should beat the crowd.

7    Most people will come down at 1:00 for lunch.  So that's one

8    alternative.  The law clerks can tell you others in the

9    neighborhood if you feel like you want to get outside of the

12:34 10    building for whatever reason.

11           All right.  We'll recess for lunch, we'll reconvene at

12    1:30.

13           (Lunch recess taken.)

14           THE CLERK:  All rise for the jurors.

15                    (Jurors enter.)

16           THE CLERK:  All rise for this Honorable Court.

17                    (Court enters.)

18           THE CLERK:  Please be seated.  Court is in session.

19           THE COURT:  Just to reinforce the video, I put

20    together a glossary of patent terms you may find helpful

21     just as a definitional aide.  Jurors, we'll move now to the

22    opening statements by counsel.  As I indicated earlier,

23     these are not argument.  These are simply a preview of the

24     evidence that each side expects to offer in support of their

25     position.

1        Each side will take 30 minutes, perhaps a little bit

2   more.

3        But Mr. Mueller, will you be addressing the jury on

4   behalf of plaintiff?

5             MR. MUELLER:  Yes.  Thank you, Your Honor.

6                  OPENING STATEMENT BY MR. MUELLER

7             MR. MUELLER:  May it please the Court, ladies and

8   gentlemen of the jury, good afternoon.  I'm Wes Mueller, and

9   I represent the people from EveryScape.  Mr. Jim Schoonmaker

10  is the president and CEO of EveryScape.  Can you stand up

11   please.  And I also want to introduce the other lawyers who

12   will be helping me.  Mr. David Airan, who you'll see quite a

13  bit, and Mr. Aaron Feigelson.  Thank you.

14      This case is about EveryScape's invention on a better

15  and easier way to edit pictures, and as we talk about it,

16   you'll hear a lot of different aspects about the technology.

17   But think about these things that we call vanishing points,

18    and we'll be talking about vanishing points quite a bit as

19  we go along.

20        Now, who were the inventors?  Well, the inventors were

21   two Ph.D. candidates.  Well, one was a Ph.D. candidate.  His

22  name was Mok Oh, and he was studying at MIT in their

23  computer graphics department, and he worked alongside

24   another individual named Fredo Durand.  And Professor Durand

25  had already received his Ph.D.  He was working on his

1    post-graduate work, and the two collaborated together at MIT

2    during that time period.

3        Now, they obtained two patents, and I'd like to just

4     briefly show those to you, and the Court -- and as you saw

5     in the video -- has indicated that we typically call them by

6      their last three numbers.  And I'm showing you here on the

7    video, and you'll likely have copies in a notebook, the

8      first patent has a number 7,327,374, and we'll be referring

9    to that patent throughout this trial as the '374 patent.

10    And the number of the patent is in the upper right-hand side

11    of the document.

12        You can also see that the patent on its front page

13    indicates that Mok Oh, as well as Fredo Durand, are the

14    inventors.  And similarly, with respect to the second

15     patent, we call that the '022 patent.  That one was issued

16    in September of 2009, and again, the same inventors.

17        Now, you've heard a little bit about the rights granted

18     by patents, and in the video, we saw that patents go all the

19    way back to the Constitution, and our founding fathers

20    thought they were so important that in the Constitution,

21    they granted Congress the power to create laws to protect

22    inventors such as Professor Durand and Doctor Oh for the

23    inventions that they made, and the right was to exclude

24     others, and so we've had actually the patent statute for 255

25    years or so, and it's worked well since that time.

1        Here are the inventors -- and you'll meet them as we go

2   along in this trial.  Mok Oh -- again, he is an

3   entrepreneur.  He loves creating things and he enjoys

4   forming new companies.  Mok Oh is now at a company called

5   MoJu, and we'll talk a little bit about that.

6        The other inventor which -- whom you'll meet is Doctor

7    Fredo Durand, and he is a professor at MIT in their computer

8   graphics department, and you'll hear about some of the

9     things that he did with Doctor Oh, as well as perhaps some

10  of the things he does today.

11       Now, despite all their hard work, and despite the fact

12  that they obtained patents, and they assigned those to

13  EveryScape, as it turns out, Adobe infringes their two

14   patents.  So what this case is about, because liability for

15  infringement, Adobe is not disputing.  This case is about

16   whether Adobe owes EveryScape damages and how much it owes.

17   That's why we're here, and we're here to ask that you help

18  us set things right.

19       Now, who is EveryScape?  It's a small company, about 22

20   people work there, located out in Newton; and they've been

21    around since around 2002, and that's when Doctor Oh formed

22  the company by himself.  I don't know if you've heard the

23  term "bootstrapping."  You might hear that throughout the

24  course of this trial.  It's where you basically have no

25    investment from outside sources, so you're working day and

1    night without any income.

2         And Doctor Oh worked for years at EveryScape.  At the

3    time -- one of the things that is interesting about this

4    case is the company was called Mok3, M O K 3, after his

5     name.  And they thought it was a cute, a cute thing to have,

6     but they changed it to EveryScape, and the reason that they

7    did that is that EveryScape today is in the business of

8     making what they call, like, immersive experiences.  They're

9    like photographs where you can actually step into this

10   world, and look around, and see what might be in the

11   interior of a building.

12        Now, their customers are people like small restaurants

13   and hotels, you know, where you might want to go on the

14     internet, click, and look around to see if there's a place

15   that you might want to visit.  That's EveryScape.

16        Now, let's talk about the technology that Doctor Oh and

17    Professor Durand created, and it's -- it can be explained in

18   part by looking at the image that I've shown you.  It's a

19    picture of a railroad track, and you can see on the railroad

20   track, as you look -- if you're standing at the end of a

21    track looking down, it looks like the two sides of the track

22   are coming together, and they are coming together and

23   meeting, and they're meeting at this point called a

24    vanishing point.  And as you'll hear some of the testimony

25    throughout this trial, that vanishing point that you see off

1      in the distance, well, there's actually a vanishing line

2       which corresponds to the horizon, and if there are multiple

3      vanishing points, you can create a vanishing line between

4      two vanishing points.  And we'll get into that.  I'm just

5      trying to lay some of the groundwork.

6          And so the invention that we're going to talk about is

7      all about determining what the vanishing points are in an

8      image, and then using math to convert those vanishing

9      points, and to convert an image that looks like the train

10      tracks that you see here to appear to the computer -- again,

11      it doesn't appear to you.  The picture doesn't change.  But

12       it appears to the computer as if you're looking right over

13       the top of the image, and you're looking straight down, and

14       there is a figure from the patent, which I believe is -- we

15      have it in the next slide, but I also want to show it to you

16      on the board.  And in this simple case of a chessboard, you

17       can see where, if this is an image, you took a picture of a

18      chessboard, and it has what's known as this concept of

19       perspective foreshortening, and that's what we also saw with

20      the train tracks.

21          The tracks look as if they appear to go off to

22       infinity.  In this case, the chessboard, although it might

23       not be too easy to see because the board doesn't go off to

24      infinity, there are lines that you can think about which

25       would go off this way, and other lines that will go off this

1    way, and they go way off into the distance.

2         But if you can define, using the computer, where those

3    lines might exist, what the math that Doctor Durand and

4    Professor -- or Doctor Oh and Professor Durand developed and

5     patented was the math to take this, which is -- which they

6     called an "image plane," that's the plane of the image, and

7    move it to this.  That's where you're looking at it right

8      overhead.  And importantly, what they realized is once you

9    moved it here, that you could then enable the system to

10    allow the user to edit.

11         Now, how would that occur?  Because again, what you're

12     looking at is just the image, so the user is only going to

13     be looking at the image.  However, the math is treating the

14    image as we see over here.  So this is what's called the

15    image plane, or where the computer is actually doing the

16    processing is called the "world plane," and what the two

17     inventors realized is if you use this concept of image plane

18    and world plane, you would open yourself up to this full

19    image being fixed or being automatically corrected for

20     perspective, and then enable you to edit anywhere the image

21     in a way that was much better than was done before.  You're

22     going to hear a lot more about exactly how this is done.  I

23    just want to get you to think about, okay, what is the

24    general concept.

25         Now, one of the other aspects that this invention

1    involves is this concept called a Clone Brush or editing

2    tool, and that's where you can see this s and d, which we

3     have in the image plane.  Now, the concept of a Clone Brush

4    in the absence of this perspective correction, or in the

5     absence of fixing for what appears to be an image that's out

6    of -- that is out of whack from the sense of:  I'm not

7    looking at it straight overhead.

8         Now, the concept of a Clone Brush was known, and that

9    is where you can basically clean up an image by taking a

10    little bit, say, from over here and moving it to over here.

11    It's called a source and a destination.  So you'll be

12     hearing about source positions and destination positions as

13    we go on too.  That's referring to the editing operation

14     that you are actually doing.  And so there are actually two

15    different concepts you have to keep in mind.  One is this

16    concept of the math that's taking me from here to here.

17     Again, all you see is this.  And the second concept is then

18     editing, and the inventors refer to this as editing in the

19    world plane.

20         So what happens is, for example, if this box is too

21     big, you want to copy it back here -- if you click the image

22    into this kind of mathematical format, that when you move

23    the box from here to back here, it actually gets smaller.

24    So it automatically fixes for the perspective distortion

25     that's in the image.

1          Let me talk now, since I spent a little bit about why

2     we're here, I want to talk about how we got here.  And

3     that's where Adobe comes in.  And just as a frame of

4     reference, Adobe is a company that's about $36 billion in

5      market cap.  They have, I don't know, 12,000 employees, and

6     they make a product that's known as Photoshop.  But to

7      understand how we got to this situation, I have to take you

8     back a few years -- actually, back to around 2002.

9          And for that, what we have on our screen now is a

10    timeline, and you can see that in 2002, Doctor Oh got his

11     Ph.D. thesis from MIT, formed his company Mok3.  And in the

12     course of that, Mok3 of course was trying to find investors

13      to help it develop its technology on some of the graphical

14      things that related to its Perspective Clone Brush, as well

15      as what they called this 3D reality editor.  You might hear

16    a little bit about that in this trial as well.

17          And in the course of that, Mok3's CEO at the time, who

18     is a man named Yonald Chery, reached out to Adobe and said,

19    Look, we've got some cool technologies.  You might be

20    interested in them.  One of them was a Perspective Clone

21    Brushing tool.  That was in 2003.  Adobe's reaction was:

22    We're not interested.

23          You can see from the timeline then, that Mok3 at the

24    time, later EveryScape, filed a patent application.  Now,

25    what happened next is, after the patent application was

1      published, the parties, both of them, both Mok3 and Adobe,

2      began to develop this Perspective Correcting Clone Brushing

3      tool.  And in fact, the Mok3 Clone Brush tool was introduced

4      in the marketplace in January of 2005.

5          Now, at that time, unknown to Mok3, Adobe was

6      attempting or was about to launch its new Photoshop product,

7      which was called CS2, and in the course of introducing its

8      CS2 product, Adobe conducted what it called a Press Tour,

9      and for that, it went around to try and -- try to garner

10     interest in the marketplace, and let's look at some of the

11     interest that it garnered.  That's on the next page.

12         The code name for Adobe's new product, new Photoshop

13     product was called "Space Monkey," and you'll hear evidence

14     in this case as to that.  And let's look at what the Press

15     Tour revealed from the standpoint of Adobe.  Because

16     remember, at that same time, Mok3 was out there trying to

17     sell its own Perspective Clone Brush.  So you see from a

18     comment from Ed Lee, who was one of the individuals working

19     closely with Adobe's marketing people to figure out exactly

20     how the product would work, actually was working with a

21     gentleman named Kevin Connor, who you may be hearing from,

22     from Adobe's side.

23         Well, Ed Lee said, Look, you just put a company out of

24     business.  It's a little startup company in Boston known as

25     Mok3.  Now, why was that?  Well, I want to show you.  And so

1    at this point, I want to play you first the promotional
2     video of the Mok3 Clone Brush.  It's also going to give you
3     some background.  It's about two or three minutes, and then
4    I want to play you the promotional video of the Adobe CS2
5    product with its feature that it called Vanishing Point.
6          Can we have that, please.
7                         (Video played.)
8          MR. MUELLER:  Now I'd like to show you Adobe's
9    promotional video for Vanishing Point.
10                        (Video played.)
11         MR. MUELLER:  So again, in this case, Adobe does
12     not contest that -- whether or not it infringes.  It agrees
13      that it infringes.  And so the question we submit is:  What
14    are the appropriate damages that it should pay.
15         Let's look just for a minute, and we'll be talking
16    about these throughout the trial.  When it introduced its
17     product, look at what it said about it:  It's revolutionary.
18    You can effortlessly clone, save hours, cutting hours off
19    your editing time.
20          So exactly what are Adobe's excuses for not owing
21    EveryScape any money?  Well, I don't know exactly what
22      they're going to say, but I do know that they've contended
23    in this case that there is prior art.  There is something
24    that was done before which shows what the MIT doctorate
25    candidates and professor invented.

1          Now, what they're going to say is this piece of prior

2     art called Painter 7 -- you'll hear about it as the trial

3     goes forward.  It was a product made by Corel.  They're

4     going to argue that this Painter 7 product actually shows

5      all elements of the claim, and as you listen to the evidence

6     from Adobe's witness as to why Painter 7 invalidates the

7     claim, I want you to ask yourself:  Are they saying that

8      Painter 7 is using vanishing points to math what I'm looking

9       at -- this image in an image plane into a world plane?  Are

10      they using vanishing points in the math?  Because we submit

11     that they're not.

12          And as you're -- and you will also see various

13      demonstrations by various people who have -- who are either

14      experts in this case, or in the case of another individual,

15      a man named Erik Johnson.  And let me tell you just a little

16     bit about a demonstration that Mr. Erik Johnson made.

17          First of all, who was he?  He's the gentleman who

18      developed Painter 7, the math behind Painter 7 in the first

19     instance.  He was -- so he is a software developer.  He's

20     the one who wrote the code, and he is the one who takes

21      responsibility that -- yes, this is how this software works.

22          Now, interestingly, Erik Johnson was in-house at Adobe

23     in the time period in which Adobe was developing its

24      Vanishing Point software, and Mr. Johnson certainly didn't

25      tell Adobe:  When you're saying that this is revolutionary,

1    you shouldn't be doing it because it's the same invention

2    that I did in Painter 7.  He wasn't saying that.

3         But let's take a look at what he did to this image,

4    which is actually an image that's provided in Adobe

5     Photoshop -- an image that's provided to help the user learn

6      how to edit with this perspective issue in the image.  You

7      can see the boards are coming out at you.  Well, let's look

8    at what he did when he tried to edit it.

9         Again, he was -- he couldn't do it, not because he's

10   not good at editing photos.  I have no doubt that he is.

11   But he didn't have the underlying math in Painter 7.  He

12    didn't have the power to be able to move the image from the

13   plane in which the image sits, that's called the image

14    plane, into a single world plane, which is, again, by using

15     vanishing points in the math, and then be able to touch up

16   the image anywhere he wanted to in it.  And that's really

17   why it's better and faster.

18        So again, another thing you might hear throughout this

19   case, and we don't know why Adobe or what Adobe's excuses

20    all will be, but one of them that we've heard before is that

21   the invention is trivial.  It just doesn't mean that much

22    because we have a lot of features in Photoshop.  And there

23    is no doubt that Photoshop does have a lot of features, but

24    let's look at what their CEO, Mr. Shantanu Narayen said, in

25   2012.  He's talking about Vanishing Point and one other

1    feature, and he's saying:  Users will want to get

2    subscriptions to our software.

3         They were moving from selling Photoshop by CD versus

4     putting it on a subscription basis.  They call it the cloud.

5    The evidence will show that Adobe was trying to move and

6    still is trying to move its customers to a cloud-based

7    model.

8         You can see in February 2012, Adobe is saying Vanishing

9     Point is a feature that people consider magic.  So again, we

10     think here that infringement has already been made out.  We

11    don't believe the patents are invalid.  Painter 7 is

12     entirely different, and we believe that EveryScape should be

13    awarded damages to compensate for its -- for the

14     infringement by Adobe.  And so therefore, we're going to be

15    asking you at the end of this trial to award EveryScape

16    damages.

17         Again, I thank you for your time and service.  It's you

18    people who make our justice system work.  Thank you.

19            THE COURT:  Thank you, Mr. Mueller.

20         Mr. Scherkenbach, were you making the opening for the

21    defense?

22            MR. SCHERKENBACH:  I will, Your Honor -- thank

23    you -- with your permission.

24                OPENING STATEMENT BY MR. SCHERKENBACH

25            MR. SCHERKENBACH:  Good afternoon, ladies and

1    gentlemen.  My name is a Frank Scherkenbach.  I was

2    introduced before, but I wanted to introduce myself

3    directly.  I am the lead lawyer for Adobe, and you'll be

4    hearing from me throughout the case to give you Adobe's

5     perspective on the relevant facts and on the issues in the

6    case.

7         You're also going to be hearing from my colleagues,

8    Adam Kessel and Betty Chen at different times during the

9    proceedings, and Adobe will be represented throughout the

10   proceedings by Mr. Tom Hogarty.  Tom, would you stand up.

11    Mr. Hogarty is a director of product management at Adobe for

12   digital imaging, and we're also going to have with us for

13    most of the trial, Miss Karen Robinson, who is the Associate

14   General Counsel of Adobe.

15        Now, I know we've just met, but I'm going to ask you

16   for a favor, and the favor picks up on something that the

17   Judge initially instructed you already this morning.  And

18    that favor is this:  Don't jump to conclusions.  One of the

19    things as jurors that we value most about your contribution

20    to this process is the common sense that you bring to bear.

21        And just as in your own personal lives, you know there

22   are two sides to every story.  It's true in this case, there

23    are two sides to the story you just heard, and what we would

24   ask is that you wait to hear Adobe's side of the story

25    before making up your minds, because we believe the evidence

1    will show a couple of things:  First of all, that the

2    suggestion that Adobe took something or copied something

3     from Mok3 or EveryScape, the evidence isn't going to support

4    that.  That's not going to be what happened at the end of

5    the day.

6         The second thing is that Adobe didn't intend anybody to

7    infringe their patents.  Adobe didn't induce anyone to

8     infringe.  We didn't actively encourage anyone to infringe

9     their patents.  The third thing is:  It turns out that this

10   notion of clone brushing with perspective -- that was the

11    demonstrations that you saw, you're going to see a lot more

12   demonstrations -- it turns out that had been done before

13    Mok3 ever did it, and before Adobe ever did it.  No one in

14    this courtroom right now, the evidence will show, invented

15   that.

16        It was invented by another company, Corel, by a

17    different individual, Erik Johnson.  You're going to hear --

18   hear his testimony, see him -- see him testify by video.

19   And he'll explain how he came up with a product that did

20   that first.

21        And so at the end of the day, because somebody else did

22   it first, and again as you were instructed a little

23    preliminarily, and you are going to hear a little more about

24   this later, if somebody else does it first, then the

25   patentee who is before you, there's no liability for

1    infringement.

2         All right.  Now, most of you may have heard about

3    Adobe, or have some idea about Adobe and what Adobe does

4    coming here today.  Adobe makes a lot of products:

5     Postscript, PDF.  A lot of people are familiar with PDF --

6    if you work with documents -- Portable Document Format.

7         Adobe makes tools called DreamWeaver and Flash for the

8    Web.  DreamWeaver allows you to author web pages.  Flash is

9     something that pops up on your computer screen a lot if you

10    try to play content from a website.  Those are Adobe tools.

11         Adobe Premier and After Effects for -- if you're in the

12    film business or the TV business, these are sophisticated

13    image editing tools for those sorts of applications.

14         So a lot of that -- you heard about Adobe's market cap

15    and 12,000 employees and all of that.  Lot of those folks

16     are working on those sorts of products, which have nothing

17    to do with this case.  Okay.

18         This case is about Photoshop but a piece of Photoshop.

19    And in particular -- so Photoshop has been around, the

20    evidence will show, a long time.  It was actually first

21    released in 1990.  All right.  1990.  35 -- 25 years ago.

22    I'm a lawyer, not a mathematician.  25 years ago.  Okay.

23    And the evidence is actually going to show that Photoshop

24    has had a clone stamp tool since 1990.  So this notion of

25     painting over things and painting out things you don't like

1    in a photo, been around a very, very, very long time.  This

2    case is about a really special kind of clone stamp tool, and

3    that's what we have to focus on.

4        Now, Vanishing Point, which you heard a lot of

5    references to, is a feature in Photoshop, and there is a

6    part of the Vanishing Point feature in Photoshop that's at

7    issue in this case.

8        Now, I put up a timeline on the screen to give you a

9    little bit of the roadmap to some of the evidence you're

10   going to see that pertains to the development of clone stamp

11   tools generally, and Vanishing Point in particular.  As I

12   mentioned, the evidence will show that Photoshop has had a

13   clone stamp tool since 1990 when it was introduced.

14       As you may imagine -- you see the 1992 entry, you're

15   going to hear evidence of the number of innovations that

16   have been in -- that have been made to make Photoshop what

17   it is.  There are now over a hundred patents on various

18   features of Photoshop.

19       One of those features is Vanishing Point.  You see the

20   entry for 2003.  There is a little picture there of a

21   gentleman named Steve Troppoli.  Vanishing Point was

22   actually developed here in the Boston area by two

23   gentlemen -- Steve Troppoli and Ralf Berger.  And it was a

24   two-man company.  And they actually developed this tool

25   called Vanishing Point, part of which has a Perspective

1    Correcting Clone Brush.  They demonstrated their tools to

2     Adobe in 2004.  Adobe liked the tool and acquired it.  And

3    that's how it came to be part of Photoshop.

4        All right.  And that was in, as I say, in 2004.  Kevin

5     Connor of Adobe will testify and talk about what Adobe saw

6     of value in Vanishing Point, what the various features were

7      that were demonstrated to Adobe, and a little bit about the

8    transaction.  Because one of things that you're going to

9    hear evidence on are the damages issues in the case, and

10   while you didn't hear a damages number in Opening from

11   EveryScape, I'm here to tell you it's a big number.  It's

12    something over $14 million is what they're going to ask for

13   in this case.

14       They didn't -- I don't know why they don't mention that

15   to you, but that's the number you're going to hear, and

16    that's why we're going to put in evidence of other numbers

17    that we think is relevant, like the fact that Adobe acquired

18   all of Vanishing Point for $1.3 million.

19       All right.  Vanishing Point was introduced in early

20   2005 at Photoshop World.  That's the entry there in the

21    middle.  You're going to hear a little bit about that.  And

22   then Adobe, as I mentioned, the evidence will show that

23    there are significant parts of Vanishing Point that are --

24    go above and beyond the idea of correcting for perspective

25   with a Clone Brush.  That's part of it.  Certainly that's

1      one of the tools.  There are other tools and other

2       capabilities, and in fact, Adobe has received four patents

3      on those other aspects of Vanishing Point.

4          All right.  So that's a little overview of the -- sort

5       of a road map and the timeline, and we're going to come back

6      to those pieces throughout the case.

7          Now, I wanted to give you a little bit of a preview, or

8       a response, I guess I should say, to the notion that Adobe

9       somehow took something from the plaintiff.  It's one thing:

10       Not only do we have this tool in Vanishing Point, but that

11       it actually came in some sense from them.  It was suggested

12       to you -- there were points in their timeline that suggested

13      that to you.

14          One of the points that was made was in 2003, Mok3

15       approached Adobe in a fundraising effort, and that's true.

16      And you're going to hear evidence that they actually

17      approached lots of folks, as a startup company has to,

18      because they have to raise money to stay afloat, and they

19       approached many, many companies, and they made their pitch

20       to many companies, including Adobe, and the contention that

21      was suggested to you in Opening here is that we were

22      shown -- Adobe was shown the Perspective Clone Brush tool

23      that this case is about.

24          That's going to turn out not to be true.  The evidence

25      is going to show that there was a Perspective Clone Brush

1    tool in that presentation in 2003.  Absolutely.  I'm showing

2    it to you here on the screen.  It was not the technology at

3    issue in this case.  It was a three-dimensional Clone Brush

4    tool.  As I said, the evidence is going to show there are

5    many flavors of Clone Brushes -- some pertain to the

6    patents.  Some do not.

7         And so this is one issue right away you're going to

8    hear some evidence on pretty early in the case -- whether

9    this prior contact had anything at all to do with the

10   technology in this case.

11        One other point before I move on:  This is 2003.  This

12   contact happened 2003.  The evidence will be that the first

13   actual embodiment or software plug-in tool for their patents

14   didn't exist until December of 2004; didn't even exist at

15   the time of this contact.

16        One other thing that you might hear about, you didn't

17   hear about it in Opening, but we expect it to be another

18   issue, is that Mr. Troppoli -- so Mr. Troppoli is -- along

19   with Mr. Berger, created Vanishing Point, and he has a bunch

20   of notes.  He has a notebook, and he has some loose-leaf

21   notes.  He is going to come in here.  He is going to show

22   you those.  We're going to talk about them.  And buried in

23   there, there is a notation, MACH3.  It's on your screen.

24   MACH3 -- like the razor blade.

25        It has been suggested that that's actually a reference

1    to Mok3, the predecessor of EveryScape.  If that is --
2    continues to be an issue in the case -- we think it might
3     be -- Mr. Troppoli is going to come in here and explain to
4    you what that notation means, why it's there, how it got
5    there, and more importantly, straight up, did he take
6    anything at all from the plaintiff.  You're going to hear
7    that directly from the horse's mouth.
8        Now, the other suggestion is that there was an
9    interaction with -- between the plaintiff and a
10    representative of Adobe at Photoshop World in 2005.  So that
11     vanishing window washer example you saw -- little bit over
12     the top by the Adobe presenter -- that's a guy named Russell
13    Preston Brown.  He's sort of a Photoshop evangelist.  He
14    does a lot of the company's presentations.  He did that
15    presentation in 2005 -- where this window washing demo
16    happened.
17        And you may hear evidence about some interactions
18    between the companies there and about EveryScape, at that
19    point in 2005, forming the opinion that there was a
20    potential problem here, that at that point in 2005, they
21     might suggest to you, we think something is wrong with Adobe
22    coming out with the same tool.
23        Now, one of the -- and there's going to be evidence
24    about that.  There's going to be evidence about when this
25     case got filed, and then there's going to be evidence about

1    what happened in between.  But one thing you are not going

2    to see in all that evidence is any attempt by EveryScape to

3    bring any potential problem to Adobe's attention.

4        First, the evidence will show the first time EveryScape

5    said anything to Adobe about a potential problem was when

6    this lawsuit got filed in September of 2010.

7        All right.  So with that, let me show you what the

8    evidence is going to be about the patents at issue in this

9    case, and in particular, what particular flavor of Clone

10   Brush do they relate to.  What do they actually require.

11       And you're going to get to see this word -- the Judge

12   introduced you to it -- homography.  Not a household term.

13   Not a term certainly I'd ever heard of before this case.

14   Maybe you haven't either.  But this case is about a Clone

15   Brush of a very special kind that uses specifically

16   homographies, which is a kind of math, as you will hear.  It

17   has to use homographies to do this clone brushing, this

18   painting out.  Okay.  And that word is in the patent

19   throughout.  More importantly, it's in the Claims.

20       And this again harkens back to some of the preliminary

21   instructions, and you'll get a lot more instruction on this:

22   When you're doing your work in this case, what you need to

23   have in mind is what does the patent claim say, and you have

24   to compare the claim to the prior art.  That's going to be a

25   core task and a core issue for in you this case.  And as

1     you'll see, this homography notion is at the center of the

2    claims.

3         Now, I mentioned -- speaking of prior art -- what is

4    the evidence going to show about what was known in the prior

5    art.  Certainly, Clone Brushes were known in the prior art.

6    I told you, going way back to 1990, you're going to -- you

7    don't have to take my word for it.  The evidence is going to

8     show that.  Here's a little example of a before and after.

9    This actually came with an early version of Photoshop where

10   you have an airplane in the sky, and maybe you don't want

11    the airplane there.  You could paint it out with a -- what's

12   called a traditional Clone Brush.

13        Now, that Clone Brush didn't correct for perspective,

14   grant it, but the notion of replacing image data in one

15    place of an image with image data from somewhere else in the

16   image -- very old.  Been around a long time.

17        Now, what else will the evidence show has been around a

18    long time.  Well, homography actually.  The notion -- use of

19     homography and digital imaging, the math for homographies,

20   you will see both the patents themselves acknowledge

21   homographies were known.

22        Showing this on the screen here, there is a paper by a

23   group of folks where the lead author is Liebowitz.

24   Liebowitz is a group out of the United Kingdom of Oxford

25    University.  They did a significant research in this field.

1    And the bottom half of the screen is actually a little

2     excerpt from that Liebowitz paper talking about homography,

3    and in fact, it turns out that paper has extensive math

4    describing how to do these homographies.  And there's no

5     dispute about that and no dispute that was in the prior art

6    also.

7         Another piece of evidence on the state of the prior art

8    that you will see is a textbook by a man named George

9    Wolberg, who actually wrote a book called Digital Image

10    Warping, and he has a whole section on homographies.  This

11    is a relatively old book too -- 1990.  So you get the idea,

12    the evidence will show that these concepts were well-known.

13         In fact -- and you'll see in the source code of

14    Vanishing Point -- so the source code being the instructions

15    that actually get interpreted by the computer to run the

16     program -- you'll see excerpts of that.  And that evidence

17    will show that when Mr. Troppoli wrote the software, he

18     actually credited the Wolberg textbook as the source of the

19    math.  So again, it's been suggested to you that

20     Mr. Troppoli took something from the plaintiff, but if you

21     look at his actual source code, you'll see that he says he

22    got it from Wolberg.

23         So that brings us to the question of what is the

24     evidence going to show on putting these concepts together:

25    Clone Brush on the one hand, homographies on the other --

1       did somebody do that before the plaintiff.  And you're going

2       to see evidence on that, and the evidence you're going to

3        see is all about Corel Painter.  Corel Painter.  Painter is

4       the name of the product.  Corel is the company.

5             And you will see evidence about -- in particular,

6       Painter 7 in 2001 is the version that the evidence will

7        focus on, but the evidence will show actually that the same

8        feature was around even earlier in Painter 5 and Painter 6,

9       that it had a Perspective Correcting Clone Brush, and the

10       dispute will be, and what you have to decide is:  Does that

11      product with that Perspective Correcting Clone Brush, is

12       that described in their patent claims.  That's the validity

13       issue.

14         Some of the evidence you're going to see on this is the

15      Painter 7 -- well, obviously the software.  We have the

16      software.  The software will be demonstrated for you.  We

17       have the manual for the software.  That's -- an excerpt of

18       that is on the screen now.  No dispute that it's prior art.

19         Here is the gentleman Erik Johnson who created it.

20      Mr. Johnson won't be able to testify live but his deposition

21       was taken by video.  We expect to play some of that for you,

22      and he'll talk about how he came up with this and how it

23      worked.

24         You have at the bottom of the screen there, an excerpt

25       from the User Guide, so in addition to the manual, we have a

1    user guide that talks about the perspective brush, and there

2    you have an example of a butterfly in various perspectives.

3    As I mentioned, we have the software.  The software can be

4    run.  It can be demonstrated, and it will be so you can see

5    it for yourself.

6         Here is an example where, at the upper left and the

7    upper right -- well, the upper left is the first image.  You

8    can see that one side of that building doesn't have as much

9    glass as the other side.  Maybe you want it to be more

10   parallel, have more windows.  You can use Painter 7 to

11   accomplish that with the Perspective Clone Brush.

12        The result is there at the bottom, and you can see how

13   the window that's been added at the upper left is -- it

14   maintains perspective.  Meaning it's bigger in the

15   foreground, smaller as it gets farther away from the camera.

16   Perspective has been maintained.  And there will be a lot of

17   examples like that that you will be able to see, and -- with

18   your own eyes and draw your own conclusions.

19        One is this chessboard example.  This is actually

20   running now a demo of Painter 7.  You were shown by

21   EveryScape, this chessboard example using their tool, which

22   they say practices their patent.  Here is an example using

23   Painter 7, same image, and you can see the chess pieces were

24   painted out.  Perspective is maintained.  So the squares

25   match perfectly.  The background, the way they're supposed

1    to look, perspective is maintained.

2         All right.  Now it's going to turn out -- the evidence

3    will show that EveryScape was aware of a version of Corel

4    Painter, and what they said about it back in the day when

5    they became aware of Corel Painter, it will be an issue

6    whether that matches with what they say in this case.

7    That's all I'll say about that right now.  But that's an

8    issue you're going to see evidence on.

9         You're going to see that EveryScape was not only aware

10    of Corel Painter, it considered it a competitive tool, and

11    actually, they have a -- in at least one of their documents,

12    they identify it as a competitive tool.  And one of the

13    other pieces of evidence on Corel Painter -- and this again

14    goes back a little bit to something you saw in the video --

15    is:  It's not a piece of prior art that was considered by

16    the patent office.  All right.

17         So you folks, in this case, will be the first people to

18    assess this, to look at the evidence on Corel Painter, and

19    figure out whether this patent should have issued if you had

20    knowledge of Corel Painter.  That's the core issue.  The

21    patent office never had Corel Painter, never made that

22    determination.  You will.

23         If we get to damages, what are some of the evidence

24    you're going to see on that, just briefly.  Obviously, we

25    hope you don't get there, but we don't know how you're going

1        to decide the case, so I want to preview quickly some of the

2        evidence that you might see on those issues in the case.

3            One thing you're going to see is the -- you know, was

4        the tool that Mok3 had, that EveryScape had, did people want

5        it?  Was it successful -- was it a successful tool?

6            Well, you draw your own conclusions on whether it's

7        successful or not.  They sold 18 total copies for about

8        $843.  That's what evidence is going to be on whether they

9        could sell this tool.  You're also going to see that the

10       focus -- the evidence will show the focus of Mok3 from the

11       beginning was actually a very different technology that

12       didn't relate to the Perspective Clone Brush.

13           You were -- there was described to you these WebScapes.

14       I guess they didn't end up showing you one, but you're

15       probably going to see one this afternoon when

16       Mr. Schoonmaker takes the stand.  WebScapes -- what the

17       companies does now -- in fact, it is pretty cool.  If you

18       have a restaurant or hotel, and you want to advertise your

19       services online, you can create -- essentially what it is,

20       is a virtual tour, a virtual experience of moving through

21       the space, moving through the restaurant.  What does it look

22       like at that restaurant.  Do I want to go there.  What does

23       it look like inside that hotel.

24           That's a core to their business now.  They have patents

25       on that.  They have technology around that.  Neat stuff.

1    Nothing to do with the technology at issue in this case.

2    That's what the evidence is going to show.  But when they

3     were pitching investors, that's the technology that was the

4    focus.

5         You're going to hear some testimony from Mr. Scott

6     Johnson.  I have that slide up now.  Mr. Johnson is one of

7      the primary investors in their company, and the investment

8    thesis always was this 3D Web Reality Editor or WebScape

9     type technology.  It was never the Perspective Clone Brush.

10         All right.  And one of the other things that you're

11     going to weigh is this question of:  If the feature was as

12    valuable as EveryScape says it was, if it really was that

13    valuable, why is it suit wasn't filed until September of

14     2010?  Why?  I'm just going to leave you with that thought

15    because we're going to come back to it.

16         Now, I mentioned -- if any of you have used Photoshop

17    or seen it, it's got a lot of features.  It's going to be

18     undisputed that it has a lot of features.  And if you get to

19      the damages part of the case, one of the things you have to

20      decide is how important is the Perspective Correcting Clone

21    Brush tool to the overall package.  Right.

22         What's actually at issue in the case is not Photoshop.

23      It is not -- I've done a pop-down menu there.  You see, if

24    you click on Filter, there is a whole number of different

25    filters in Photoshop -- one of which is Vanishing Point,

1      highlighted in blue.  Okay.  But you click again, there is a
2      screen that has -- you can see at the upper left.  I know
3       it's small -- Vanishing Point.  And it turns out Vanishing
4       Point itself has nine different tools.  Those are the little
5        icons on the left bar there, left margin there.  Nine tools
6       in Vanishing Point.  One of those is the issue in this case,
7      the Perspective Correcting Clone Brush tool.  All right.
8          And so you want to be careful as you go through the
9      case and you hear the evidence -- when you hear Vanishing
10     Point, which is a term that the plaintiff will use as a
11     shorthand to refer to what's at issue, Vanishing Point
12      really is the entire plug -- the entire plug-in, the entire
13       filter.  It's one tool in Vanishing Point that we're really
14     talking about.
15         Revolutionary.  Is it revolutionary?  Did Adobe call it
16     revolutionary?  Well, whether it is revolutionary or not,
17     who knows.  That's for you to decide.  Did Adobe call it
18      revolutionary?  Sure.  The marketing people absolutely did.
19      They were excited about this tool.  There is a reason Adobe
20     paid $1.3 million to acquire this technology.  It's neat
21     stuff.  All right.  And you're going to hear about the
22     reasons for the transaction.
23         You're also going to hear about all the other things
24     Vanishing Point can do and these other tools inside
25     Vanishing Point can do that don't pertain to the accused

1    piece of it.

2         You can extend buildings.  There is a tool in Vanishing

3    Point you're going to hear called the Marquee tool that you

4    would use to do something like that -- wrap words around the

5    edges.  There is an example we created there -- the Moakley.

6    That's the courthouse, the Moakley Courthouse -- wrapping

7    the text around the Moakley Courthouse and so forth.

8         As I mentioned, those Adobe innovations that were part

9    of Vanishing Point resulted in patents for Adobe that you

10   can take into account when assessing the relative

11   contributions to the overall value of the tool.

12        And let me just end with a little lineup of the

13   witnesses you are going to see from Adobe, or hear from,

14   from the Adobe side.

15        I mentioned Steve Troppoli, the Vanishing Point

16   developer.  He hopefully will be here live.  Kevin Connor,

17   who worked at Adobe for a long time, acquired Vanishing

18   Point on behalf of Adobe.  Was involved in that.  He should

19   be here live.  Tom Hogarty, I already introduced.  Back in

20   the relevant timeframe, he was the product manager for

21   Photoshop, and actually one of the things he did was

22   demonstrate Photoshop and demonstrate Vanishing Point.  He's

23   going to testify.

24        Erik Johnson, I mentioned, developed the Corel

25   Perspective Clone Brush tool, a prior art tool.  George

1    Wolberg who authored this textbook that has a discussion of

2    homographies, he will at least testify by deposition.

3    There's a chance we can have him testify by video.  We'll

4    talk about that.

5        Then there will be two expert witnesses for Adobe.  Dr.

6    Hany Farid is our technical expert who will talk about his

7    assessment of the prior art as compared to the claims, and

8    then finally, Mr. Ned Barnes will be our expert witness on

9    the damages issues in the case at the very end of the case.

10       So that's a preview of the Adobe evidence that you're

11   going to see and how it fits in.  At the end of the case,

12   we'll be asking for a verdict of no induced infringement;

13   that Adobe didn't intend anybody to infringe this patent;

14    that the patents are not valid because Corel did it first,

15    and that therefore, the damages issues are moot because no

16   damages are owed.  Thank you very much.

17       THE COURT:  Thank you very much.  All right,

18    counsel.  Good job.  I think, jurors, we've got a good idea

19   of what the different positions of the parties are.  I'm

20   going to suggest, let's take a 10 minute break while they

21    get set up for the first witness.  We'll come back and go to

22   approximately 4:00 for the day.  So why don't we take 10

23   minutes so everyone can get comfortable, and then we'll

24   finish up for the end of the day.

25       THE CLERK:  All rise.

| | |
|---|---|
| 1 | (Court and jurors depart.) |
| 2 | (Recess taken.) |
| 3 | THE CLERK:  All rise for the jurors. |
| 4 | (Jury enters and is seated.) |
| 5 | THE CLERK:  All rise for this Honorable Court. |
| 6 | (Court enters and is seated.) |
| 7 | THE CLERK:  Please be seated.  Court is in session. |
| 8 | THE COURT:  Mr. Mueller, first witness, please. |
| 9 | MR. AIRAN:  Your Honor, it's David Airan on behalf |
| 10 | of EveryScape.  We call to the witness stand, Jim |
| 11 | Schoonmaker. |
| 12 | JAMES SCHOONMAKER, Sworn, takes the stand |
| 13 | THE CLERK:  Please be seated.  Please state your |
| 14 | full name and spell your last name for the record. |
| 15 | THE WITNESS:  James Schoonmaker.  It's spelled S C |
| 16 | H O O N M A K E R. |
| 17 | DIRECT EXAMINATION |
| 18 | BY MR. AIRAN: |
| 19 | Q.   Good afternoon, Mr. Schoonmaker. |
| 20 | A.   Good afternoon. |
| 21 | Q.   With whom are you employed? |
| 22 | A.   EveryScape. |
| 23 | Q.   What is your current position? |
| 24 | A.   I'm the president and CEO. |
| 25 | Q.   For how long have you held that position? |

1    A.    Almost 10 years.

2    Q.    And where is EveryScape located?

3    A.    It's located in Newton, Massachusetts.

4    Q.    How many people does EveryScape employ?

5    A.    We employ about 22 people.  But we also have this notion

6          of photographic ambassadors which are contractors that work

7          with us across the country, and there is hundreds of those

8          folks who have been certified by us to capture the kind of

9        photography we need to do what we do.

10   Q.    What does an ambassador do for EveryScape?

11   A.    When someone wants to purchase a product from us, we

12         then send a photographer out to capture photographic images

13        of that particular place, and then they send those images to

14         us, and then we use them with the technology of EveryScape

15        to create the final product.

16   Q.    Does EveryScape actually employ these ambassadors?

17   A.    No, they're independent contractors.

18   Q.    Where do they work?

19   A.    They're located literally all over the country.  We have

20         to be able to -- if you sell this in Dubuque, we have to be

21         able to get someone there, and obviously, it makes sense to

22        have people close to where the customers are.  And we do

23         that on a national basis.

24   Q.    So you have folks located here in Newton?

25   A.    Yes.

1    Q.   And that's about 22?

2    A.   Correct.

3    Q.   You're the plaintiff in this action -- EveryScape?

4    A.   Yes.

5    Q.   And Adobe is the defendant in this action?

6    A.   Yes.

7    Q.   Why are you here today?

8    A.   Because we believe Adobe infringes EveryScape's patents,

9    and we really just want to be made whole and be treated

10   fairly.

11   Q.   Let me hand you Exhibit 1.

12        MR. AIRAN:  May I approach the witness, Your Honor?

13        THE COURT:  You may.

14   Q.   Let me hand you Exhibit 1 in this case.  That's the

15   actual working copy.  You have Exhibit 1 in your book as

16   well.  Do you have that document, sir?

17   A.   I do.

18   Q.   What is that document?

19   A.   It is the Structure-Preserving Clone Brush patent, our

20   first one.

21   Q.   And that's United States Patent Number 7,327,374?

22   A.   That's correct.

23   Q.   And you recognize that as the patent that EveryScape

24   owns?

25   A.   Correct.

1   Q.   And as Judge Stearns indicated, we can call that the

2    '374 patent?

3   A.   Yes.

4   Q.   Common terminology?

5   A.   Yup.

6   Q.   Let me hand you Exhibit 2.

7            MR. AIRAN:   May I approach, Your Honor?

8            THE COURT:   You may.

9   Q.   Do you have that document, sir?

10  A.   I do.

11  Q.   What is that document?

12  A.   This is our second Structure-Preserving Clone Brush

13   patent.

14  Q.   And we can call that one the '022 patent -- do the last

15   three digit of the patent -- is that correct?

16  A.   That's also correct.

17  Q.   Those two patents that you have in front of you, they're

18   the reason we're here today?

19  A.   That's correct.

20  Q.   Who are the named inventors on those patents?

21  A.   Doctor Mok Oh and Doctor Fredo Durand.

22  Q.   And EveryScape owns those two patents.

23  A.   That's correct.

24  Q.   Before I get too deep into the patents, I want to ask a

25   little bit about your background.  Can you describe for the

1    jury what your education is?

2    A.   Sure.  I got my degree, Bachelor of Science Degree in

3    Mechanical Engineering at Worcester Polytechnic Institute

4    here in Worcester, Mass., with a specialization in

5    aerospace.  I received that in 1989.

6         Later, I got a Masters in Business Administration

7    from the Sloan School at MIT here in Boston, and received

8    that in 1996.

9    Q.   And what did you do prior to working for EveryScape?

10   A.   You know, I basically, very early in life, became kind

11    of fascinated with the idea of starting things and building

12   things.  My very first company was a company called Cape

13   Construction on Cape Cod.

14        My father was a Baptist minister and my mother was

15   the organist, and they couldn't really afford to put me

16   through school, so they said:  You've got to figure this

17    out.  So I started Cape Construction, and during the summers

18   and winter breaks, I would build additions, decks, things

19    like that, and I really kind of caught the entrepreneurial

20    bug.  It was a difficult time, but you know, probably one of

21   the best times of my life.

22        From there, went and finished my degree.  Came out

23   of that, worked for Textron, which is a very large

24    conglomerate much like General Electric.  Lots of different

25   kinds of companies, things like that.  I worked for a

1   billion dollar division in Stratford, Connecticut called

2    Textron Lycoming.  That's when I kind of got the itch to go

3   back and start companies again, and so went to the Sloan

4    School at MIT primarily because it had this specialization

5   in entrepreneurship and new product development.  You've

6   probably heard lots of companies get started out of MIT.

7    But I wanted to see what that was about and see if that was

8   something for me.

9         And as a result of that, we spun one company out of

10    that with my experience called Intersense, which was in the

11   virtual reality space.  We actually were the device that

12    measured how your head moved as you wore these glasses.  So

13    the computer knew what graphics to actually show you inside

14   the head-mounted display.

15         From there I went to a company called emPower,

16   which was a light electric scooter company, which allowed

17    you to kind of go about 20 miles on a charge.  It was kind

18    of a cool company as well.  From there, I went to NerveWire

19   Systems, which was a systems integration company.  So it

20    basically would take off-the-shelf bits of software for very

21   large companies, like Nokia or Merrill Lynch, and try and

22   solve problems by writing custom stuff on top of that to

23   solve a particular problem.

24         And then from there, I went to a company called

25   Liquid Machines, which was in the enterprise rights

1    management space, which basically allowed you to control

2      access to documents.  Think about it as kind of a security

3    company.  And from Liquid Machines, I went to EveryScape.

4    Q.   Sounds like you did -- you gravitated towards smaller

5    companies.  Is that --

6    A.   Yeah, definitely.  As I said, that was kind of a passion

7    of mine.

8    Q.   And did that relate at all to your education at MIT?

9    A.   Yes.

10   Q.   How so?

11   A.   Well, you know, again, the focus there in the Sloan

12   School, which was very unique at the time, was an

13   entrepreneurship, so you could actually go, and there was

14    actually a course called The Entrepreneurship Lab, where you

15   actually got to work in small companies as part of your

16    degree, and that's where I --

17   Q.   And eventually, you came to work at EveryScape?

18   A.   Correct.

19   Q.   When was that?

20   A.   I initially consulted with them for awhile in the

21    late -- excuse me, the early part of 2005, and then became

22   an employee somewhere in the mid part of 2005.

23   Q.   And you've been there ever since.

24   A.   Correct.

25   Q.   So you're going on your tenth year at EveryScape.

1    A.    Yes, I am.

2    Q.    Was the company always called EveryScape?

3    A.    No.  When I got there, it was called Mok3.

4    Q.    Do you know why it was called Mok3?

5    A.    Yes.  They were -- and I think rightfully so -- very

6     impressed with the speed that the software could actually

7      create these 3D models, so again, the core technology behind

8       it was the ability to take 2D photography and add structure

9        to the images, and do interesting manipulations with them.

10      And so creating these kind of 3D models, we can do it very,

11       very quickly, and so it was -- the speed of sound Mok is --

12       the Mok1 is one times of speed of sound; Mok2, two times the

13      speed of sound, et cetera, and it was 3D, so that's when

14      they came up with the Mok3.

15   Q.    Why did the company change names?

16   A.    It changed names in 2008 primarily because I kind of

17      didn't like the way we spelled it.  It was kind of a silly

18     way, M O K, the number 3.  Primarily because that was --

19      back then, even then, domains mattered.  So if you wanted to

20      search for it on the Web, you wanted to get a short pithy

21       domain, but I didn't think it really described what we did

22       very well, and WebScapes was the product we were marketing

23      at that point in time, so in 2008, we changed the name to

24      EveryScape.

25   Q.    Other than the name change, did anything else change in

1    the business?

2    A.    No.

3    Q.    We can call the same company either Mok3 or EveryScape.

4    A.    Yes.

5    Q.    It means the same thing.

6    A.    It's the same company.

7    Q.    What is EveryScape's current business?

8    A.    EveryScape currently uses that kind of technology DNA,

9     that ability to kind of take pictures, give them structure,

10     and then kind of do interesting things with them to create

11     immersive experiences of places you see in this courtroom --

12     where we will be able to take some photography, and use that

13     and manipulate it in a way where again, we would teach the

14     software, where the floor of this particular room was, and

15     then we could kind of, through some magic of software, kind

16     of extrude up the walls, up to the ceiling, and then all the

17    pixels would kind of know where to go in order to create

18    this particular room.

19    Q.    Did that technology originate at MIT?

20    A.    Yes.  So it was one of the two core kind of applications

21     of this idea of adding structure to images -- one being the

22    Perspective Clone Brush, and the other being what we now

23    call Reality Editor.

24    Q.    Do you have an example of a WebScape to share with the

25    jury today?

1   A.    I do.

2   Q.    Can we have that, please.

3   A.    So what we have here is an example of what we call a

4   WebScape.  If you -- see, he's actually taking the cursor

5    and kind of looking around.  You kind of get a very -- 360

6   degree view of this particular place.  Unfortunately, the

7   display at least for me is a little warped.

8   Q.    Yes, it is a little.

9   A.    Doesn't look like that in the real world anyway.  So the

10    point being is that, again, if you wanted to get a sense of

11   where you wanted to go to this restaurant -- this particular

12   restaurant is Tommy Doyle's in Newton -- you get a pretty

13   decent idea.  And then we added to that this idea, orange

14   arrows, you can click those, and you can begin to kind of

15    feel like you're moving through the environment into another

16    part of Tommy Doyle's -- say you're really interested in the

17    bar area, or you wanted to see if you can actually hang out

18   there with a friend, et cetera.

19         And the last thing we added were what we call these

20    interactive elements, which is -- it's great that you can be

21     able to kind of experience what Tommy Doyle's actually is,

22   but what if I want to actually understand why people go

23   there.  And so we would take these kind of reality style

24   videos of somebody who's literally sitting at the bar and

25   say:  Why do you come here?

```
 1                      (Video played.)
 2   A.    So we would take a bunch of those, and we would just
 3    kind of embed them in the contents so people would get a
 4    good sense of why people go to Tommy Doyle's.
 5   Q.    So would Tommy Doyle's be a customer of EveryScape?
 6   A.    Yes.
 7   Q.    How does the public access these WebScapes?
 8   A.    There's a bunch of different places we have -- we sell
 9     through the yellow pages.  So if you go to yp.com and search
10      for dentists in Miami, we've got many, many, many dentists
11      in Miami that allow you to kind of walk through and see the
12     dentist's office.  Is it clean?  Do they use the latest
13      equipment?  Is there a place to have your kid play while you
14     actually get your teeth cleaned.  It's things like that.
15           It's also on Bing.  So if you go to Bing.com and
16      search through the content, you'll find it on there as well.
17   Q.    Is EveryScape working on new technology these days?
18   A.    Yes.  We're always working on new technology.
19   Q.    By reference to the WebScape we just saw, can you
20     describe what you're working on and how you might be
21     improving that?
22   A.    Yeah, if you want to click on the arrow closest there --
23     you know, one of the interesting things is -- pan to the
24     right a little bit, please, and then click that orange
25     arrow -- is to be able to kind of not just see what the
```

1    inside of Tommy Doyle's is, but we wanted you to be able to

2    actually get a sense of the outside.

3         And so this was kind of the beginning of an

4    experience of kind of connecting all of a certain part of

5    the world together.  And so what we've done is we built kind

6    of a real 3D experience, which again is using the same

7    technology, the same software in fact -- using it a little

8    bit further.  In order to get true 3D experiences, we call

9    that next generation local search or next generation

10   mapping.

11   Q.   Did you bring with you an example of a next generation

12   mapping?

13   A.   Yeah, I can't do them live, but there is a video of

14   somebody using the system live that we can show.

15   Q.   Okay.

16   A.   So what we've got here is somebody on an iPhone who is

17   actually going to go to an app, and they're going to type in

18   their search.  In this case, it's going to be Italian

19   restaurants.  And when I'm done typing here, you'll see what

20   will look like kind of a satellite image of the North End of

21   Boston.  And as we all know, the North End of Boston has

22   lots of Italian restaurants.  But there's so many to choose

23   from, which one will I want to choose.

24        So at this point, these little brown circles with a

25   knife and fork on it, those are identifying the location of

1      an Italian restaurant in that particular part of the world.

2      I can click one of those, and you'll see what happens next.

3           So go ahead and pause the video here.  So again, we

4      kind of used our software to allow you to kind of connect to

5      the experience of being up in the sky, down into the street,

6      and then into this particular restaurant called Bacco's.

7           Now, once you're inside this restaurant, you can

8      kind of do a lot of what we were doing before in Tommy

9      Doyle's.  Go ahead, click play again.  And again, pan around

10     the restaurant, have that 360 degree view.  There is, again,

11     information embedded in the contents, so if you wanted to

12     find the phone number or the Web address of where that

13     particular restaurant's website was, you could do that.

14          Similarly, if you've -- pause here.  If you look at

15     that kind of white chevron-shaped thing right there, that is

16     the new form of the orange arrow.  So when I click that --

17     go ahead and do that -- it will actually take you to the

18     second floor of Bacco's, and again, in a very kind of

19     realistic way.  Not that it's realistic to go through the

20     floor, but it's kind of what that geometry really

21     represents.

22          And so I can zoom around, I can pan around, I can

23     actually see that there's window seating.  It will be a

24     pretty cool place to actually get a drink.  So you see

25     another one of those chevrons.  Again, I want to see the

1    neighborhood.  I can click one of those, and actually go out

2    and experience the street part of the North End.  You know,

3    what is that particular area like.  Can I park there.  You

4    know, what might else I want to know about this particular

5    place.

6    Q.   Can I interrupt you just for a moment?

7    A.   Sure.

8    Q.   Now, is the technology that EveryScape is using, was

9    that developed at MIT as well?

10   A.   It's the same technology.

11   Q.   Okay.  So these are examples of some of the things that

12   you're working on at EveryScape right now?

13   A.   Correct.

14   Q.   Would you describe EveryScape as a technology company or

15   as a service company?  How would you describe EveryScape?

16   A.   It's definitely been a technology company from the

17   beginning.  That's what sets us apart from other people.

18   And so, you know, again, that's the DNA, and as you can see,

19   going from where we were in 2005 to being able to do this

20   today, it's come a long way.

21   Q.   And as the president and chief executive officer of

22   EveryScape, are you familiar with its history?

23   A.   Yes.

24   Q.   And do you know why EveryScape was founded?

25   A.   I do.  To commercialize this idea that was, you know, in

1      some MIT thesis about kind of adding structure to imagery,

2     and trying to manipulate images in interesting ways, like

3      creating 3D models from imagery, which is what you see here.

4    Q.   Can you identify some of the founders of EveryScape?

5    A.   There was Doctor Mok Oh, Yonald Chery, and then Fredo

6     Durand.

7    Q.   Those are three of the founders?

8    A.   They're three -- there are others, but those are the

9     primary ones I dealt with.

10   Q.   Doctor Oh, we've heard his name before in the openings.

11    Had he recently graduated from MIT?

12   A.   Yes.

13   Q.   Okay.  Do you know whether -- or what Doctor Oh and

14     Doctor Durand developed at MIT as it relates to this case?

15            MR. SCHERKENBACH:  Objection, Your Honor.

16     Foundation.

17            THE COURT:  Sustained.

18   Q.   Okay.

19            Does EveryScape this day use the technology that

20     Doctor Oh developed at MIT?

21   A.   Yes.

22   Q.   And can you describe how you know that?

23   A.   Well, basically, if you look at Doctor Oh's thesis, it

24     talks about both Perspective Clone Brush and this

25     technology.

1    Q.    And you saw the video in the opening, correct?

2    A.    I did.

3    Q.    And does that explain what a Perspective-Correcting

4    Clone Brush does?

5    A.    Yes.

6    Q.    And that work was described in a thesis published at

7    MIT?

8    A.    Yes.

9                MR. SCHERKENBACH:   Objection.   Same objection.

10               THE COURT:   I think this would be something that

11   was well within his professional competence.

12   Q.    Now, Mr. Schoonmaker, did EveryScape develop the

13   Perspective Clone Brush as a commercial product?

14   A.    Yes.

15   Q.    And were you the CEO when that happened?

16   A.    Not necessarily during the development of it, but when

17   we test launched it, yes.

18   Q.    And can you tell the jury what general timeframe that

19   was in?

20   A.    Actually, let me restate.   I was a consultant with the

21   company during the test market phase, but they launched the

22   test market in January of 2005.

23   Q.    Okay.   And does EveryScape have company records that

24   explain how it set the price to sell the Perspective Clone

25   Brush tool?

1   A.   Yes.

2   Q.   Okay.  And I want to direct your attention to Exhibit

3    256.  Should be in your book there.

4   A.   Okay.

5   Q.   Do you have that?

6   A.   I do.

7   Q.   What is that?

8   A.   You know, it's kind of a product business plan for the

9    plug-in strategy.

10  Q.   These are part of the company records -- Exhibit 256?

11  A.   Yes.

12       MR. AIRAN:  Mr. Corrillo, can we shrink that a

13   little bit?  I don't know if you can see that Exhibit

14   sticker on it.  This way maybe.

15  Q.   I want to direct your attention now to page 2 of that

16   Exhibit.

17  A.   Okay.

18  Q.   And what do you see on page 2?  Can you describe that

19   for the jury?

20  A.   One of the challenges, particularly in start-up

21   companies, with new technologies, new products and a new

22    company is trying to figure out what your product should be

23   priced at.  It's a pretty difficult challenge typically.

24       In this case, there was actually a good situation

25    where there was this kind of vibrant plug-in community that

1    lots of people were using to write cool software that would

2    be plugged into Adobe Photoshop to solve problems that Adobe

3    Photoshop wasn't solving natively.  And so we go online and

4    see those and see how many products were priced at different

5    price levels.

6    Q.   You mention a plug-in.  What is a plug-in?

7    A.   A plug-in is again a third-party piece of software that

8    gets written to add some functionality to an original piece

9    of software that doesn't have a functionality.  So at this

10   point in time, Photoshop did not have a Perspective Clone

11   Brush, so we wrote the plug-in to provide that functionality

12   to Photoshop.

13   Q.   Can you describe what a plug-in might be in terms of,

14   say, an iPhone?

15   A.   Sure.  A good example is if you think about Photoshop as

16   the platform, if you will, and that we were adding more kind

17   of capabilities to what Photoshop could do, much like kind

18   of the Apple Store does online.  So you know, again, when

19   you buy your iPhone, it's got apps on it.  It's clearly got

20   software on it, but you can add more stuff to it by actually

21   purchasing more apps and putting those on the phone.

22   Q.   So Exhibit 256 is the market research that EveryScape

23   had done to determine how to price its Perspective Clone

24   Brush?

25   A.   Correct.

1   Q.   And what does the Table in the middle of page 2 tell you

2    about that research?

3   A.   It tells me, you know, what number of products.  And by

4    number of products, I don't mean how many were sold.  I mean

5     how many companies were offering a product that would solve

6    a particular problem.

7           So if you look at kind of the second threshold,

8    maybe the bottom threshold, it would say that there were two

9    products that were being sold for a price of between $351

10   and $405.  Just above that, you know, there would be 16

11   products that were priced between 151 and $200.

12          So it gave us kind of a rough sense of where we

13   should be pricing-wise.

14  Q.   And what was the range of prices that you found for

15   plug-in products for Adobe Photoshop?

16  A.   Basically, it was a low of $51 and looks like a high of

17   about 400.

18  Q.   Okay.  How did EveryScape use that data?

19  A.   Well, there's a couple things that you do.  One is you

20    actually come up with a weighted average, which is kind of

21   what we show here on this particular page, but then you kind

22    of sanitize that, or excuse me, sanity check that with your

23   own feeling about how sophisticated the features are in

24   these other products that you're trying to compare it to.

25   So that would be kind of the next level of analysis you'd

1    do.

2    Q.   So some of your market research showed an average

3     weighted price of $122.35 for a plug-in?

4    A.   Correct.

5    Q.   And it was your objective to become an authorized

6     plug-in for Adobe?

7    A.   Correct.

8    Q.   All right.  And I want to direct your attention to the

9     next page of that Exhibit, the third page.

10   A.   Um hmm.

11   Q.   You see there that there is a reference to Competitors?

12   A.   Yes.

13   Q.   You were present for Mr. Scherkenbach's opening

14    statement?

15   A.   I was.

16   Q.   He mentioned the competitors for the Perspective Clone

17    Brush and he mentioned Corel -- do you recall that?

18   A.   I do.

19   Q.   Do you see that on this document?

20   A.   I do.

21   Q.   Okay.  Did EveryScape consider Corel and the Painter

22    product to be a competitor of it when it launched the

23    Perspective Clone Brush?

24   A.   Yes, we did.

25   Q.   Can you tell me why?

A.   Well, I mean, Corel had kind of this type of Perspective

Clone Brush that was not nearly as fast and not nearly as

accurate as the one that we had developed, but clearly,

there was that capability out there, and we wanted to offer

a better version.

Q.   You heard Mr. Scherkenbach say in his Opening Statement

that Adobe believes Painter 7 -- that product invalidates

your company's patents -- did you hear that?

A.   Um hmm.

Q.   Do you agree with that?

A.   No, I don't.

        MR. SCHERKENBACH:  Objection, Your Honor.

        THE COURT:  Sustained.

Q.   Is there a difference between Painter and the approach

described by the Perspective Clone Brush?

        MR. SCHERKENBACH:  Same objection.

        THE COURT:  You might want to ask a few questions

about whether he's ever done a side-by-side comparison and

what that consisted of.

Q.   Mr. Schoonmaker, at the time that you did this market

research, you had looked at the Painter 7 -- or Painter,

right, the Painter product?

A.   Yes.

Q.   Okay.  And did you evaluate how the Painter product --

as a company.  I'm asking as a company now.  Did the company

1        evaluate whether Painter, the Painter product was the same

2      as the Perspective Clone Brush product?

3    A.   Well, I evaluated it from a competitive level and

4      determined it wasn't the same.

5    Q.   Okay.  And can you explain to the jury why that was the

6      case?

7              MR. SCHERKENBACH:  Objection.  Foundation.

8              THE COURT:  I think it's enough.  I'll allow that.

9      Go ahead.

10             THE WITNESS:  Oh, I'm sorry.

11    A.   Yes.  No, I mean, I think the key component of what

12      we're really trying to do is speed up the process of this

13       kind of perspective cloning and improve the quality of the

14        output.  These are digital images.  Being a few pixels off

15      matters a lot.  You can easily see it if your nose is

16       slightly askew, or some other part of the picture is wrong,

17      so we really wanted to kind of improve upon what was the

18      then -- Corel's product.

19             And so the idea of being able to kind of lock in

20       the structure, or teach, again, the computer, that there is

21      a plane that some information is going to be copied from,

22       and then be able to not kind of worry about that plane ever

23      again, and just be able to Clone Brush to your heart's

24      content, really was a meaningful improvement over the way

25      that you had to do it before.

1    Q.    Would EveryScape have any objections to Adobe using a

2     Painter type approach in its Photoshop product?

3    A.    Not at all.

4    Q.    Insofar as EveryScape is concerned, Adobe can have that

5     technology.

6    A.    Yes.

7    Q.    I want to direct your attention a little bit further in

8     that Exhibit -- and I think it's page 11.

9    A.    Okay.

10   Q.    Let me get there myself.

11            Actually, let me go back to page 7 of that Exhibit.

12   A.    Okay.

13   Q.    Marketing pricing -- do you see that?

14   A.    I do.

15   Q.    There was a recommended price that your company came to,

16    or at least this marketing plan recommended -- is that

17    correct?

18   A.    That's correct.

19   Q.    What was the recommended price based on this market

20    research done by EveryScape?

21   A.    Again, what I was kind of talking about before, once you

22     got that weighted average, you kind of look at and compare

23    it to kind of the other products and what they're capable

24     of.  And the sophistication of and the level of improvement,

25     we really thought it skewed towards the higher end of that

1        range.  So that's where we kind of came up with this 150 to

2        $300 range that we should be in.  But it was a new product.

3        It was a new company.  So we decided to be on kind of the

4        lower end of that high range.  We ended up with about

5        $170 -- 169.99.

6    Q.   So what were the sales channels through which the

7        Perspective Clone Brush could be sold?

8    A.   Again, at this time frame, we were really just doing a

9        test market.  So we put it in two websites -- company called

10       toolfarm.com, and another website called pluginz, I N Z.com,

11       and you know, put it out there to try and see if we could

12       understand whether we'd gotten the features right, whether

13       the work flows for the user were right, whether we actually

14       priced it right.

15            There was lots of things we didn't know, including,

16       you know, how did you describe it; what was the benefits;

17       and how do you talk about that to an average consumer.  And

18       so that's what the point of that particular phase of the

19       process was.

20   Q.   Did you have a seemless transition to the marketplace?

21   A.   No.

22   Q.   Can you describe what kind of problems you faced trying

23       to do this test marketing?

24   A.   One of the challenges we faced is -- you spend a lot of

25       time and energy kind of building the core technology, the

1   core idea if you will, and you in some sense get enamored

2    with your own ideas, and the last thing that we really added

3    to the software late in the game, which was the license.

4    You know, when you install a piece of software, sometimes

5     you have to type in this cryptic set of alphanumeric keys in

6    order to get rights to use it -- the license key, if you

7    will.  And that didn't work very well.  We had a lot of

8    complaints, and we, in fact, had to cancel some orders.

9   Q.   That's the activation part --

10  A.   Yes.

11  Q.   -- that you were talking about.  So you had some

12   difficulties with the activation?

13  A.   Right.  So yes, they were able to down -- we had a free

14   trial.  So you could download the software for free, but

15   then after some period of time -- you may have seen this,

16   you know, somewhere -- you have to pay for it.  And they

17   would try and buy it, and at that activation step, it got

18   ugly.

19  Q.   Could you tell the jury what general timeframe we're

20    talking about here for this test marketing commercialization

21   that you were doing?

22  A.   Yeah, it was basically from January 2005 through kind of

23   mid March 2005.

24  Q.   Okay.  And did you put a lot of marketing effort behind

25   this product?

1  A.   No, we didn't.  I mean, again, the point wasn't really

2   to have the full product launch.  The point was to put it in

3   a bunch of beta testers' hands so we could get a sense of

4   what they would do with the tool, how they would use it.

5   Again, what the pricing was, et cetera.

6  Q.   Did the public show any interest in the product, even as

7   you described it?

8  A.   Yes.  They downloaded it almost 300 times.

9  Q.   Okay.  Did EveryScape eventually give up any hope of

10   selling the Perspective Clone Brush?

11  A.   Yes.

12  Q.   And why was that?

13  A.   In that March timeframe, we learned that Adobe had

14   launched Vanishing Point inside Creative Suite 2.

15  Q.   And I want to direct your attention back to Exhibit 256,

16   and if we can go to page 11 of that Exhibit.

17  A.   Okay.

18  Q.   So what is the jury looking at here?

19  A.   Again, it's part of these types of plans.  You put

20   together how you're going to take it to market, and how

21   you're going to promote it initially.  How do you make

22   people aware of it.  Again, we're a no-name company with a

23   no-name product.  We needed to get the word out some way.

24   One of the best ways you do that is kind of through trade

25   shows.  So that's what this is -- a list of potential trade

1    shows we could go over the course of the year.

2    Q.   One of them listed is Photoshop World in Las Vegas?

3    A.   Correct.

4    Q.   Could you describe to the jury what Photoshop World in

5    Las Vegas was?

6    A.   Photoshop World is a huge conference where people who

7    love or use Photoshop on a regular basis would go to, to

8    learn what the new features might be.  It's also where this

9    vibrant plug-in community would be.  So they would buy kind

10   of smaller booths around kind of where Adobe's booths would

11   be.  It's quite a spectacle.  I mean, lights, and sometimes

12   they'd invite rock bands.  I mean it was -- it was a lot of

13   fun actually to learn about what that -- what was going on

14   with that particular component of software and what was new

15   about it.

16   Q.   And there's a reference:  Get in Adobe Booth, do you see

17   that?

18   A.   Correct.

19   Q.   What does that mean?

20   A.   One of the tactics that startups do is try to co-brand

21   themselves.  If you don't have a name, you get a name by

22   actually associating yourselves with another company.

23          And obviously, with Photoshop, Adobe was the

24   company you wanted to be associated with, so often times you

25   would approach the platform company -- in this case Adobe --

1    and just say, hey, can we present in your booth.  We'll show

2     our software working alongside your software so people can

3    get a sense of how these things go together.  And

4    oftentimes, if what you're doing is important, is cool

5    enough, they'll actually do that.

6    Q.   So as part of EveryScape's marketing plan as indicated

7     by 256, you were going to attend the Photoshop World in

8     March of 2005?

9    A.   Correct.

10   Q.   And that was a few months after you had done this test

11    launch of the Perspective Clone Brush?

12   A.   It was six or seven weeks.

13   Q.   What did you learn at the March 2005 Photoshop World

14    conference?

15   A.   That Adobe was going to offer basically our tool,

16    natively, in the application.

17   Q.   What was EveryScape's reaction to that?

18   A.   It's kind of like a gut punch.  I mean, you know, you --

19    it's hard enough to actually come up with an idea that a

20    company like Adobe would consider important enough to

21     actually put in their software.  Then you go from that idea

22    to trying to develop a product around that idea, and then

23    from there, you actually try and put it out in the

24     marketplace and get people sensitive to it.  There's just a

25    tremendous amount of energy and hope, actually, that you put

```
 1    in this idea.

 2            It was particularly painful because we had just

 3     gotten started.  We'd gotten all the way to the end of our

 4     race, and we're just beginning -- we've got to take it into

 5     the marketplace to figure out what we were going to do with

 6     it, and you know, kind of the rug got pulled out from

 7     underneath.

 8  Q.   Was EveryScape expecting to make some revenues from the

 9     sale of its Perspective Clone Brush?

10  A.   Yes.

11  Q.   And did that happen?

12  A.   Yes, we sold some copies.  Again, with -- there were a

13     couple of things at work here.  One is our accounting

14     systems back then were very weak.  You know, I guess the

15      first thing, or the last thing you do is the licensing key.

16     The second to last thing was accounting in a startup

17      company.  All you do is hire engineers and develop software.

18     That's kind of where your focus is.  So we weren't really

19     doing anything other than getting paper receipts and

20     entering it into a computer.  So our records aren't very

21     good from that point in time, but again, we really had a

22     very positive response to the downloads, which is really

23     what you look at.

24            People care about this.  You know, they know what

25      the price is when they download it, so they could see, you
```

1      know, people are willing to go through that effort; was

2       there real interest there.  We're really excited about those

3       early results.

4   Q.    And after EveryScape launched Vanishing Point, did

5        EveryScape meet its expectations to sell Perspective Clone

6       Brush?

7   A.    No.

8   Q.    Why not?

9   A.    We were dead in the water.

10   Q.    How come?  Can you explain that to the jury, please?

11   A.    I'm sorry.  Well, look, again, the whole nature of

12      plug-ins is you're adding features and functionality to a

13      platform that doesn't have it.  That's why people come to

14       you and buy it.  If the native application already has that

15        functionality there, there's not much of a market there for

16      it.

17   Q.    And you heard Mr. Scherkenbach say on the Opening that

18        EveryScape had some communications with Adobe about funding

19      your startup.  Do you recall that?

20   A.    I do.

21   Q.    Did EveryScape, after this point in time, after the

22       March 2005 Photoshop World conference when you learned that

23      Vanishing Point had been put into Photoshop, did you do

24      another round of financing at that time?

25   A.    Yes.

1    Q.   And can you describe to the jury what that round of

2    financing -- how that went?

3    A.   Well, we tried to raise money to then kind of focus on

4    the other component of the technology, this Reality Editor

5    technology, and could not get any investors interested in

6    funding it.  So we actually had to go back to our existing

7    investors and get them to kind of put us on some borrowed

8    time to see if we can actually rescue the business.

9    Q.   Were you hoping to get some positive cash flow out of

10   the Perspective Clone Brush?

11   A.   Yes.  The whole point was -- again, when you think about

12   new ideas, you kind of want to get to the easiest thing to

13   get into the market first.  And so getting the plug-in

14   strategy going was really key because it was kind of a ready

15   made market, it was 2D Clone Brush.  So we weren't really

16   talking about 3D, so we knew that a lot of people used

17   Photoshop for editing pictures.

18          So the market out there would be significantly

19   larger than our 3D tool that we were subsequently trying to

20   develop, which people really weren't into at that particular

21   time.  In fact, we're still considered ahead of our time

22   with the kind of things that we're doing.

23   Q.   So did the company actually go out of business at that

24   point in time?

25   A.   It didn't technically go out of business, no.

1    Q.   Were you close?

2    A.   Very close.

3    Q.   You hung on.

4    A.   We hung on.

5    Q.   Okay.

6    A.   We did have to lay off people.  We had to do all kinds

7     of things in order to make it through that period.

8    Q.   That's when you refocused the company?

9    A.   Correct.

10   Q.   Did Adobe, or I'm sorry, did EveryScape have patents at

11    the time of the Photoshop World conference in 2005?

12   A.   We filed for our patents, but they hadn't been granted

13    yet.

14   Q.   When did EveryScape's patents actually issue?

15   A.   The first one was in February of 2008.

16   Q.   Okay.  And why didn't EveryScape, at that point in

17    time -- the patents issued in February of 2008.  Why didn't

18    EveryScape at that point in time just go right up to Adobe

19    and say, Hey, we have a patent, stop infringing?

20   A.   Well, I mean, that whole period was kind of strange.  We

21    were already moving onto this other part of our business,

22    and it's just not part of the startup playbook to kind of go

23    sue a multi-billion dollar company, but yet, we really felt

24    harmed.  I mean, we really felt like we suffered a lot as a

25    point in that process.

```
 1              So we had to think very carefully about it, and
 2    along that process of thinking about it, we learned that
 3    just the act of reaching out to Adobe or any company and
 4     saying that we had a patent on something that you infringed,
 5    was justification for them to sue us.  And again, if you
 6      think about that, that's a pretty daunting thing.  I can't
 7    even talk to this company and tell them that I think they
 8     infringed because they may turn around and sue us, and we
 9     have no capability of defending ourselves in that regard.
10    Q.   How big a company in terms of sales is EveryScape these
11     days?
12    A.   Today it's about five million.
13    Q.   As part of your business, you keep up with the graphics
14      companies and other public companies.  Does Adobe make its
15     finances available publicly?
16    A.   Certainly.
17    Q.   How much -- how big is Adobe in terms of its annual
18     sales?
19    A.   It's about 4 billion.
20    Q.   What's the ratio -- if you can do that math in your
21     head -- between your sales and theirs?
22    A.   It's about 800 times.
23    Q.   800 times?
24    A.   Yes.
25    Q.   And was that size difference at all intimidating to you
```

1    when you had your patent, and you thought:  I'm going to go

2     up against a company that's 800 times bigger?

3    A.   Yes.  I mean, you know, I don't know if I watch too many

4     lawyer shows or not, but you know, large companies have the

5     ability to kind of make lives difficult for other companies

6     when you're -- when they feel like they're threatened.  So

7    we really were not thrilled about that whole idea.

8    Q.   And eventually you did bring the lawsuit, right?

9    A.   We did.

10   Q.   And that was in 2010?

11   A.   Correct?

12   Q.   And it's been, you know, four plus years in the

13    litigation process?

14   A.   Yes.

15   Q.   Been a long process for you?

16   A.   It has.

17   Q.   Why don't you just give up at this point?

18   A.   Because we invented this technology.  This is our

19     invention.  The whole notion of patents is there to protect

20      the people who come up with the ideas and bringing them to

21    market first.  We were that company.  And you know, we

22     really felt like we needed to right this wrong -- if not for

23      us, but for all the other startup companies that were also

24    running into the same thing.  And we didn't have the

25    resources really up until 2010 to begin this process.

```
 1              MR. AIRAN:  Thank you, I'll pass the witness.

 2              THE COURT:  Mr. Scherkenbach.

 3              MR. SCHERKENBACH:  Thank you, Your Honor.

 4         Your Honor, may I approach the witness?

 5              THE COURT:  You may.

 6              THE CLERK:  Do you have one for the judge?

 7              MR. SCHERKENBACH:  One for the judge and --

 8         May I proceed, Your Honor?

 9              THE COURT:  You may.

10              MR. SCHERKENBACH:  Thank you.

11                     CROSS-EXAMINATION

12   BY MR. SCHERKENBACH:

13   Q.   Good afternoon, Mr. Schoonmaker.

14   A.   Good afternoon.

15   Q.   We've met before, right?

16   A.   We have.

17   Q.   I took one of your depositions in this case, right?

18   A.   You did.

19   Q.   Okay.  The book you have in front of you, we may or may

20     not need to refer to, but it has your deposition transcripts

21      and a few documents that I might ask you to take a look at.

22    Okay?

23   A.   Great.

24   Q.   All right.  I actually want to start with Photoshop

25      World in 2005.  You talked about that a little bit on your
```

1    direct -- is that right?

2    A.    Sure.

3    Q.    Okay.  And that's where Adobe introduced Vanishing

4     Point.  That's your understanding?  Yes?  You didn't attend

5     the conference, right?

6    A.    I did not.

7    Q.    Okay.  And so you don't have any firsthand knowledge of

8     what happened at the conference, or what was said or not

9     said at the conference, right?

10   A.    I was not at the conference.

11   Q.    Okay.  Now, you mentioned also on your direct exam, some

12     products and technologies other than the Perspective Clone

13     Brush plug-in, right?

14   A.    Correct.

15   Q.    I think I heard you refer to, toward the end here,

16     Reality Editor.  You mentioned that?

17   A.    Sure.

18   Q.    Okay.  That was a tool that turned panoramic images into

19     3D models -- fair?

20   A.    Yes.

21   Q.    And you don't know whether anyone using that technology,

22     the Reality Editor technology, uses any Perspective Clone

23     Brush technology -- right?

24   A.    I'm not familiar enough with the process that they use.

25   Q.    Right.  So you can't say as you sit here that the

1    Reality Editor technology includes any Perspective Clone

2    Brush technology -- fair?

3    A.    Fair.

4    Q.    Okay.  You also talked about WebScapes, right?

5    A.    Yes.

6    Q.    You demonstrated that for the jury, right?

7    A.    Yes.

8    Q.    Showed -- and again, you don't know whether WebScapes

9    used the Perspective Clone Brush technology in any way --

10    fair?

11    A.    I do know that when they build the 3D models of rooms

12    like this, that some of the things that happen are things

13    again getting kind of distorted, and I do know that there

14     are clone brushes that they use to fix that kind of thing.

15    Q.    Let me ask the question again.  You don't know whether

16    WebScapes used the Perspective Clone Brush technology in

17    particular in any way -- true?

18    A.    I am not close enough to it to know.

19    Q.    Okay.  In fact, Mr. Johnson (sic), it's true, isn't it,

20     that you don't know whether any technology or product that

21     your company offers today uses the Perspective Clone Brush

22    technology -- true?

23    A.    True.

24    Q.    Now let me turn to some of the testimony about numbers,

25     and financial impact, and that sort of thing.  First of all,

1   do you know what damages your company is seeking in this

2   litigation?

3   A.   I do.

4   Q.   What's the number?

5   A.   It's somewhere around 14, $15 million.

6   Q.   14, 15 million.

7   A.   Um hmm.

8   Q.   And you talked a little bit about the sales of the Clone

9   Brush plug-in on your direct; right?

10  A.   Yes.

11  Q.   Okay.  And I think you said you sold maybe 18 copies,

12  right?

13  A.   I don't know that I said how many, but during the test

14  market phase, there was some number that were sold.

15  Q.   Okay.  Let's talk about that.

16       MR. SCHERKENBACH:  Can I have Exhibit 173 please,

17  Mr. Sayres.

18  Q.   So you can look at this either on your screen,

19  Mr. Schoonmaker, or in your book.  And this is a document

20  that shows a tally of Clone Brush plug-in sales, is that

21  fair?

22  A.   This is -- was compiled by us as part of the deposition

23    process, I think, where we tried to compile as much of the

24  data we actually had back then.  So again, it's as good a

25    list that we could put together what the actual sales were

1      in that time.

2   Q.    Right.  And I understand there may be some limitation --

3      you mentioned in the deposition that some of your older

4      financial data is maybe less than perfect -- right?

5   A.    I'm afraid so.

6   Q.    Hardly surprising for a start-up -- right?

7   A.    Shouldn't be, but yes.

8   Q.    But in any event, you asked your people to put this data

9       together to give you the best snapshot you could have as to

10     what the sales actually were, right?

11  A.    Well, we were asked to present the data, and this is

12     what we were able to put together.  I don't know if it

13      reflects actually what the sales were.  This is as close as

14     we could get.

15  Q.    It's as close as you could get.  Fair enough.  So we see

16      on the left side there:  Sales.  I'm going to try this with

17     some trepidation here.  Circle it.  There we go -- Sales,

18     you see that?

19  A.    I do.

20  Q.    And we can add them up.  There were 18 total sales?

21  A.    Yeah.  I believe that's right.

22  Q.    And the total net revenue was about what, $843 -- you

23      see that?

24  A.    Correct.

25  Q.    I believe you said on direct that these sales happened

1    during what you called the test marketing period; is that

2    right?

3    A.   Well, we basically test marketed the period of January

4    through, again, the time of Photoshop World, but we just

5    stopped paying attention to it altogether.

6    Q.   All right.  But you don't disagree that your own data

7    shows some sales continuing past the Photoshop World

8    conference in March of 2005, right?

9    A.   Yeah.

10   Q.   In fact, 15, at least, of the 18 sales occurred after

11   the conference -- right?

12   A.   That's correct.

13   Q.   Some of them continuing into 2006, right?

14   A.   Yeah, we left it on toolfarm and pluginz, and some

15   people were still intrigued by it, I guess.

16   Q.   Now, obviously, as you said on Direct, EveryScape had

17   higher hopes for the plug-in sales, right?

18   A.   Correct.

19   Q.   And one of the reasons that you had higher hopes was

20   because the product was intended to address a ready-made

21   market; right.

22   A.   Correct.

23   Q.   That market was made by Adobe through Photoshop, right?

24   A.   Yes.

25   Q.   And that's because obviously there were lots of people

1   out there already using Photoshop; right?

2   A.   Correct.

3   Q.   Millions of people?

4   A.   Millions, yeah.

5   Q.   Made an attractive market for you to target, right?

6   A.   Yes.

7   Q.   And it's a lot easier to sell into that sort of a

8    situation as a new company, instead of trying to develop

9    your own brand or your own product awareness; right?

10  A.   Yes.

11  Q.   As you put it in deposition, plug-ins have a nice

12   feature like that -- right?

13  A.   Yeah.   Sure.

14  Q.   Okay.   But it all starts with Adobe -- right?

15  A.   Well, you have to have the platform.   Yes.

16  Q.   Right.   So no Photoshop, there wouldn't be any plug-in,

17   right?

18  A.   Or you'd have to write Photoshop, which would be hard.

19  Q.   It would be hard.

20  A.   Yeah.

21  Q.   All right.   And you concede, Adobe has built a nice

22   piece of software in Photoshop, right?

23  A.   Yes.

24  Q.   And if the Perspective Clone Brush, Mr. Schoonmaker,

25   were not patentable, okay, obviously Adobe could develop

1      that feature itself and that would be a rational legal thing

2     to do.  Right?

3              MR. AIRAN:  Objection, Your Honor.  Hypothetical.

4              THE COURT:  Overruled.

5     A.   Yes.

6     Q.   So if it turns out your company wasn't first with this

7      technology, there's no problem with Adobe coming out with

8      its own version of it, right?

9     A.   Correct.

10    Q.   All right.

11              And you understand the jury is going to decide that

12     question, right?

13    A.   I do.

14    Q.   All right.  And you obviously also understand that Adobe

15      believes that it can offer its own Perspective Clone Brush

16     without using any valid intellectual property of your

17     company -- right?

18              MR. AIRAN:  Objection, Your Honor.  How could

19     Mr. Schoonmaker possibly know what Adobe believes?

20              THE COURT:  I agree with you.

21              MR. SCHERKENBACH:  All right.  I'll withdraw the

22     question.

23    Q.   All right.  Let's talk about -- the last thing you

24      talked about on Direct was sort of how we got from here to

25      there, how we got from Photoshop World to this courtroom

1    today -- right?

2  A.   Okay.

3  Q.   All right.  Now, you testified that you were concerned

4     immediately after Photoshop World about the fact that Adobe

5    had come out with a Perspective Correcting Clone Brush --

6    right -- you as a company?

7  A.   Yes.

8  Q.   And in fact, isn't it true that internally at your

9    company, there were people at that time who thought Adobe

10   might be infringing what you thought was your technology,

11   right?

12  A.   I'm sure there were people who had that opinion, yeah.

13  Q.   Including Mok Oh, right?

14  A.   Yes.

15  Q.   But we can agree, no one from EveryScape approached

16   Adobe in the 2005 timeframe, right?

17  A.   I don't agree.  Mok did approach them at the World

18   Photoshop.

19  Q.   I'm sorry, let me rephrase the question.

20        In the period of 2005 after the Photoshop World,

21   when you said, hey, we think there is a problem here, no one

22    came to Adobe at that point in 2005 and said, hey, we think

23   there is a problem, right?

24  A.   Not to my knowledge.

25  Q.   Okay.

1          MR. SCHERKENBACH:  Can we have Exhibit 147, please.

2    Q.   Mr. Schoonmaker, this is an email to -- again, please,

3     either paper or screen -- an email to you and Mok Oh from

4     Scott Johnson dated May 7, 2005; right?

5    A.   Um hmm.

6    Q.   Okay.  And can you tell jury who Scott Johnson was,

7     please?

8    A.   He was one of the investors in EveryScape -- at that

9     time Mok3.

10   Q.   Okay.  And you -- as of May 2005, you were the CEO or --

11   A.   Close, yeah.

12   Q.   And Mok Oh obviously was a technical person at the

13    company and an inventor, right?

14   A.   He was the CTO.

15   Q.   CTO.  Chief Technology Officer?

16   A.   Right.

17   Q.   All right.  And Mr. Johnson writes to you and says --

18    well, the subject is Idea -- true?

19   A.   Yes.

20   Q.   Okay.  And he says, "We should approach Adobe

21    immediately as a way to get some early cash.  Do you see

22    that?

23   A.   I do.

24   Q.   And this, in May 2005, that's somewhat after the

25    Photoshop World conference, right?

1    A.    Correct.

2    Q.    Okay.  But again, that didn't happen.  Nobody approached

3    Adobe in 2005 after Mr. Johnson suggested that -- true?

4    A.    To my knowledge, that's correct.

5    Q.    Okay.  And you don't personally recall doing anything to

6    follow-up on Mr. Johnson's suggestion, right?

7    A.    No, I recall.  Just, it's just kind of not in our DNA.

8    You know, these things are unfortunate, but there's not a

9    lot you can do about them.

10   Q.    You said that on -- you said that on Direct too, but

11   ultimately, it was in your DNA to sue because you sued --

12   right?

13   A.    Yes.  Well, I mean, we needed to find a way to get made

14    whole, and it was pretty clear there was only one way to do

15   it.

16   Q.    Now, let me move on from 2005.  You've been the CEO

17   since sometime in 2005 -- true?

18   A.    That's correct.

19   Q.    You're the CEO today.

20   A.    I am.

21   Q.    In the entire timeframe that you've been CEO, you never

22   reached out to Adobe about this alleged problem -- true?

23   A.    Correct.

24   Q.    And that's true even though you personally had other

25   dealings with Adobe since 2005 -- right?

1   A.   Yes.

2        MR. SCHERKENBACH:   Can we have Exhibit 160, please.

3    Let's start with the one at the bottom, Mr. Sayres, please,

4    or in the middle I guess.  It's the first email in the

5    chain.

6   Q.   So Mr. Schoonmaker, there is an email -- the first email

7    here is from you to a gentleman named John Landware -- you

8    see that?

9   A.   I do.

10  Q.   February 28, 2006, right?

11  A.   Yes.

12  Q.   Subject:  Catching up.  Right?

13  A.   Correct.

14  Q.   Now, you knew Mr. Landware from one of your prior

15   companies, isn't that right?

16  A.   Also correct.

17  Q.   So you had actually interacted with Adobe -- it was at

18   Liquid Machines, wasn't it?

19  A.   Um hmm.

20  Q.   Sorry, you have to say yes.

21  A.   Yes, sorry.

22  Q.   Thank you.  And so here you are now at a different

23   company, Mok3, and you're reaching out to Adobe in a

24   different context -- right?

25  A.   Yes.

1    Q.   By the way, your email here says, SuperTour.com; do you

2     see that?

3    A.   I do.

4    Q.   So we're not confused, because I don't think you used

5      that term on Direct, that at one point was -- well, it was

6      at least a brand that you used associated with some of your

7     products or services?

8    A.   That's a good way to put it.  Again, I really hated the

9     way we spelled Mok3.  So Super Tour was kind of the first

10     name that we actually used to describe what we were doing at

11     that time.

12   Q.   Okay.  And in fact, you say that in email here.  You say

13     that one of the things you're working on is launching a

14      travel portal, and second line there called supertour.com,

15     right?

16   A.   Correct.

17   Q.   And that site uses Flash and ShockWave heavily -- true?

18   A.   Correct.

19   Q.   And at this point in time, both Flash and ShockWave were

20     Adobe Technologies, correct?

21   A.   Correct.

22   Q.   And you said to Mr. Landware, "We need to develop a

23      relationship with Adobe/Macromedia to better leverage these

24     programs" -- true?

25   A.   Platforms, yes.

1    Q.    Platforms.  Sorry.  And the answer is?

2    A.    "Yes."

3    Q.    Thank you.  Okay.  All right.  Now let's go up to the

4     top.  Mr. Landware responded, right?

5    A.    Yes.

6    Q.    A little bit later.  And he says, "Hi, Jim.  Nice to

7      hear from you.  All is well in San Jose.  A little behind on

8       email though."  He says, "How can I help on the navigation

9      front."  Right?

10   A.    Correct.

11   Q.    So he's actually offering to help you.

12   A.    On this particular issue, which was a different issue.

13   Q.    Actually, the other thing -- let's go back to the prior

14     email at the bottom.  In addition to help with the platform,

15     you were actually -- see the last sentence there, "By the

16     way"?

17            MR. SCHERKENBACH:  Next one down, Mr. Sayres.

18   Q.    "By the way, we'll also be looking for a next round of

19     investment in the next couple of quarters, and we are

20     looking at Granite Entries as a potential lead" -- do you

21     see that?

22   A.    I do.

23   Q.    So you were actually -- at that time, you wanted Adobe

24     to be a potential lead investor in the next financing for

25     EveryScape, right?

1    A.   One of many, but yes.

2    Q.   Okay.  And so you wanted technical collaboration and

3     maybe potentially Adobe to invest, right?

4    A.   Sure.

5    Q.   Okay.  And you understood him to be offering to connect

6     you with sort of the right people -- is that fair?

7    A.   Probably, yeah.  I'm not sure what he meant.

8    Q.   Now, you didn't say anything to him in this email about

9     having a potential issue with Adobe misusing your

10    technology -- fair?

11   A.   No.  But we had learned that we couldn't.

12   Q.   Okay.  I didn't ask you why.

13   A.   Yeah.

14   Q.   But so -- let me establish a foundation first.  So you

15    didn't say anything to Mr. Landware.

16   A.   Yes.

17   Q.   And you didn't say anything to him otherwise, outside

18    the context of this email, about any issue.

19   A.   Right.

20   Q.   And your testimony to the jury is you felt that you

21    could not do that.

22   A.   Correct.

23   Q.   Let's go onto 2007.

24        MR. SCHERKENBACH:  Can we have Exhibit -- actually,

25     in your book, look at Exhibit HE.  It's sort of towards the

```
 1   back.
 2   Q.   And let me just lay some foundation here.  This is an
 3    email chain in the 2007 timeframe involving you, and Mok Oh,
 4   and Scott Johnson, and some other people, right?
 5   A.   Correct.
 6   Q.   And would you agree it has to do, generally speaking,
 7    with whether to take action regarding your issue with Adobe?
 8   A.   Yes.
 9         MR. SCHERKENBACH:  Your Honor, we would move the
10   admission of Exhibit HE.
11         MR. AIRAN:  Your Honor, this is subject to the
12   court's ruling in the past, so we'll accept the court's
13   ruling and not object to it.
14         THE COURT:  You'll have to remind me of what the
15   next Exhibit Number would be.
16         THE CLERK:  395, Judge.
17         THE COURT:  How much?  395 is next.  All right.
18    This will be admitted as Exhibit 395.  At a point, I have a
19   remark for the jury about the contents.  So go ahead.
20         MR. SCHERKENBACH:  Thank you.  So we'll call it
21   Exhibit 395 now.  And can we put that up, please, on the
22   screen.
23         (Document marked Exhibit No. 395 and received in
24          evidence.)
25   Q.   So we already established who was involved in the email
```

1    chain.  And this relates generally actually to EveryScape

2      receiving notice that the first of its Clone Brush patents

3     was going to issue -- true?

4    A.   Yes.

5    Q.   Okay.  And you see actually -- at the top here, it says,

6     "The patent is issuing now."  Right?

7    A.   Yes.

8    Q.   And this is -- by the way, this is Mr. Johnson speaking,

9     right?

10   A.   Yes.

11   Q.   Okay.  And again, so we're all on the same page here,

12      he's a large investor -- was at the time -- in EveryScape?

13   A.   Sure.

14   Q.   Okay.  And then Mr. Johnson says, "So Adobe will have

15     decent incentive to license it."

16   A.   That's what it says.

17   Q.   Then Mr. Johnson says, "We can always tell them we are

18     going to sell it to NTP," correct?

19   A.   Yes.

20   Q.   With a smiley face at the end -- right?

21   A.   Yes.

22   Q.   And that's a reference to selling the patent to someone

23     else who would enforce it against Adobe -- right?

24   A.   I really am not clear what he's trying to get at there.

25   Q.   So your testimony is you have no idea what that

1    reference is.

2    A.   I have no idea what that reference is.

3         THE COURT:  I know what it refers to.  NTP is a

4    company that has a reputation for very aggressively

5    litigating patents, sometimes on behalf of another party.

6    Probably most famous for the litigation that was bought

7    against RIM or the Blackberry manufacturer.

8         In the patent world, sometimes these -- there's a

9    pejorative term that patent lawyers like to throw around

10    called troll.  I don't think you should read anything into

11    it.  Just it means an aggressive litigator.

12    Q.   So notwithstanding this email traffic in 2007, it

13    remained the case that no one from EveryScape approached

14    Adobe in 2007 either; true?

15    A.   Up until this point, we didn't have a patent so we

16    couldn't approach Adobe anyway, and yes, at this point, we

17    now were about to get a patent anyway in February.

18    Q.   And still no one said -- even though now you have notice

19    the patent's issuing -- no one in 2007 reached out to Adobe

20    and said, Hey, now we think we have a problem.  We're going

21    to get a patent.  Right?

22    A.   For the same reasons we've been mentioning.

23    Q.   All right.  So let's go onto 2008.  And then you

24    actually got the first patent in February 2008 -- correct?

25    A.   Correct.

1    Q.   You're not aware of anyone from EveryScape approaching

2    Adobe in 2008 either, right?

3    A.   No.

4    Q.   Okay.  Let's go onto 2009, and in your book, can you

5    find Exhibit HN.  HN, please.

6            This is -- you agree this is an email exchange in

7    sort of the March -- well, it's an email in the March 2009

8    timeframe.  Subject:  Management Meeting Notes and

9    actions -- right?

10   A.   Yes.

11   Q.   You sent it?

12   A.   Yes.

13   Q.   And this was something you did in the ordinary course of

14   business at Mok3, right?

15   A.   This wouldn't have been ordinary actually because this

16   was a meeting I wasn't at.  I had asked someone else to

17   actually take notes in my absence, but then he gave me the

18   notes.  I copied and pasted them into the email, and asked

19   people to make edits if he had gotten anything wrong.

20   Q.   But you were doing that as part of your job in

21   connection with being the CEO of Mok3, right?

22   A.   Yeah.

23   Q.   All right.  Fair enough.

24            MR. SCHERKENBACH:  Your Honor, I move the admission

25   of HN also.

```
 1              THE COURT:  Exhibit 396.

 2              (Document HN marked Exhibit 396 and received in

 3       evidence.)

 4   Q.   So Exhibit 396, notwithstanding what you just said,

 5       Mr. Schoonmaker, you have no doubt you actually sent the

 6       email, right?

 7   A.   Yes.  I'm reasonably sure I sent the email.

 8   Q.   And you see under Mok, down toward the bottom -- can we

 9       blow that up.  It says, "Make sure Scott takes lead on

10       looking for patent troll," right?

11   A.   Yes.

12   Q.   And the Court has already explained that term to the

13       jury.  You recall we discussed this in your deposition,

14       right?

15   A.   Sure.

16   Q.   Well, if you don't, you don't.  That's fair.  I mean --

17       do you remember I asked you whether you had any

18         understanding of what that term meant and how it was being

19       used there?

20              MR. AIRAN:  Your Honor, if he's going to ask him

21       about the deposition, he should probably give it to him.

22              THE COURT:  That might be helpful.

23   Q.   I'll just withdraw the question.  We don't have to have

24       a memory test.

25   A.   Okay.
```

1   Q.   Regardless of whether you had an understanding, you see

2      at least the document indicates that Mok Oh is supposed to

3    make sure Scott takes lead on looking for patent troll --

4    right?

5   A.   That's what it says.

6   Q.   Okay.  And you don't know whether Mr. Oh, in fact,

7    followed up on this action item -- true?

8   A.   I don't.

9   Q.   But we know again, no one from EveryScape approached

10   Adobe in 2009 -- right?

11  A.   Correct.

12  Q.   Okay.  So that brings us to 2010, and the lawsuit was

13   filed in 2010, right?

14  A.   Yeah.

15  Q.   Okay.

16           September, right?

17  A.   Yup.

18  Q.   Okay.  And you don't have any reason to think that Adobe

19     had any indication from EveryScape, prior to the filing of

20    the lawsuit, that it was going to be sued -- right?

21  A.   I mean, Adobe clearly was aware of our intellectual

22     property.  It had been cited in some of your patents, so I

23    can't say that.  But I am not sure that they had any idea

24    that we were going to sue them.

25  Q.   All right.  Now, in terms of how Adobe either developed

1       or acquired Vanishing Point, you don't know anything about

2       what happened inside Adobe -- fair?

3   A.    Fair.

4   Q.    All right.  So you don't know whether Adobe developed it

5       in-house or acquired it from some other company -- right?

6   A.    I don't.

7   Q.    So you're not in a position to say one way or the other

8       whether Adobe took anything from Mok3 or EveryScape, right?

9   A.    I'm not sure what you mean by took.

10  Q.    Actually derived the technology from seeing your

11      technology -- you don't know whether that happened.

12  A.    There's some suspicions, but I don't know, no.

13  Q.    All right.  Finally, Mr. Schoonmaker, am I correct that

14      you own a substantial number of stock options in EveryScape?

15  A.    Sure.

16  Q.    Okay.  Something like 800,000 or 900,000 as of the time

17      of your deposition -- right?

18  A.    It's about five percent of the company.

19  Q.    Right.  And is that -- what's the number today?  Is it

20      the same number?

21  A.    It's the same number.

22  Q.    Same number.  All right.  And if EveryScape succeeds in

23      this suit, obviously an investor is going to benefit through

24      their ownership of shares in the company -- right?

25  A.    Sure.

1    Q.   So it would be fair to say, you personally will benefit

2      if EveryScape collects their 14 or $15 million from Adobe in

3     this case -- right?

4    A.   Yeah.  Not as much as you think, but investors have a

5     lot of money in EveryScape.

6    Q.   All right.  I have no further questions.  Thank you.

7              THE COURT:  Redirect?

8              MR. AIRAN:  I do, Your Honor.

9                         REDIRECT EXAMINATION

10   BY MR. AIRAN:

11   Q.   Mr. Scherkenbach just asked a couple questions about

12     whether Adobe took anything from you.  Did Adobe take your

13     invention?

14   A.   Yes.

15   Q.   And have they used it?

16   A.   Yes.

17   Q.   Okay.  I want to go back to trial Exhibit 147 in your

18     book.  If you can have -- if you can turn to that.

19              Are you there?

20   A.   I am.

21   Q.   There is a reference to --

22              MR. AIRAN:  Can we have that please, 147 please.

23   Q.   The top there is a reference to --

24              MR. AIRAN:  Mr. Corrillo, I think your screen is a

25     little off again.

1    Q.   Let me just read it into the record.  "After reading the

2     article in the Times that said the only interesting thing in

3     the new release is the Perspective Clone Brush" -- do you

4     see that?

5    A.   I do.

6    Q.   Do you recall -- Mr. Scherkenbach didn't give you the

7     Times article, did he.

8    A.   No.

9    Q.   Do you recall an article -- what was the Times article,

10    first of all?

11   A.   It was about Vanishing Point.

12   Q.   And that's the New York Times?

13   A.   Correct.

14   Q.   Do you recall seeing a New York Times article on or

15    about May 7, 2005?

16   A.   Sure.

17   Q.   And that's what this email is referencing?

18   A.   Correct.

19        MR. AIRAN:  May I approach, Your Honor?

20        THE COURT:  You may.

21        MR. AIRAN:  Your Honor, may I publish the New York

22    Times article to the jury?

23        THE COURT:  You may.

24   Q.   So I've now put on the screen, trial Exhibit CZ.  Do you

25    have that, sir?

1    A.    I do.

2    Q.    That's entitled:  A New Photoshop Makes Retouching

3     Reality Somewhat Easier.  Do you see that?

4    A.    I do.

5    Q.    And do you see the date of May 5, 2005 on that?

6    A.    I also do.

7    Q.    Okay.  Was that the article that Mr. Johnson was

8     referencing in his email?

9    A.    Yes.

10   Q.    And I want to direct your attention to page 4 of that

11    Exhibit.  And the first full paragraph, "By far."  Do you

12    see that?

13   A.    Yup.

14   Q.    Says, "By far the coolest new feature in Photoshop CS2,

15    though, is called Vanishing Point.  It's also the most

16     difficult to describe; in the attempts you find on the Web,

17    you can practically see the knuckle marks on the writers'

18    forehead."  Do you see that?

19   A.    I do.

20   Q.    Then the article goes on to praise Vanishing Point --

21    right?

22   A.    Yes.

23   Q.    And that's what Mr. Johnson was referencing in his May

24    7, 2005 article, right?

25   A.    Correct.

1  Q.   And you thought that was your invention.

2  A.   Yes.

3  Q.   And that's invention that the New York Times was

4    publicizing as the coolest feature in the launch of CS2 --

5   is that what you understood this article to be doing?

6  A.   Yes.

7            MR. SCHERKENBACH:  Objection, Your Honor.

8            THE COURT:  Overruled.

9            MR. AIRAN:  Your Honor, at this time, I'd move into

10   evidence Exhibit CZ.

11           THE COURT:  CZ becomes 397.

12        (Document CZ marked Exhibit No. 397 and received in

13    evidence.)

14 Q.   Now, Mr. Scherkenbach, on cross-examination, asked you a

15    number of questions about the small number of sales that you

16    had.  Do you remember that?

17 A.   I do.

18 Q.   Why did EveryScape only have a few -- a small amount of

19    sales of the Perspective Clone Brush?

20 A.   It was in the market at least as a viable product for a

21    number of weeks.  When you launch a new product, you're not

22    going to get to meaningful revenues for literally years.  It

23    takes a long time.  We didn't have a brand.  We didn't have

24    anything, and you know, we were really just testing the

25    product at that point in time.  So what we were really

1    looking for is how many downloads did we get.  Did people

2     download the free trial.  Did people care at all.  You never

3      know until you actually launch these things whether you've

4       got something or not.  And to within a matter of weeks, to

5     have 300 people download it with literally no marketing,

6      nothing really going on as far as telling people about it,

7       they just discovered it on toolfarm.com, which is not a --

8     you know, it's not Amazon.

9    Q.   And what happened after the March 2005 Photoshop World

10    conference?  What happened next to your product?

11   A.   Oh, it just -- it was dead.  Nobody cared anymore.

12   Q.   Why was that?  Can you explain to the jury:  Why was it

13    dead at that point in time?

14   A.   Because you didn't need it.  You had the functionality

15    in Vanishing Point in the base product.

16   Q.   And just a few more questions and I'll stop.

17     Mr. Scherkenbach asked you a number of questions about why

18    you didn't move faster against Adobe -- right?

19   A.   Sure.

20   Q.   And your patent, when did it issue again?

21   A.   February 2008.

22   Q.   And you brought that patent suit within two years about?

23   A.   Yes.

24   Q.   And then this lawsuit has been pending for more than

25    double the amount of time, hasn't it.

```
 1   A.   Yes.

 2   Q.   So within two years of your patent issuing, you filed

 3        the lawsuit.  That was in 2010.  We're standing here today

 4     asking for relief from this jury in January of 2015 --

 5     correct?

 6              MR. SCHERKENBACH:  Objection to the argumentative

 7     nature of the question and leading.

 8              MR. AIRAN:  I'll withdraw it.  I have no further

 9     questions.

10              THE COURT:  Anything further?

11              MR. SCHERKENBACH:  I have one question.

12                         RECROSS-EXAMINATION

13   BY MR. SCHERKENBACH:

14   Q.   This New York Times article you were directed to?

15   A.   Yes.

16   Q.   I neglected to catch the Exhibit Number.  It's in

17     evidence now.

18              THE COURT:  397.

19              MR. SCHERKENBACH:  Thank you, Your Honor.

20   Q.   397.  You pointed out language referring to Vanishing

21     Point -- true?

22              It's on -- well, here.  We can go to page 4.  Let's

23     just put that reference up.

24              MR. SCHERKENBACH:  The first full paragraph,

25     please, Mr. Sayres.  Just pull that up.
```

1   Q.   You can see a reference to Vanishing Point, right?

2    That's a very bad circle.  Do you see where I --

3   A.   I do.

4   Q.   Okay.  There isn't any language here about the

5    Perspective Correcting Clone Brush tool specifically in

6    Vanishing Point -- right?

7   A.   Sure.  Everybody knows it's the same thing.

8   Q.   Oh, is that right?  Do you know -- well, wait a minute.

9    You've never used Vanishing Point, right?

10  A.   I personally have never used it.

11  Q.   Okay.  So you don't know how many tools make up

12   Vanishing Point -- right?

13  A.   Other than your Opening Statement.

14  Q.   All right.  And in fact, as I understand it, you've

15   never used Photoshop -- right?

16  A.   I honestly don't know.  It's been a long time.

17       MR. SCHERKENBACH:  All right.  Nothing further,

18   Your Honor.

19       THE COURT:  All right.  Thank you very much,

20   Mr. Schoonmaker.

21    All right, jurors, that conveniently takes us almost to

22   4:00, so as promised, I'm going to excuse you now.  We'll

23   start right at 9:00 tomorrow morning.  Again, we'll have

24   breakfast set up for you around 8:00.  So if you want to

25    come earlier, relax and get something to eat, we'll be all

1    set to go at 9.  All right, counsel, we'll see everyone

2    tomorrow morning at 9 a.m.

3           THE CLERK:  All rise.

4                      (Jury and Judge depart.)

5       (Proceedings suspended at 4 p.m.)

```
 1                  - - - - - - - - - - - -

 2                     CERTIFICATION

 3          We certify that the foregoing is a correct transcript

 4   of the record of proceedings in the above-entitled matter to

 5   the best of our skill and ability.

 6


 7


 8   /s/Debra M. Joyce              January 13, 2015
     Debra M. Joyce, RMR, CRR       Date
 9   Official Court Reporter

10


11


12


13   /s/Lisa Valdario              January 13, 2015
     Lisa Valdario, RPR, CRR        Date
14   Official Court Reporter

15


16


17


18


19


20


21


22


23


24


25
```

1    INDEX

2    WITNESSES:

3    JAMES SCHOONMAKER

4    Direct by Mr. Airain p. 55

5    Cross by Scherkenbach p. 89

6    Redirect by Mr. Airan p. 111

7    Recross by Mr. Scherkenbach p. 116

8

9                      EXHIBITS

10

11       395 (formerly HE) - email chain, 2007   p. 104

12       396 (formerly HN) - email chain, March 2009  p. 108

13       397 (formerly CZ) New York Times article,

14        May 5, 2005  p. 114

15

16

17

18

19

20

21

22

23

24

25