1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3     *  *  *  *  *  *  *  *  *  *  *  *  *  *
     *EVERYSCAPE, INC.,            *
4            Plaintiff            *     CIVIL ACTION
              vs.                 *     No. 10-11597-RGS
5                                 *
     *ADOBE SYSTEMS, INC.,         *
6            Defendant            *
     *  *  *  *  *  *  *  *  *  *  *  *  *  *
7

8               BEFORE THE HONORABLE RICHARD G. STEARNS
                UNITED STATES DISTRICT JUDGE and a JURY
9                     Jury Trial Day 6
                      January 20, 2015
10

11   APPEARANCES:

12          LEYDIG, VOIT & MAYER, LTD, (By Wesley O. Mueller,
     Esq., David M. Airan, Esq., Aaron R. Feigelson, Esq.,) Two
13   Prudential Plaza, Suite 4900, 180 North Stetson Avenue,
     Chicago, Illinois   60601-6731, on behalf of
14   Plaintiff

15          FISH & RICHARDSON, P.C., (By Frank Scherkenbach
     Esq., Adam J. Kessel, Esq., and Betty H. Chen, Esq), One
16   Marina Park Drive, Boston, Massachusetts 02210, on
     behalf of Defendant

17

18

19
                              Courtroom No. 21
20                            1 Courthouse Way
                              Boston, Massachusetts 02210
21

22          James P. Gibbons, CSR, RPR, RMR, CRR
                 Debra M. Joyce, RMR, CRR
23              Official Court Reporters
            1 Courthouse Way, Suite 7205
24            Boston, Massachusetts  02210
                  jmsgibbons@yahoo.com
25

```
 1                    P R O C E E D I N G S
 2           THE CLERK:  All rise for the jury.
 3        (Jury in.)
 4           THE CLERK:  All rise for this Honorable Court.
 5        Court is open, you may be seated.
 6        The case before this Court carries Case No. 10cv11597,
 7    EveryScape versus Adobe Systems.
 8           THE COURT:  Good morning, counsel.  Good to see you
 9    again.
10        And it's especially good to see you, Jurors.  It was a
11    great weekend, particularly if you're a football fan.  It
12    wasn't so good for washing cars, I discovered yesterday.
13        All right.  I think we're ready to resume.
14        It will be cross-examination.
15           MR. SCHERKENBACH:  Thank you, your Honor.
16        Good morning, ladies and gentlemen.
17                        CROSS-EXAMINATION
18    BY MR. SCHERKENBACH
19    Q.   Good morning, Mr. Yurkerwich.
20    A.   Good morning.
21           MR. SCHERKENBACH:  May I approach to hand out some
22    cross-examination binders?
23           THE COURT:  You may.
24           MR. SCHERKENBACH:  Thank you.
25    Q.   This is your report, deposition transcripts, and
```

1  documents, okay?

2  A.   Okay.

3  Q.   All right.

4       I want to talk first about what it is you valued for

5  purposes of doing your damages analysis in the case.

6       You understand, first of all, that the accused

7  functionality is specifically associated with Vanishing Point's

8  clone stamp tool, right?

9  A.   That's the tool that's been found to infringe.

10  Q.   And, obviously, there are tools within Vanishing Point

11  other than the clone stamp tool, right?

12  A.   There are other tools in Vanishing Point, yes, that I

13  understand incorporate some of the same code that's in the

14  accused tool.

15  Q.   That isn't what I asked you, and that's not in your expert

16  report.  So let me ask the question again.

17       There are tools in Vanishing Point other than the

18  accused clone stamp tool, correct?

19  A.   That's correct.

20  Q.   And, in fact, as of the time of the hypothetical

21  negotiation in 2008, there were nine other tools in Vanishing

22  Point besides the clone stamp tool, right?

23  A.   I believe there were eight others.

24  Q.   Well, actually there's -- we'll see if we can establish

25  this.

1              So Photoshop CS2 came out in 2005, correct?

2    A.    Yes.

3    Q.    That product -- the Vanishing Point in that product had

4    nine total tools including the clone stamp, right?

5    A.    Correct.

6    Q.    Do you recall Photoshop CS3 came out in 2007?

7    A.    I think that's right.

8    Q.    And that version of Photoshop added a tenth tool, the

9    measurement tool.

10             Do you recall that?

11   A.    Yes.  I think it might have been in Extended.

12   Q.    Okay.

13             But, in any event, there was a flavor of Photoshop

14   that came out in 2007 that added a tenth tool; is that fair?

15   A.    Yes.  And, again, I think it was in Extended, right.

16   Q.    So at the time of the hypothetical negotiation in 2008, if

17   you look collectively at Photoshop CS3 and Photoshop Extended,

18   there were ten total Vanishing Point tools, right?

19   A.    Yeah, at least in Photoshop Extender, correct.

20   Q.    And you actually have a screenshot in your expert report

21   that shows these tools.

22             Do you recall that?

23   A.    Yes.

24   Q.    Let's take a look at Paragraph 10, this screenshot in

25   Paragraph 10, of your report, and we'll put it on the screen.

1    You can look in your --

2              MR. SCHERKENBACH:  Can we blow up just the

3    screenshot, Mr. Sayres, as big as you can.

4    Q.   So on the left-hand side here, the left-hand side of the

5    screen, you can see the various tools in Vanishing Point,

6    right?

7              I can sort of circle them there.

8    A.   Yes.

9    Q.   That's the toolbox for Vanishing Point, right?

10   A.   Yes.

11   Q.   And the first one at the top there, it actually doesn't

12   have the box around it, is the "edit plane" tool.  There's an

13   edit plane tool, right?

14   A.   There is an "edit plane" tool, yes, and a "create plane"

15   tool.

16   Q.   And a "create," and the next one below it is the "create

17   plane" tool.  That's the one that actually is highlighted in

18   this figure, right?  It has a little box around it, that second

19   one.

20   A.   I believe so, yes.

21   Q.   And then the next one down with that sort of box with the

22   dotted line that's the "marquee" tool, right?

23   A.   Correct.

24   Q.   And then the one below that looks like a stamp, that's

25   actually the "clone stamp" tool, correct?

1    A.    Yes, it is.

2    Q.    And below there's a "paintbrush" tool, right?

3    A.    Yes.

4    Q.    And then we have the "transform" tool below the

5    paintbrush.

6          Do you see that?

7    A.    Yes.

8    Q.    Below that there's an "eyedropper" tool, right?

9    A.    Correct.

10   Q.    And below that there is a little sort of yardstick. That's

11   the "measurement" tool, right?

12   A.    Yes.

13   Q.    Then we have the "hand" tool?

14   A.    Correct.

15   Q.    And the "zoom" tool, right?

16   A.    Yes.

17   Q.    Okay.

18         Now, you showed the jury on Friday a number of

19   documents, Photoshop documents, third-party documents,

20   basically saying good things about Vanishing Point, right?

21   A.    Yes.

22   Q.    Touting it as, you know, groundbreaking, and that sort of

23   thing?

24   A.    "Magic, wow."

25   Q.    You will agree that none of those statements was specific

1    to the clone stamp tool alone, fair?

2    A.    Well, I would have to go back and look at those because

3    they did describe some of the details of Vanishing Point. And,

4    at lease in my opinion, what was embodied in these documents is

5    -- relies upon the technology of the clone stamp tool as

6    incorporated in Vanishing Point.  So it's the heart of

7    Vanishing Point, in my opinion.

8    Q.    Well, that's your opinion, and you understand at the end

9    of the day the jury is going to decide whether there's value in

10   Vanishing Point separate and apart from the clone stamp tool,

11   right?

12   A.    Well, correct.

13         I would just say that I think the technology that's

14   patented and found to infringe is really the heart of the tool

15   that was used to market Photoshop.

16   Q.    That's your opinion, right?

17   A.    Yes.

18   Q.    But let's look at some of the documents you actually

19   showed the jury.

20         MR. SCHERKENBACH:  Can I have exhibit DI, please,

21   first.

22   Q.    This is the transcript of the conference call of

23   Mr. Narayen.  You remember you referred to that on your direct?

24   Adobe's CEO in 2012 participated in this conference call with

25   investors, right?

1  A.   Yes, of course.

2  Q.   And one of the things he referred to was Vanishing Point,

3  right?

4  A.   Right.

5       Is that in this book as well?

6  Q.   It is in the book, but it might be easier to put it on the

7  screen.  It's probably way towards the back of your book, DI.

8  A.   Okay.

9  Q.   But it's also on the screen.

10  A.   All right.

11  Q.   And this is the actual transcript of the conference call.

12       MR. SCHERKENBACH:  Bear with me a moment.

13       (Pause in proceedings.)

14       MR. SCHERKENBACH:  It's on page 9.

15  I'm sorry for the delay here, I should have brought my

16  reading glasses.

17       So towards the bottom of page 9 of the exhibit, the

18  bottom third or so, Mr. Sayres.  It's the last paragraph.  It's

19  over here.  The last paragraph where Mr. Narayen is -- can you

20  blow that up?

21  Q.   Do you see the reference here, and I believe this is what

22  you highlighted for the jury in response to one of the

23  questions.  Mr. Narayen says, "So think about it as a really

24  cool new feature of Photoshop, something like Vanishing Point

25  that people can consider magic or Content Aware fill that

1   people consider magic," and so forth, right?

2   A.   Correct.

3   Q.   He's referring to Vanishing Point there as a whole, right?

4   A.   Yes.

5   Q.   There is no specific mention of the clone stamp tool for

6   Vanishing Point, right?

7   A.   No.

8           MR. SCHERKENBACH:   Your Honor, I probably should for

9   the record move in DI as the exhibit next in order.

10          MR. AIRAN:   No objection.

11          THE COURT:   472.

12          (Defendant's Exhibit No. 472 received in evidence.)

13          MR. SCHERKENBACH:   Thank you.

14      And let's have Exhibit 442.

15   Q.   You recall you showed some marketing collateral that

16   related to Photoshop CS2 on your direct?

17   A.   Yes.

18   Q.   And this one, too, refers to Vanishing Point.  You see the

19   bullet there on the first page, "Vanishing Point, Nothing less

20   than revolutionary.  Vanishing Point let's you effortly clone,

21   paint, and transform with tools that automatically adjust to

22   the visual perspective of your images."

23          Do you see that?

24   A.   Yes.

25   Q.   So the clone stamp tool is mentioned, fair, right?

1    A.    It is.

2    Q.    Along with a couple of other tools of Vanishing Point,

3    right?

4    A.    Correct.

5    Q.    So it's not singled out as the only tool that's referred

6    to here, fair?

7    A.    No, it's not.

8          But, as I said, I believe the other tools rely upon

9    some of the same code that's used in the infringing tool.

10   Q.    Okay.

11         And that's based on your discussion with

12   Dr. Bystrom, right?

13   A.    Correct.

14   Q.    So we'll talk with her about that.

15         Let me look at Exhibit 460, and this is the last one

16   of the marketing collateral we'll look at.

17         You recall referring to this on your direct exam. It's

18   a third-party publication called "Event DV," right?

19   A.    Yes.

20   Q.    And it's for -- apparently it's targeted to videographers,

21   right?

22   A.    Correct.

23   Q.    And if we look at page 38091 and highlight the first

24   paragraph under "Vanishing Point."

25         It's certainly called a "cool new filter," right?

1   A.   (No response.)

2   Q.   Just the title, "Vanishing Point, and other cool new

3   filters."

4   A.   Yes, it is.

5   Q.   And if you actually look at the discussion here as it

6   begins, "This is one you really have to see to fully

7   appreciate, but I'll attempt to describe what it can do..."

8        Do you see where I am?

9   A.   Yes.

10  Q.   Then he continues -- the document continues, "Vanishing

11  Point allows you to draw multiple 3D grids on to your

12  photograph.  Each grid can be pulled far off into the distance.

13  With a simple control/command click, you can create other

14  90-degree angle grids."

15       Do you see that?

16  A.   Yes.

17  Q.   That's not the clone stamp tool, right?

18  A.   Well, again, I think it incorporates code from the clone

19  stamp tool.

20  Q.   That's your opinion based on what you're reading here?

21  A.   No, no.

22  Q.   Okay.

23       So this actually, Mr. Yurkerwich, this is referring to

24  the plane-tearing technology that Mr. Troppoli and

25  Mr. Berger got a patent on, isn't it?

1  A.   Which is incorporated in the patent and -- yes, which is

2  in the patent.   Their patents rely upon the patents that have

3  been found to infringe.   They reference them.

4  Q.   They reference them.

5       Okay.   I'm actually going to come back to that.

6       So you understand that when Adobe got its patents on

7  Vanishing Point it told the Patent Office about the EveryScape

8  patent, right?

9  A.   Yes.

10 Q.   And still got it's patents notwithstanding citing the

11 EveryScape work?

12 A.   That's not unusual.   They incorporate the technology. They

13 rely upon it.   They can't be practiced without it.

14 Q.   You're not giving a technical opinion on that, are you,

15 sir?

16 A.   No.

17 Q.   Thank you.

18      All right, now, let's go from there to how you

19 actually arrived at your numbers, all right.

20      Now, in your analysis you started with what you say is

21 Adobe Photoshop profit, and you apportioned that down to what

22 you believed to be the apportioned profit associated with

23 Vanishing Point, right?

24 A.   I did that for purposes of setting the stage for the

25 negotiation, yes.

1    Q.    All right.

2          And you showed the jury nine steps for doing that

3    apportionment to Vanishing Point on a couple of slides, and I

4    think they got marked as Exhibits 469 and 470; is that right?

5    A.    Yes.

6    Q.    We're going to take a look at 469.  It's up here on the

7    screen.

8          And on this slide you showed the percentages that, in

9    your view, result from apportioning Photoshop value to

10   Vanishing Point using two different approaches, right?

11   A.    Correct.

12   Q.    One is what you called the "Product Comparison Approach"

13   and the other is what you called the "New Feature Comparison

14   Approach," correct?

15   A.    Yes.

16   Q.    And the first one, Product Comparisons, yield this

17   1.56 percent number, and the New Feature Approach yielded this

18   5.36 percent number?

19   A.    Correct.

20   Q.    And, as you testified on direct, that's the percentage of

21   the value of Photoshop attributable to Vanishing Point in your

22   opinion, right?

23   A.    Well, these particular percentages are, as I said, feature

24   counts, which I'm using to apportion the value of Photoshop to

25   Vanishing Point for purposes of this negotiation.

1   Q.   And "VP" on your slide, it's in two spots there, obviously

2   that refers to "Vanishing Point," right?

3   A.   Yes.

4   Q.   And then now let's go to 470, Trial Exhibit 470.  That was

5   your next slide, right?

6   A.   Yes.

7   Q.   And you start with the 1.56 percent and the 5.36 percent

8   at the top, right?

9   A.   Correct.

10   Q.   And then you apply Adobe's profit margin, and you take a

11   weighted average to get down to this number of 1.42 percent on

12   the right side.

13         Do you see that?

14   A.   Yes.

15   Q.   And you testified that's the percentage of Photoshop

16   profit that you believe is attributable to Vanishing Point,

17   fair?

18   A.   Again, that I believe would be used in the negotiation.

19   Q.   "Used in the negotiation," but please answer my question.

20         When it says 1.42 percent, that's the percent of the

21   profit of Photoshop that, in your view, is attributable to

22   Vanishing Point, right?

23   A.   In my view would be used as an input for the negotiation

24   for the profit related to Vanishing Point.

25   Q.   Fair enough, okay.

1          And, finally, we get to roughly this $2 number at the

2    bottom when you take 1.42 percent and you multiply it by the

3    Photoshop ASP, average selling price, of $141, right?

4    A.    Yes.

5    Q.    And that's, as you testified on Friday, this label here,

6    "Base apportionment price."  You testified that's the

7    apportioned profit associated with Vanishing Point as included

8    in Photoshop, fair?

9    A.    Yes.

10   Q.    All right.

11          Now, just before we get to the -- you did a

12   dilution then, what you called a "dilution adjustment" after

13   this calculation on Slide 470, right?

14   A.    Yes.

15   Q.    Just before we get there, these two approaches, the

16   Product Comparison Approach and the New Feature Comparison

17   Approach, and I think you said this, they're both feature

18   counting approaches; is that fair?

19   A.    At least part of it is.  Part of it is feature counting.

20   Q.    So, as you said on Friday, the product comparison

21   approach, to do that you simply added up the check marks, as

22   you put it, right?

23   A.    Correct.

24   Q.    And in the upgrade approach, or what's call the "New

25   Feature Comparison Approach" on your slide, you also

1   apportioned the revenue of Photoshop to Vanishing Point based

2   on the number of times a feature is mentioned in certain

3   documents, right?

4   A.   Correct.

5   Q.   All right.

6        So that also involves feature counting, right?

7   A.   Right.  As I said, it's an input to this analysis, yes.

8   Q.   Now, you've obviously testified as a damages expert in

9   many cases, right?

10  A.   About 20 trials and a few more depositions.

11  Q.   Twenty trials.  Maybe you've been deposed in 50 patent

12  cases, something like that?

13  A.   Probably at least, yes.

14  Q.   At least.

15       But you've never done an analysis in a patent case

16  before that involved this sort of feature counting, right?

17  A.   Not feature counting, per se.  Certainly features and the

18  importance of features have been present in other matters.

19            MR. SCHERKENBACH:  Let's go on to dilution

20  adjustment now, and for that I would like to have Exhibit 471.

21  Q.   This is in another slide you showed on Friday, correct?

22  A.   Yes.

23  Q.   All right.

24       And we have here in Column 10 a dilution adjustment

25  factor, correct?

1    A.    Correct.

2    Q.    And just looking at the percentages for now, you applied a

3    straight-line dilution of 5 percent per year beginning in 2005

4    and ending in 2024, correct?

5    A.    Yes.

6    Q.    And I gather you chose 2024 because that's the date the

7    last of the patents expires, right?

8    A.    Correct.

9    Q.    And so if we look at 2005, there is no dilution.  It's 100

10   percent, right?

11   A.    First year.

12   Q.    For the first year, and then by the time we get to 2024,

13   there's only 5 percent left, right?

14   A.    That's right.

15   Q.    And you applied this dilution because you recognized that

16   the apportionment percentage would be diluted over time as new

17   few features are added and as time progresses beyond the

18   initial launch of Vanishing Point, true?

19   A.    That is at least part of why I did apply the percentage

20   because that could happen.

21          I'm not -- I guess I would just say I also

22   discussed that the parties would negotiate whether that was a

23   fair dilution factor from each of their perspectives.  It

24   provides a baseline.

25          MR. SCHERKENBACH:  Let me have Paragraph 73 of the

1    expert report, just so we can get on the same page here.

2    And, again, we'll put it on the screen, or you can look in your

3    book.

4    Q.   Regarding dilution you say in the second sentence here

5    beginning with "given," 'Given Adobe's practice of adding

6    features at each upgrade cycle, I recognize that the

7    apportionment percentage would be diluted over time as new

8    features are added and as the time progresses beyond the

9    initial launch of the accused functionality," correct?

10   A.   Yes.

11   Q.   And your point I think you just made is you chose

12   5 percent, but the parties may have negotiated what the

13   percentage would actually be, right?

14   A.   Well, or they might say, I think it's a much lower

15   percentage because in 2012 the CEO is still touting Vanishing

16   Point, for example.

17   Q.   Fair enough.

18         So I just want -- there are two reasons you give here.

19   One is new features get added and the other is the passage of

20   time, right?  Those are both potential reasons why the value of

21   Vanishing Point would be diluted?

22   A.   They are potential reasons, yes.

23   Q.   And if I can try to explain this a bit more colloquially,

24   it's sort the "new toy phenomenon," right?  If the child has a

25   couple of toys, any given toy is more valuable than the child

1  who has lots of toys, right?

2  A.   Well, I mean here we're dealing with adults.  So I am not

3  sure if the child analogy is necessarily -- we're dealing with

4  mature users.

5  Q.   Well, you've got a pool of features.  If the pool is

6  smaller, any given feature is going to be more valuable than if

7  there's a big pooling of features, right?

8  A.   That's part of why I did the feature analysis.

9  Q.   That's my point.  Fair enough.  We agree on that.

10        And the other aspect of this is just over time, as a

11  feature no longer is a new feature and other new features get

12  added, that initial feature we're talking about becomes less

13  valuable as a consequence of that, right?

14  A.   I think it depends on the features.  There's some things

15  you just can't live without, or you would rather not live

16  without.

17        MR. SCHERKENBACH:  Let's go back to Exhibit 471.

18  Q.   In your analysis, you did assume that the value of

19  Vanishing Point over time would decline, right?

20  A.   Again, for purposes of negotiating this royalty, I thought

21  that that's at least what, you know, Adobe might contend.

22  Q.   Right.  And let me take a concrete example, okay.

23        So in 2005 we already mentioned that there was no

24  dilution, so a hundred percent of the value you counted for

25  that year, right, or you reflected it here anyway.

1    A.    Except I just should point out that that did not translate

2    into part of the negotiation because the patent hadn't issued.

3    Q.    "Hadn't" issued?

4    A.    Had not issued yet.  That's why there are zeros on the

5    other side.

6    Q.    But by 2008 you have -- that dilution has gone from

7    100 percent to 85 percent, correct?

8    A.    Correct.

9    Q.    And so your $2 per unit royalty has gone from $2, call it,

10   to a $1.71, right?

11   A.    That's correct.

12   Q.    All right.

13   A.    I should say the dilution factor -- you called it a

14   "royalty."  It's the dilution factor went to 1.71.

15   Q.    Well, that is your per-unit royalty.  $2 goes to a $1.71

16   royalty per unit, right?

17   A.    It's an input into a calculation of a lump-sum royalty.

18   Q.    Okay.

19          And in this particular -- just sticking with this

20   period of time between 2005 and 2008, one of the reason

21   dilution makes sense is, we already talked about this,

22   Photoshop CS3 came out in 2007 and added a whole slew of new

23   features to Photoshop, right?

24   A.    Well, I was not specifically attempting to account for

25   that in this factor.  This was more of a generalized factor to

1    allow the parties to negotiate a price.

2    Q.   Well, I believe we already agreed earlier this morning

3    that one of the reasons you applied dilution was because new

4    features got added over time, fair?

5    A.   It's a consideration that would be discussed in the

6    negotiation, yes.

7            MR. SCHERKENBACH:  Can I have Exhibit 60, please.

8    Q.   Just on this issue of CS3 adding features over CS2.

9            MR. SCHERKENBACH:  Maybe we can go to page 20 of the

10   exhibit, Mr. Sayres.

11   Q.   You know the way these guides work, Mr. Yurkerwich, having

12   reviewed them.  There's a "What's new" section in every user

13   guide for sort of the next generation of Photoshop.

14           You're familiar with that?

15   A.   Yeah, I considered it in my analysis.

16   Q.   Okay.

17           So if we go to the "What's new" feature in

18   Photoshop CS3, there's a couple of pages of new features

19   listed.  The first set is "productivity enhancements," right?

20   A.   Yes.

21   Q.   And if we go to the next page, there's another series of

22   new features called "Image editing improvements," true?

23   A.   Yes.

24   Q.   And if we keep going, there's another set of features that

25   were added relating to "Compositing enhancements," right?

```
1    A.    Correct.
2          MR. SCHERKENBACH:  Scroll down, Mr. Sayres, or go to,
3    actually, the next page.
4    Q.    We've got at the top "3D and motion advances."  There's a
5    number of features that were added pertaining to that, true?
6    A.    Yes.
7    Q.    And then "Comprehensive image analysis."  There's a number
8    of features added pertaining to that, right?
9    A.    Including the measurement tool, which is in Vanishing
10   Point.
11   Q.    Yes.  There you go.
12         So, again, that's really the point, isn't it, that one
13   of the features that was enhanced was Vanishing Point, among
14   many other features in Photoshop, right?
15   A.    Well, the way new software releases are sold is with new
16   features.
17   Q.    All right.
18         And, as you put it in deposition, "This dilution
19   adjustment is intended to reflect a potential decline in the
20   relative importance of the invention out into the future,"
21   right?
22   A.    Correct.
23   Q.    All right.
24         Now, let's look at how the dilution factor is applied
25   in a particular year on your chart to actually get to a
```

1    royalty, okay.

2         MR. SCHERKENBACH:   And for that I want to go back to

3    Exhibit 471.

4    Q.   So let's take, to make the math easy here and because it's

5    2015, let's look at the year 2015, okay.   And you see roughly

6    what Mr. Sayres has highlighted, the entry for the year 2015?

7    A.   Correct.

8    Q.   And the dilution factor in that year is 50 percent, right?

9    A.   Right.

10   Q.   So you apply -- you multiply, essentially, the starting

11   value attributable to Vanishing Point of $2 by 50 percent and

12   you get a dollar, right?

13   A.   Yes.   There's some decimal points hidden here, by the way.

14   Q.   And I don't want -- there's some rounding issues.   We

15   don't have to get into that, but let's call it a buck, all

16   right?

17   A.   That's fine.

18   Q.   Fair enough.

19        And then actually I think unfortunately these column

20   are slightly misaligned?

21   A.   Yes, they're not lined up.

22   Q.   But you take your $1 diluted.

23   A.   I think it would be to the box up --

24   Q.   It goes to the box on top?

25   A.   I think so, yeah.

1    Q.   You take your $1 diluted value of Vanishing Point times

2    2,212,875 units, and -- again, there's rounding issues, but

3    essentially that's how you get to your $2,220,718 royalty for

4    that year, correct?

5    A.   Correct.  That's the math, and there's some hidden decimal

6    points in the --

7    Q.   Right.

8         And I don't mean to suggest there's any issue with the

9    way you did the math in this example.  It's just the way, you

10   know, the rounding works.  Fair enough.

11        And then, finally, to get to an amount that you say

12   would actually be paid -- or should be paid by Adobe to

13   EveryScape, you take the present value of that for this year of

14   2015, $2,220,718, and the present value of that is $1,029,236,

15   right?

16   A.   Well, you have the math correct, but the problem that I

17   have with your statement is that I wasn't making a calculation

18   as a royalty for a particular year.  This was for a model that

19   the parties would use to negotiate a paid-up license, and

20   that's one of the inputs into the model.

21        So there are other factors surrounding the model, and

22   the model is driven towards getting to this lump-sum payment

23   for an exclusive license.

24   Q.   I'm coming to that --

25   A.   Okay.

1   Q.   But just so the jury can understand your math, did I

2   correctly describe the math for 2015?

3   A.   Yes.

4        I would just add that the present value factor was

5   Adobe's cost of capital, which is 11 percent, which is why it's

6   a pretty dramatic reduction.  It goes from estimated, I guess,

7   royalty of 2.2 down to 1 million.  Less than half.

8   Q.   And the reason -- and I'm not sure you explained that, but

9   the reason you discount that to present value is that $2.2

10  million, call it, in 2015 is worth less in 2008, if I can put

11  it that way, right?

12  A.   That's almost okay.

13       But in Adobe's world they would be paying this money

14  up front.  So they're taking capital out of their business and

15  paying it out.  So they would be asking, essentially, Well, we

16  want to get our normal return, and what's a normal return?  The

17  average person can't get

18  11 percent, but in their business, they're a very successful

19  business, their -- they get an 11 percent return.

20       So this gives them an 11 percent return on their

21  money.

22  Q.   Okay.

23       Maybe to put this in a little more -- in even more

24  accessible terms, this present value calculation, it really

25  pertains to sort of the time value of money; is that fair?

1  A.   Yes, it is related to that, but it's a little bit more

2  than that when you're using an 11 percent number.  It -- well,

3  it favors Adobe.

4  Q.   To get to the bottom line, $14.-roughly-6 million number

5  that you presented on Friday, you add up these calculations

6  that we just went through for 2015, you add them up or for each

7  year from 2008 through patent expiration, fair?

8  A.   Yes.

9  Q.   Now, you said that that was an input into the negotiation;

10  is that right?

11  A.   Yes.

12  Q.   But in your opinion the input equals the output, right?

13  A.   It does turn out to be the answer, yes.

14  Q.   Yes.

15       So you went through the -- you showed the jury the

16  Georgia Pacific factors and grouped them and talked about them

17  a little bit, but, at the end of the day, this 14.6 million

18  input is what you say would be the output of the Georgia

19  Pacific analysis, right?

20  A.   I said 14.5.  It rounds down.

21  Q.   Let's call it 14.5.

22       All right.  Now, back to features for a minute.  So

23  you acknowledged, and you've been here throughout the trial,

24  that Adobe has four patents on aspects of Vanishing Point,

25  right?

1   A.   Yes.

2   Q.   And in forming your opinions in the case, so prior to the

3   trial, you didn't consider the fact that Adobe received its own

4   patents on Vanishing Point, right?

5   A.   I'm not sure exactly when I became aware of that.

6   Q.   Let's look at Exhibit 2 to your expert report.

7          So in your report you have an exhibit that list the

8   things you considered in forming your opinions, right?

9   A.   Yes.

10   Q.   And it's called "Documents Considered."  You see it there?

11   A.   Yes.

12   Q.   And there's a little section on patents.

13          MR. SCHERKENBACH:  Let's go to the next page.

14   Q.   And you see "Patents Considered," and you list the two

15   EveryScape patents, right?

16   A.   Correct.

17   Q.   You don't list any Adobe Vanishing Point patents, right?

18   A.   That's correct.

19   Q.   And if we were to look through the body of your report,

20   we're not going to see any discussion of the Adobe Vanishing

21   Point patents, right?

22   A.   That's correct.  They may have been an exhibit to one f

23   the depositions that is listed in my report.

24   Q.   Do you recall, as you sit here today?

25   A.   Not as I sit here.  I am just pointing that out.

1   Q.   And you didn't mention the Adobe patents in your testimony

2   on Friday, either, did you?

3   A.   I don't believe so, no.

4   Q.   Now, if you assume -- and your bottom line is obviously

5   the $14.6 million.

6   A.   14.5.

7   Q.   Say again?

8   A.   14.5.

9   Q.   I'm sorry.

10          $14.5 million.

11          So if you were to assume each of the ten Vanishing

12  Point tools were equally important, that number gets divided by

13  ten, roughly?

14  A.   No, because it's not calculated based on a per-tool basis.

15  Q.   Well, let me put it this way.  You haven't done the

16  analysis as to what the number would be if the jury values each

17  of the ten tools in Vanishing Point equally, right?

18  A.   Correct.

19          I don't think that would be appropriate.

20  Q.   But you understand the jury could see that otherwise,

21  right?

22  A.   Absolutely, absolutely.

23  Q.   And if they see it otherwise, they've got to do their own

24  analysis to get to a number because that's not an analysis you

25  did, right?

```
 1   A.    Correct.

 2         I believe I've given them a lot of data, but, again, I

 3   don't think it would be appropriate because the patented

 4   technology is the heart of Vanishing Point.

 5   Q.    In your opinion.

 6   A.    In my opinion.

 7   Q.    And if they were to say, Yeah, you know what, maybe we

 8   don't divide by ten, maybe we divide by some other number,

 9   four, considering the clone stamp one of the four primary

10   image-editing tools in Vanishing Point, you haven't done an

11   analysis to analyze what number that would yield using your

12   framework, right?

13   A.    Correct.

14   Q.    One last topic, non-infringing alternatives.

15         As I understand it, in your analysis you assumed there

16   were no acceptable non-infringing alternatives to the

17   perspective correcting clone brush that's claimed in the

18   EveryScape patents, fair?

19   A.    Yes.

20   Q.    As you said in your report, you were unaware of any

21   available non-infringing alternatives, right?

22   A.    Correct.

23   Q.    And you also said in your report that you discussed this

24   issue with Dr. Bystrom, and she told you there were no

25   alternatives, right?
```

1    A.    Acceptable alternatives.

2    Q.    Acceptable alternatives, right?

3    A.    Yes.

4    Q.    So, for example, you have not taken into account whether

5    Painter 7 -- withdrawn.

6          You have not taken into account Painter 7 as an

7    available non-infringing alternative, right?

8    A.    I don't believe it's acceptable.

9    Q.    Again, that's a calling for the jury to make, right --

10   A.    Yes.

11   Q.    -- whether it's acceptable or not?

12   A.    Absolutely.   Absolutely.

13   Q.    So you never mentioned Painter 7 in your report at all,

14   right?

15   A.    I don't think so, no.

16   Q.    And you heard Dr. Oh testify in this trial, right?

17   A.    Yes.

18         MR. SCHERKENBACH:   Can I see the trial transcript at

19   page 63, lines 9 through 12.

20   Q.    Do you recall Dr. Oh actually talked a little bit about

21   Painter 7 and what a user could accomplish with Painter 7?

22         And he testified in response to the question: "Now,

23   Dr. Oh, from your understanding of Painter, could you have done

24   these same operations with respect to the image that you've

25   been editing?

1          "ANSWER:  I can certainly reach a similar result at

2     the end."

3          Right?  That was his trial testimony, right?

4     A.   Right.  I don't think that that indicates that he believes

5     it would be acceptable in terms of --

6     Q.   He at least acknowledged that you can reach a similar

7     result with Painter as you can with the Mok3 tool, right?

8     A.   But not in the same efficient, time-saving manner.  I

9     think that's part of this acceptability issue.

10    Q.   Now, you understand Corel was selling a version of Painter

11    at the time of the hypothetical negotiation in 2008?

12    A.   Yes.

13    Q.   And that happened to be Painter X at that point in time.

14    Are you aware of that?

15    A.   It could be.

16    Q.   So in this case we've heard about so far at least Painter

17    7, right, the jury has?

18    A.   I remember Painter 7, yes.

19    Q.   But Corel has continued to come out with versions of

20    Painter since Painter 7, right.

21    A.   Correct.

22    Q.   So at the time of the hypothetical there was a version of

23    Painter, correct?

24    A.   Yes.

25    Q.   And that version of Corel Painter also had the same

1   perspective clone brush tool, right?

2   A.    I don't know.

3         Certainly not the same as the patented invention, if

4   that's what you're saying.

5   Q.    The same as the one in Painter 7.  It just carried the

6   feature throughout?

7   A.    It could be.  I --

8   Q.    You don't know?

9   A.    I have not studied the Painter 7 tools from a technical

10  point of view.

11        MR. SCHERKENBACH:  Let's look at the user manual for

12  Painter X.

13        First of all, let's get the dates straight.

14        We're looking here at Painter X User Guide, and can we

15  look at the copyright date on that.

16  Q.    "Copyright 2006," you see that, the lower left?

17  A.    Yes.

18  Q.    And if we go to page 201, there's a Section 201 -- cloning

19  discussion starts on 195, and then on 201 there's this

20  reference to "multipoint cloning," and this same butterfly

21  example of cloning in perspective.

22        Do you see that?

23  A.    What am I looking at?

24  Q.    Well, that there's perspective here, the last paragraph,

25  "Perspective Cloning, applies perspective to the source

1  image... the relative position."

2         Do you see that?

3  A.   Yes.

4  Q.   So you don't have any reason to doubt that this version of

5  Painter that was available at the time of the hypothetical had

6  the same perspective cloning tool that was in Painter 7, right?

7  A.   I would not want to comment on that from a technical point

8  of view.

9  Q.   So you don't know?

10  A.   I'm not a technical person.

11  Q.   Do you know whether Painter is sold today, a version of

12  Painter?

13  A.   I believe it is, yes.

14  Q.   In fact, you can go to Amazon and buy Painter 15 today,

15  can't you?

16  A.   It wouldn't surprise me.

17         MR. SCHERKENBACH:   Let's try it, if the Internet is

18  willing.

19  Q.   So this is a page we captured just a day or so ago.

20         You go to Amazon, search for "Corel Painter," you get

21  Corel Painter 2015 in stock for 398.99, right?

22  A.   That's what it says.

23  Q.   And if we were to look at the user manual for this, we're

24  going to see the same perspective cloning feature that's been

25  there since at least Painter 7, aren't we?

1   A.   I guess.  I don't know.

2          MR. SCHERKENBACH:  Well, let's look at the user guide,

3   page 185, the user guide for Painter 2015.

4   Q.   We have the same -- actually, now they have the butterfly

5   at the bottom of the page, and now we've got a guitar example

6   for the perspective 4P clone brush; is that right?

7   A.   That's what the screen shows.

8   Q.   Okay.

9          Now, you understand that EveryScape affirmatively

10  contends that Painter is not the clone brush -- the perspective

11  clone brush in Painter is not covered by the claims of its

12  patents, right?

13  A.   I believe that it has -- it is establishing that their

14  patent is different.

15  Q.   So EveryScape says, Painter 7, that's different than the

16  patent, right?

17  A.   Correct.

18  Q.   So that's clearly a non-infringing alternative to the

19  patent in EveryScape's view, right?

20  A.   No.  It -- you have to remember it's not acceptable,

21  apparently, to Adobe because they're not using it.

22  Q.   I want to treat the two separately.  Acceptability on the

23  one hand from whether it's non-infringing on the other.

24          We can agree that EveryScape itself contends that the

25  Painter perspective clone brush is not an infringement of its

1   patent, right?

2   A.   I don't know that.

3   Q.   You don't know that?

4   A.   No.

5   Q.   All right.

6        But, in any event, your analysis assumed there would

7   have been no acceptable alternative at all to the EveryScape

8   Perspective Clone Brush, right?

9   A.   As -- particularly as used by Adobe in Vanishing Point,

10  yes.

11       MR. SCHERKENBACH:  No further questions, your Honor.

12       THE COURT:  Mr. Airan.

13                      REDIRECT EXAMINATION

14  BY MR. AIRAN

15       MR. AIRAN:  Can we switch over to the slide deck,

16  please.

17       Slide 15, please.

18  Q.   And Mr. Yurkerwich, Mr. Scherkenbach asked you a number of

19  questions about this slide.

20       Can you tell us, did you ever calculate, using your

21  dilution factor and the per-unit costs by year, did you ever do

22  like a calculation of the net of all of those per-unit figures

23  that are shown in that chart?

24  A.   I did, and as I told Mr. Katz in my deposition, if you

25  divide the 14, if you divide -- if you divide the 14-and-a-half

1  million by the 32 million units, it's approximately 45 cents

2  per unit.

3         So that would be the effective rate per unit, 45

4  cents.

5         MR. AIRAN:  If we can switch over, and if I can have

6  up Exhibit 460, please.

7      And if we can go to the same section.  It's on page 3 of

8  that exhibit, I believe, and if you can highlight "Vanishing

9  Point and other cool new filters," call that out, please.

10  Q.   Mr. Scherkenbach asked you a number of questions about

11  this section.  Do you recall that?

12  A.   Yes.

13         MR. AIRAN:  And Mr. Corrillo, actually if you can go

14  to the next paragraph down, please.

15  Q.   Now, Mr. Scherkenbach didn't ask you any questions about

16  the next paragraph, which says, "Once your grid is created by

17  plotting four corner points, you have a grid that allows you to

18  clone, paint, and paste elements along that grid."

19         Do you see that?

20  A.   Yes.

21  Q.   So this is saying you use the "grid" tool to use the

22  "clone" tool?

23  A.   Correct.

24         MR. AIRAN:  Now, if we can have up Exhibit 60, please,

25  and if we can go to page 19 of that exhibit, and if you can

1   maybe enlarge the whole screen, the whole page.

2   Q.   Mr. Scherkenbach asked you a number of questions about

3   this page as well.  Do you remember that?

4   A.   He did.

5   Q.   And a number of features that he pointed out that were in

6   CS3, he asked you a series of questions about those new

7   features; do you remember that?

8   A.   Yes.

9   Q.   Did Mr. Narayen call out any one of those features from

10  CS3 in his report to the investors?

11  A.   No.  He only -- he referenced two features, one of them

12  being Vanishing Point.

13  Q.   Mr. Yurkerwich, you did an apportionment analysis of the

14  profit.  Is that what some of your testimony was?

15  A.   Yes, to help with the negotiation of the paid-up royalty,

16  yes.

17  Q.   And does Adobe do that, do you know?  Do they do that

18  themselves?

19  A.   Well, they do a lot of market research where they attempt

20  to learn why people buy products, and they actually rank the

21  products on a percentage basis based on features.

22  Q.   And you were here when Ms. Morgan testified by deposition.

23  There was a video deposition.  Do you recall that?

24  A.   Yes.

25  Q.   She was one of Adobe's, what we call, the corporate

1    spokespeople in this trial?

2    A.    Yes.

3    Q.    And she gave some testimony about profitability.  Do you

4    remember that?

5          MR. SCHERKENBACH:  Objection, your Honor.  This is

6    beyond the scope of my cross.

7          THE COURT:  Sustained.

8    Q.    To your knowledge does Adobe do any type of apportionment?

9    A.    No, not -- well, Ms. Morgan said they didn't.

10   Q.    Do you know why, or do you have any understanding as to

11   why?

12         MR. SCHERKENBACH:  Same objection, your Honor.

13         THE COURT:  Sustained.

14   Q.    Just a couple of more questions.

15         Mr. Scherkenbach asked you --

16         MR. AIRAN:  If we can have Slide 13 back up, please.

17   Q.    You mentioned on your cross-examination by

18   Mr. Scherkenbach the years 2005, 2006 and 2007 had zero units,

19   royalty units?

20   A.    I did, but there are actually units sold during that time

21   period.

22   Q.    Do you know how many units were sold after Vanishing Point

23   was introduced to the market to the time the patent issued?

24   A.    Well, there were approximately in the United States I

25   estimated about 2.7 million.

1   Q.   2.7 million units were sold in the United States after

2   Vanishing Point was introduced and up until the time the patent

3   issued?

4   A.   Correct.

5   Q.   And your understanding of the hypothetical negotiation is

6   that there would be a total of 32 million units sold?

7   A.   Correct.

8        MR. AIRAN:  I will pass the witness, your Honor.

9        THE COURT:  Mr. Scherkenbach?

10       MR. SCHERKENBACH:  Nothing further.

11       THE COURT:  Thank you very much, Mr. Yurkerwich.  That

12  concludes your testimony.

13       (Witness excused.)

14       MR.MUELLER:  Your Honor, at this point EveryScape

15  rests its affirmative case on inducement of infringement and

16  damages.

17       THE COURT:  All right, Jurors, we've reached a

18  significant point in the trial.  You've heard a substantial

19  part now of EveryScape's testimony.  This being a civil trial,

20  you've also heard, because we've taken some witnesses out of

21  order, some of what Adobe wanted to present as well.

22       Mr. Scherkenbach, are you going to go forward now?

23       MR. SCHERKENBACH:  We are prepared to proceed, your

24  Honor.

25       And, ladies and gentlemen, Adobe will start its case by

1   calling Mr. Tom Hogarty, Tom Hogarty.

2                THOMAS HOGARTY, previously sworn

3          THE CLERK:  You're still under oath.

4          MR. SCHERKENBACH:  May I approach to hand out some

5   binders?

6          THE COURT:  You may.

7      (Pause in proceedings.

8                       DIRECT EXAMINATION

9   BY MR. SCHERKENBACH

10  Q.   Good morning, Mr. Hogarty.

11  A.   Good morning.

12  Q.   Could you please introduce yourself to the jury.

13  A.   My name's Tom Hogarty.  I'm a product manager at Adobe.

14  Q.   Can you tell us what your role is in this case?

15  A.   I am Adobe's official representative in this trial.

16  Q.   And were you also a Photoshop product manager at times

17  relevant to this case?

18  A.   Yes, I was.

19  Q.   And have you sat through all the testimony so far in this

20  case?

21  A.   I have.

22  Q.   And what's your current title, again please, at Adobe?

23  A.   I am a director of product management.

24  Q.   Tell us a little bit about your education post high

25  school, please.

A.    Sure.

I received a Bachelor of Science Engineering Degree in Mechanical Engineering from Duke University in 1998.  And then I also returned for a graduate degree at Duke, a Master's in Business in 2005.

Q.    What did you do after graduating from Duke in 2005?

A.    I took a job at Adobe as a product manager on the Photoshop team.

Q.    Why did you join Adobe?

A.    One, I've always had a couple of aspects to my career, one involving technology based on my engineering degree, and one based on photography, which has always been a passion of mine. And when I found out there was a role working on the Photoshop team, it was the perfect combination of those two interests of mine.

Q.    And what was your title then when you first joined Adobe in 2005?

A.    Product manager.

Q.    For Photoshop?

A.    Yes.

Q.    And what were your responsibilities as a product manager on the Photoshop team in 2005?

A.    Product managers have a lot of different responsibilities. We have to wear a lot of different hats. Sometimes that means going to meet with customers and understanding kind of what's

1  working for them and what's not working for them, talking with

2  the press, trying to get the press excited about a new version

3  of Photoshop, going to trade shows and showing off new

4  features, working with our PR team, working with the finance

5  team to make sure we're meeting business goals.

6         So a lot of different roles and responsibilities as a

7  product manager.

8  Q.   So is it fair to say that you were a Photoshop product

9  manager around the time Vanishing Point was first introduced

10 into Photoshop?

11 A.   That's correct.  Vanishing Point was introduced with

12 Photoshop's use 2 in the spring of 2005, and I joined in July

13 of 2005.

14 Q.   And then roughly for how long were you a product manager

15 for Photoshop?

16 A.   I was a hundred percent committed to Photoshop until 2006,

17 at which point I assumed responsibility for another Photoshop

18 product called Photoshop Lightroom.

19 Q.   And are you responsible in any way for Photoshop today?

20 A.   Yes, I am.  Over the years I have built a team of product

21 managers who are responsible for a number of different

22 solutions, mostly photography related.

23         Bridge, which is a file browser, similar to Windows

24 Explorer or a Finder on the Mac; the DNG File Format, which is

25 a photographic file format; the Camera Raw Plug-in, which

1  actually is a feature within Photoshop, my team also manages

2  that as well.

3  Q.   Let me ask you a few questions about Adobe the company,

4  given you're the rep.

5       When was Adobe founded, to your understanding?

6  A.   Adobe was founded in 1982.

7  Q.   How would you describe Adobe's business overall?

8  A.   It's a pretty diverse business, but kind of at the core of

9  it we make tools and introduce technologies with a goal of kind

10 of redefining the way that people engage with information.

11 Q.   And can you give us just a high-level overview of the sort

12 of products Adobe makes?

13 A.   Sure.

14      Adobe was involved in the desktop publishing

15 revolution with PostScript and PDF as a file format for

16 printing.

17      We also were a part of the web kind of revolution with

18 Dreamweaver as a tool to build websites, or Flash as a way to

19 deliver content online.

20      Over the years we've also built a business around

21 Acrobat, which is a really diverse set of customers, big and

22 small, that need to basically create files that are readable

23 exactly as they were intended by anyone through the Acrobat

24 reader.  That's probably the most popular tool that people are

25 familiar with.  And then, of course, Photoshop.  Over the last,

1    you know, 20-plus years it's just grown across the industry as

2    kind of the tool for image editing.

3    Q.    So when was Photoshop first introduced?

4    A.    That was February of 1990.  We're actually coming up on

5    Photoshop's 25th anniversary.

6    Q.    How would you describe Photoshop overall as a product?

7    A.    It's difficult to describe.  It really is kind of a Swiss

8    Army knife of image editing.  It means a lot of different

9    things to a lot of different people.

10          Film makers and videographers can use it for special

11   effects.  Actually, that was the original project that the

12   founders were working on, was video effects for the movie "The

13   Abyss."

14          It's also used by graphic professionals to create

15   logos.

16          It's used by web professionals to design and lay out

17   websites.

18          Most people associate Photoshop with photography, and

19   certainly photographers use Photoshop on a regular basis.

20          But what we've learned over the past almost 25 years

21   is just the diversity of functionality has led to a really

22   diverse set of customers.

23   Q.    Does Adobe have patents relating to Photoshop?

24   A.    Yes.

25   Q.    How many, roughly?

1    A.    At least a hundred.

2    Q.    How were the versions of Photoshop named?  We should get

3    that established, I think.

4    A.    Yeah, we've changed the model a couple of times over the

5    years.

6          In the beginning, Photoshop 1, pretty straightforward,

7    and then it was 2, and then it was 3, and so on and so forth

8    until we got the seventh major version.

9    So that was Photoshop 7.

10         What was happening at Adobe at the time, though, was

11   we had a number of different tools.  We have Illustrator, we

12   have in InDesign, we have Dreamweaver, and they all ended up at

13   different version numbers.  So you had Photoshop 7, and

14   Illustrator 10, and InDesign 2.  And so we wanted to package

15   them all together in a kind of bundle or suite, and so we

16   needed to rationalize the numbering convention.

17         So Photoshop 8 became Photoshop CS.

18         And then InDesign CS was released at the same time as

19   Illustrator CS.

20         And then the next later version we just called it CS2,

21   CS3, CS4, until we got to CS6, and then we decided to change

22   again.

23         And we are now currently on what we're calling

24   Photoshop CC.  "CC" stands for "creative cloud," and

25   we've -- that's not the numbering system, though.  That's

1   actually just the description of which version, plus we add a

2   year.

3          So we're on Photoshop CC 2014.

4   Q.   How many features would you say are in Photoshop?

5   A.   You know, I don't think anyone ever counted.  I know just

6   that one plug-in that I mentioned that I manage there's over

7   100 features within that single plug-in.

8          So you've got to imagine there's thousands of features

9   throughout the application --

10  Q.   And how many new features or enhancements are generally

11  introduced with each release of Photoshop?  So say going from

12  CS2 to CS3 or CS4 to CS5?

13         MR. AIRAN:  Your Honor, I object to this testimony.

14  Mr. Hogarty doesn't have the foundation to testify to this. He

15  testified that he came in 2006 and that he's a product manager

16  for Lightroom.

17         THE COURT:  I think as a spokesperson for Adobe and as

18  someone who's managed Photoshop, I think he has sufficient

19  background to testify generally as he is.

20  Q.   Okay.

21  A.   So for those major version releases, you know, well over a

22  hundred features or enhancements in each update.

23  Q.   You mentioned you were a Photoshop product manager in

24  2005, right?

25  A.   That's correct.

1    Q.    And we know Vanishing Point was introduced in 2005, right?

2    A.    Yes.

3    Q.    Were other new features also introduced in Photoshop CS2

4    along with Vanishing Point?

5    A.    Oh, definitely.  We always release a slew of new features

6    with each major update.

7    Q.    Were you actually doing demonstrations of Photoshop CS2 in

8    the 2005 time frame?

9    A.    I was.

10   Q.    Have you prepared a demonstration of one of the new

11   features in Photoshop CS2 for us known as the "spot healing

12   tool"?

13   A.    I have.

14   Q.    Can you show us that, please?

15   A.    I can, if you give me a second to get the computer set up.

16         If you bear with me while I'm getting acclimated here.

17   Q.    There we go.

18   A.    Sorry about that.

19   Q.    That's all right.

20   A.    (Demonstrating.)

21         So spot healing was one of the tools that was

22   introduced in Photoshop CS2, and it's just like it sounds. The

23   goal was to heal little bits of an image without needing to set

24   a source or destination point.  You just tell the application

25   what you want healed, and it will go ahead and heal it.

 1          And it's best if I demonstrate it.

 2   Q.   Let me interrupt you for a second.

 3          So this is called the "spot healing" feature?

 4   A.   That's correct.

 5   Q.   Go ahead.

 6   A.   So you can imagine if you had an image of these three

 7   surfers about to hop in the Pacific Ocean, and you wanted to

 8   make it a bit more dramatic and not have the other surfers in

 9   the water.

10          (Demonstrating.)

11          What you could do is, I'm zooming in, and then I'll

12   just click, and it heels that spot.

13          So now we just have the ocean.

14          So click, click, and it's just a spot healing tool

15   that is slowly -- we'll see if we can extend it and actually go

16   for a bigger spot.

17          Just removing all the surfers.

18          Okay.

19   Q.   So you were able to remove the surfers in this photograph

20   using the spot healing tool?

21   A.   That's correct.

22   Q.   Is that feature connected to Vanishing Point in any way?

23   A.   No, it's not.

24   Q.   How often did you demonstrate this spot healing feature

25   back in the 2005 time frame.

1  A.   Very frequently.  It's a really neat enhancement.

2         Having done a lot of this work in Photoshop myself,

3  having to clip multiple source and destination points over and

4  over again can get very tedious.  So the ability to do just a

5  single click was a major enhancement.

6  Q.   Is there another feature that was also newly introduced in

7  Photoshop CS2 that you demonstrated frequently back in the day?

8  A.   Yes.

9  Q.   What was that?

10  A.   That was the Camera Raw plug-in that I mentioned earlier.

11  Q.   So it's called "Camera Raw" plug-in?

12  A.   Hm-hmm.

13  Q.   Maybe just pause for a minute and tell the jury at a high

14  level what is that.  What does that mean?

15  A.   So you have to remember this is back in 2005 when digital

16  photography was really exploding on the professional market,

17  and photographers were trying to figure out how to deal with

18  all these files that were landing on their computer.

19         It wasn't a big deal in the film days because

20  basically you'd scan one out of a thousand images, maybe.

21  So most of the stuff never made it to your computer.  But as

22  all the digital files were coming onto the computer, there was

23  a problem.

24         So basically photographers were opening one image at a

25  time, making an adjustment, and then saving it or "save as,"

1    and then opening the next image.  So if you shot, you know, a

2    couple of hundred images over the weekend and you wanted to

3    edit those, it was a pretty tedious process.

4          So what photographers started to do is they would

5    write "actions," which is just kind of a script that can run on

6    a set of images.  Or, if they're really geeky, they would write

7    scripts themselves.

8          But there was a better way to solve this problem, and

9    so this plug-in -- what it allowed you to do is, let's just go

10   ahead and look at the images on the left-hand side.

11         Clearly these first few images are all pretty much the

12   same lighting condition.  So if I was going to make an

13   adjustment, I would do the same thing for all of them.  And

14   then, if we keep going down, we have other scenarios, other

15   lighting conditions that are very similar.

16         So rather than just go one at a time, what you can do

17   is select all of the images in that lighting condition, and

18   then go over to the right-hand side, and this is where all my

19   photographic adjustment tools are.

20         So I can increase the exposure, and you can see it's

21   doing it for all those images.

22         I can add some contrast.  I can even go so far as to

23   convert all of those to black and white, and you can see for

24   all of those images, they've all been converted to black and

25   white simultaneously.

1           This is something that would have taken a lot of time,

2    one image at a time, and maybe you wouldn't have gotten the

3    adjustments exactly the same across images.  So it allows quick

4    results and consistency.  This was a huge update in the CS2

5    time frame.

6    Q.   Is this Adobe Camera Raw feature related to Vanishing

7    Point in any way?

8    A.   No, it's not.

9    Q.   How often did you demonstrate this Adobe Camera Raw

10   feature in the 2005 time frame?

11   A.   Very frequently.  It was probably my most shown demo at

12   shows, like Photoshop World that we walked about, or PhotoPlus

13   Expo, a trade show in New York.

14   Q.   You're obviously familiar with Vanishing Point, right?

15   A.   Yes.

16   Q.   Can you use Photoshop without using Vanishing Point?

17   A.   Yes, absolutely.

18   Q.   Can you use Vanishing Point without using the clone stamp

19   tool?

20   A.   Yes, you can.

21   Q.   What was your first exposure to the Vanishing Point

22   feature?

23   A.   Well, when I joined in July of 2005, it's expected that

24   product managers work in trade show booths and show customers

25   new features.  So basically I had to learn all the new features

1    in CS2 and be prepared to go on the road to various trade shows

2    and show customers, because they usually would just come up to

3    a booth and say, "Hey, what's new"?

4    Q.   At that time in 2005 how many tools were part of Vanishing

5    Point?

6    A.   At that time I believe there were nine.

7    Q.   And how many are there today?

8    A.   I think we're up to ten.

9    Q.   And you said you did demonstrate Vanishing Point for

10   customers?

11   A.   I did.

12   Q.   What was one of the features that you demonstrated the

13   most in Vanishing Point?

14   A.   Probably the quickest way to get results and kind of

15   convey the feature was to use the "marquee" tool.

16   Q.   So can you show us a demonstration of that feature, the

17   "marquee" tool feature?

18   A.   Yes?

19           (Demonstrating.)

20           This was actually one of the demo files that I was

21   using in the 2005 time frame.

22           What we do is we have a set of files that are good at

23   showing off a feature, and we'd go and take these on the road

24   with us.

25           So in this case I have opened an image of a

1    building, and this one I like quite a bit because it clearly

2    shows the concept of two planes via the side of the building.

3    Q.   So just talk us through.  I know you're very fast with

4    this, but for the jurors, talk through actually when you're

5    clicking.

6            You're going to click on "filter," and then do what?

7    A.   I'm going to click on "filter," and then I'm going to go

8    down to "Vanishing Point."

9    Q.   And then what's at the left?  What are these icons here at

10   the left side of the screen?

11   A.   These are the tools that have been discussed earlier.

12           We've got a "create plane" tool, a "marquee" tool, the

13   "clone stamp" tool.  These are the tools we discussed earlier.

14           And I don't think we've gone into any detail on the

15   "brush" tool.  That's actually the ability to paint in

16   perspective.

17           And you've also got an "eyedropper" tool, which, if

18   you're painting, you want to be able to select a color from

19   within the image to load onto the brush.

20   Q.   You were going to demonstrate the "marquee" tool, I

21   believe, and can we continue with that?

22   A.   Yes.

23           So the first thing I am going to do is create the

24   plane, and there is a handy little keyboard shortcut that will

25   zoom me in so I can pick the four points.  So I am just going

1    to go ahead and click one point, two, three, and four, okay.

2          And then I'm going to extend the plane a little bit in

3    both directions.

4          Now, here what I want to do is tear a plane.  So I'm

5    going to use the control keyboard shortcut, hold that down, and

6    tear a plane at 90 degrees.

7    Q.   This feature of "plane tearing," is that the feature

8    Mr. Troppoli talked about earlier?

9    A.   It is.

10          I'm going to now extend these planes up, and this is

11    what I meant by it's very easy to show a photographer what we

12    mean by planes by using the side of the building. Then you can

13    imagine a common scenario where an architect or photographer

14    wants to create the impression of a taller building, or see

15    what a taller building would look like.

16          So what we'll do is we'll just go ahead and select a

17    portion of the side of the bidding using the "marquee" tool.

18          And then I am just going to simply copy and paste that

19    up the plane.

20          And what's neat is I can hold down the "shift" key and

21    it will stay aligned with the plane.

22    Q.   So let me just pause on that aspect.

23          So the piece that you've sort of selected and are

24    moving, it changes shape to maintain perspective as you move

25    it?

1    A.    That's correct.

2    Q.    And this is the "marquee" tool?

3    A.    That's correct.

4    Q.    Continue.

5    A.    So I'll grab the other side of the building.  Same

6    operation.  Just sliding that up the side.

7            A little bit more.

8            And that's a -- oops, I canceled that.

9            That's a quick way to show how to kind of extend a

10   building up using the "marquee" tool in Vanishing Point.

11   Q.    So did that demonstration use the clone stamp tool in any

12   way?

13   A.    No, it did not.

14   Q.    You were here for EveryScape's opening presentation where

15   they showed that demo with the window washers being removed

16   from the building, right?

17   A.    Yes, with Russell Preston Brown.

18   Q.    And Mr. Brown did that using the clone stamp tool, right?

19   A.    Yes.

20   Q.    Can that same result be achieved with the "marquee" tool?

21   A.    Absolutely.

22   Q.    Can you show us that?

23   A.    Sure.

24           (Demonstrating.)

25           I don't have the level of dramatic finesse that

 1    Russell has, but I will do my best.

 2             So, again, I've opened the image.  I've gone to the

 3    "filter" menu, and I'm going to choose "Vanishing Point."

 4             I hope it's okay.  I pre-created a plane for this so

 5    you don't have to watch me create planes on every single image.

 6             But the idea is very similar to what we just did.

 7    I grabbed the "marquee" tool.  I'm going to make a selection,

 8    and I'm simply going to copy that over the window washers.

 9             I want to make another selection because I still have

10    some lines down here.  You can see that.  So I'm just going to

11    go ahead and grab a portion here and just copy that over.

12    Q.    So the window washers are gone?

13    A.    Yes.  Just a couple of clicks.

14    Q.    Did that demonstration use the clone stamp tool in any

15    way?

16    A.    No, it did not.

17    Q.    Do you remember seeing the dog-on-the-deck image and

18    removing the rope or the brush in that image?

19    A.    I do.

20    Q.    Can that be done with the "marquee" tool?

21    A.    Yes, it can.

22    Q.    Will you show us that?

23    A.    (Demonstrating.)

24             So, again, open the image.  I am going to go to the

25    "filter" menu to "Vanishing Point."  Again, I've created a

1    plane, so you don't have to watch me doing that every time.

2            And then it's very straightforward.  So if I want to

3    get rid of the rope, which is the distracting item in the

4    image, we'll just go ahead and grab the "marquee" tool.

5    We'll make a selection kind of along the same boards, and then,

6    again, I'm just going to copy and move that up.

7    Q.   And the rope is gone?

8    A.   Yup.

9            And I will do the same thing for the brush.

10   Q.   Did that use the clone stamp in any way?

11   A.   No, it did not.

12   Q.   Did you actually demonstrate the clone stamp tool also

13   back in the 2005 time frame?

14   A.   I did.  We want to give customers an idea of all the

15   possibilities.

16   Q.   As between the "marquee" tool and the "clone stamp" tool,

17   which did you demonstrate more?

18   A.   I demonstrated the "marquee" tool a lot more, especially

19   with the building, because it's easier to get consistent

20   results quickly and convey the feature to a customer.

21   Q.   What are the some of the other tools of Vanishing Point

22   that you demonstrated back in that time frame that had a lot of

23   this sort of "wow" factor or "sizzle" or whatever you want to

24   say?

25   A.   Well, I think the thing that really kind of surprised

1    people was the ability to take text from one document and put

2    it into another document in perspective and maybe wrap text

3    around a building, or something to that effect, or transform

4    it, or make it bigger or smaller and then maybe flip it or flop

5    it.

6    Q.    Can you show us one last demonstration of that, please?

7    A.    Sure.

8             (Demonstrating.)

9             So I've picked some text from a file and copied that.

10            I'm going to open another image.

11   Q.    So we've got the courthouse we're sitting in?

12   A.    Yup.

13   Q.    All right.  Go ahead.

14   A.    So, again, I'm going to launch Vanishing Point.

15            In this case, again, I've already predefined the

16   planes that we're going to be working with, one on kind of the

17   front side here, and one as this wall bends in.

18            And so what I would do is just go ahead and paste the

19   text I was talking about earlier.  And you can see it's

20   wrapping around the side of the building.

21            Let's say you're going to have a big celebration of

22   this building, this courthouse, and you want to put a big

23   banner on the top of the building.  What you can do is we'll

24   just go ahead and start to transform this -- make this little

25   bit smaller.  That seems kind of aggressive.

1  Q.   You say "transform."  Which tool are you using in

2  Vanishing Point?

3  A.   That's the "transform" tool here on the left, and that

4  allows me to make a selection bigger or smaller, squish it.

5  I can kind of flip it around, or I can flop it.  Here's the

6  options up here.

7          It doesn't work really well with this content, but you

8  can get a clear sense of, Wow, it's just kind of -- you're

9  transforming and wrapping a building at the same time.  You can

10 get an idea what this would look like if you were going to put

11 a big banner on top of the building.

12 Q.   Is the "transform" tool the same as the "clone stamp"

13 tool.

14 A.   No.

15 Q.   Is the transform tool a helper tool to the clone stamp

16 tool?

17 A.   No, it's not.

18 Q.   Can you use the transform tool to clone brush in any way?

19 A.   No, you can't.

20 Q.   Now, there is in Photoshop something known as a standard

21 or traditional clone stamp tool; is that correct?

22 A.   That's correct.

23 Q.   Are you familiar with that tool?

24 A.   I am.

25 Q.   How long has that been around?

1    A.    That was introduced in Photoshop 1 in 1990.

2    Q.    And tell us at a high level what does that tool do?

3    A.    So what that does is allows you to take one part of an

4    image and, using a brush, copy it literally to another part of

5    the image.

6    Q.    Do you have a quick demonstration of that tool you can do?

7    A.    I do.

8            (Demonstrating.)

9            So this would be a pretty common scenario.  You've got

10   an image.  The content looks good, and I was actually going to

11   put this in a photo book at the end of the year, but once I saw

12   this Port-a-potty in the background, you know, it was really

13   hard to un-see.  I kind of wanted it to go away.  And so that's

14   a perfect chance to use the traditional clone stamp tool.

15   Q.    So you selected now the "clone stamp," the traditional

16   "clone stamp" tool?

17   A.    I have.

18           And what I am going to do is pick a source.  That's

19   going to be right over here (indicating).  And then I'm just

20   going to choose to brush over that Port-a-potty.  And what it's

21   doing is picking an area from the fence further down on the

22   left.  You can see that crosshair.  And it's replacing the

23   fence and adding another bush up top here, and a couple of more

24   clicks and the Port-a-potty is gone.

25   Q.    Did that demonstration use Vanishing Point in any way?

1    A.    No, it did not.

2    Q.    Did it use the perspective clone brush tool within

3    Vanishing Point in any way?

4    A.    It did not.

5    Q.    One last one.

6          Are you familiar with the "perspective crop" tool in

7    Photoshop?

8    A.    I am.

9    Q.    When was that tool first available in Photoshop?

10   A.    I believe that was introduced in 2001.

11   Q.    So that's four years before Vanishing Point came out?

12   A.    That's correct.

13   Q.    And what does that tool do, the "perspective crop" tool?

14   A.    What it allows you to do is -- obviously, you're going to

15   crop an image, but, at the same time, you're going to kind of

16   position the points so that it's -- you're looking straight on

17   it, let's say, a building or something that's kind of out of

18   perspective, or leaning away from you, you can kind of snap it

19   so it looks like you're looking right on top of it.

20   Q.    Can you do a demonstration of that tool for us, please?

21   A.    Yes.

22         (Demonstrating.)

23         So this is the chessboard we've seen a couple of

24   times.  So what I'm going to do is I'm just going to select the

25   "crop" tool.  I'm actually going to use crosshairs.  And you

1   will notice up here at the top there's a "perspective" check

2   box there.  So what that allows me to do is, instead of a

3   traditional crop, I can have a little fun with these points and

4   start to drag them to the four corners of the chessboard.  I

5   will do this as quickly as I can.  And I will just go ahead and

6   click "okay," that I am committing this crop, and it's now like

7   you're looking directly down on top of the chessboard.

8   Q.   And so that was done with the "perspective crop" tool?

9   A.   That's correct.

10  Q.   Did it maintain perspective?

11  A.   It did.

12  Q.   Did that involve Vanishing Point in any way?

13  A.   It did not.

14  Q.   Did it involve the "clone stamp" tool in Vanishing Point

15  in any way?

16  A.   No, it did not.

17  Q.   Now, does Adobe have information as to how often Vanishing

18  Point has, in fact, been used by customers of Photoshop?

19  A.   We do.

20  Q.   How does Adobe gather information on the use of a feature

21  like Vanishing Point?

22  A.   We --

23        MR. AIRAN:  Your Honor, I am going to object at this

24  time based on a motion that was granted this motion.

25        THE COURT:  Overruled.

1    Q.    Go ahead.

2    A.    We have what customers will see as the Adobe Product

3    Improvement Program.  It's one of those things when you launch

4    an application we ask, you know, Can we collect some

5    information anonymously while you're using Photoshop so we can

6    kind of analyze and see what's being used within Photoshop.

7          So Adobe Product Improvement Program is what an end

8    customer would see.  And on Adobe's end we call the program

9    "Headlights," because it gives us some visibility as to what

10   customers are doing in the application.

11   Q.    How did you become familiar with the Adobe Product

12   Improvement Program or the Headlights program at Adobe?

13   A.    Well, just through the course of managing Adobe software

14   products.  It was an across-Adobe initiative to collect

15   information in a kind of anonymous and similar way across

16   products.

17   Q.    How do users get into the Adobe Product Improvement

18   Program?

19   A.    They're presented with an option to opt in at some point

20   in the first few launches of Photoshop.

21   Q.    But does Adobe select itself in any way who opts in or who

22   doesn't opt in?

23   A.    No.  It's entirely up to the end customer.

24   Q.    Does Adobe pick and choose which features get recorded or

25   the usage of which features get recorded from people who have

1  opted in?

2  A.   We don't have any ability to block or unblock certain

3  features from being recorded by particular users.  It's just

4  whatever they happen to be using in the application.

5  Q.   Let's look at Exhibit 175.  We'll put it on the screen.

6  It's also in your document -- in your book there.

7       Does this document contain information from the

8  Headlights or Adobe Product Improvement Program?

9  A.   It does.

10  Q.   There are a few terms here I want to ask you about, and

11  they're actually bolded.  "Serialized Photoshop opt-in users"

12  at the top?  "Serialized Photoshop opt-in users."

13  What does that mean?

14  A.   So there's a couple of terms there.

15       "Serialized" means it's a Photoshop customer who has

16  purchased the product.  You can purchase Photoshop in a trial

17  period for 30 days before you're asked or really strongly

18  encouraged to enter a serial number and purchase the product.

19  So that's why we will call it "serialized."

20  And it's just the people who have opted into this Product

21  Improvement Program.  So it's licensed customers who have

22  chosen to participate.

23  Q.   All right.

24       And according to the data presented in this

25  exhibit, what percentage of users have used Vanishing Point?

1    A.    So across the time frame of CS5 to CS6, 2.84 percent of

2    those customers that have opted in have used Vanishing Point.

3    Q.    And the next box below refers to "serialized sessions." Do

4    you see that?

5    A.    Yes.

6    Q.    What does that mean?

7    A.    So serialized, again, means it's a licensed customer, and

8    any session is any time you open and close Photoshop.

9    So if I decided to launch and quit Photoshop ten times, that

10   would be ten sessions.  So we count each session individually.

11   Q.    So does this data indicate how many sessions included

12   usage of Vanishing Point?

13   A.    Yes.  That would be the .09 percent of sessions included

14   the use of Vanishing Point.

15   Q.    Does this data reflect all use of Vanishing Point

16   regardless of the individual tools within Vanishing Point that

17   were used?

18   A.    That's correct.  It's just launching the Vanishing Point

19   plug-in, as I did several times, nothing specific within the

20   interface.

21   Q.    So it would include any use of the clone stamp tool?

22   A.    That's correct.

23   Q.    And it would include any use of any of the other tools in

24   Vanishing Point?

25   A.    That's correct.

1    Q.   Does Adobe measure the use of just the clone stamp tool

2    within Vanishing Point?

3    A.   No, we do not.

4    Q.   This document, I believe, and it shows at the bottom left

5    here there's a reference to CS5, CS5.5, CS6, right?

6    A.   Yes.

7    Q.   Were there -- and those obviously are versions of

8    Photoshop released after Photoshop CS2 that first contained

9    Vanishing Point, right?

10   A.   That's correct.

11   Q.   I believe you referred to this earlier, but were there new

12   features within Vanishing Point that were added after Vanishing

13   Point was first introduced in 2005?

14   A.   Yes, there were.

15   Q.   What are some of those?

16   A.   The ability to measure in perspective, which is kind of a

17   neat way for -- so you define one area, if you know how big it

18   is, and then you can move the ruler around to different planes

19   and take new measurements.

20        There was the ability to save those planes as a 3D

21   layer in Photoshop, which was really powerful as well.

22   Q.   And what about the ability to adjust the angle of planes

23   or tear them off, that sort of thing?

24   A.   Absolutely.

25        So what you would see me do before with the

1    building is I had one plane, and then I tore off a plane and it

2    stayed at 90 degrees.  And on a subsequent version we gave you

3    the ability to kind of change that 90 degree if you had a

4    non-standard surface.

5    Q.   So can you give a demonstration of the feature of

6    adjusting the angle of the planes as you just described it in

7    Vanishing Point?

8    A.   Yes.

9         (Demonstrating.)

10        So I have opened an image of a blank CD case.

11        So what I'm going to do is I'm going to go to the

12   Vanishing Point filter.  I've already got a few planes defined.

13   One on the back of the CD case, one on the spine, and an extra

14   one to kind of cover this gap here.

15        And then what I'm going to do is I'm going to hold

16   down the "control" key and extend the plane.

17        And you'll see right away that's 90 degrees by

18   default, but that's not what I want.

19        So what I'm going to do is I'm going to hold down the

20   "alt" key and rotate that plane to align with the -- I guess

21   that would be the front of the CD case.

22   Q.   Did that capability you just demonstrated of tearing the

23   plane and rotating it, did this involve the "clone stamp" tool

24   in any way?

25   A.   No, it didn't.

1    Q.   Now, I believe you had another image of some artwork, and

2    what can you do with that now?

3    A.   (Demonstrating.)

4         Well, let's go back, and this is a pretty common

5    scenario where someone might lay out a piece of art work in

6    two-dimensional.  In this case it's a CD cover, front and back,

7    and then we want to see what it's going to look like when it's

8    actually on a physical object.

9         So I've copied this information.  It's on my

10   clipboard.  I'm going to go back.  The Vanishing Point filter.

11   I'm going to do this quickly because you've already seen me.

12        Extending the plane.

13        Okay.

14        Now, what I'm going to do is I'm going to take the

15   stuff that was on the clipboard and paste it into this filter.

16   Q.   So this is a paste operation?

17   A.   It is.

18        And you can see the cover is lining up nicely with the

19   planes of the CD case.

20   Q.   And did this operation demonstration involve the "clone

21   stamp" tool in Vanishing Point in any way?

22   A.   No, it didn't.

23   Q.   All right.  I want to talk now a little bit again back

24   about your experience as a product manager.

25        While you were a product manager, are you familiar

1    with whether Adobe has ever licensed technology for use in

2    Adobe products?

3    A.    Yes.

4    Q.    Have you been involved in licensing negotiations at Adobe?

5    A.    Yes.   That's one of a product manager's roles.

6    Q.    Can you look in your book at Exhibit KN, KN.

7    A.    I'm here.

8    Q.    Can you identify for the record what that document is?

9    A.    This is license agreement between Adobe and a company

10   called Pixel Genius for technology.

11   Q.    Were you involved in the negotiation for this license?

12   A.    Yes.   I negotiated this license.

13          MR. SCHERKENBACH:   Your Honor, we'd move the admission

14   of Exhibit KN.

15          MR. AIRAN:   No objection, your Honor.

16          THE COURT:   473.

17          (Defendant's Exhibit No. 473 received in evidence.)

18          MR. SCHERKENBACH:   Let's put that up.

19   Q.    Can you tell us, just at a high level, what this

20   technology in this license related to?

21   A.    This license is related to image-sharpening technology.

22          When you print an image, and on the most popular

23   printers kind of on market, which is ink-jet printers what

24   happens is the ink bleeds a little bit on the paper, making it

25   look softer than it did on your screen.   So this license is for

1    technology information to properly translate what you see on

2    your screen so you get the same level of sharpness on your

3    print automatically.

4    Q.   And this license is effective March 2007.

5         Do you see that at the top?

6    A.   Yes.

7    Q.   And can you tell us what your understanding is of the

8    rights that Adobe acquired under this license?

9    A.   In the "Grant of License," basically what Pixel Genius is

10   giving us is a "non-exclusive, worldwide, fully paid,

11   royalty-free, license, to use, copy, modify, reproduce and

12   distribute the license or data."

13        So it's a pretty broad set of rights.

14   Q.   So it's a lump-sum license?

15   A.   It is.

16   Q.   What did Adobe pay?

17   A.   Adobe paid Pixel Genius $300,000.

18   Q.   Were there any payments made based on the number of units

19   that Adobe sold that would contain this technology?

20   A.   No.

21   Q.   So Adobe paid 300,000 and could use the technology all it

22   wanted in these products?

23   A.   Yes.

24   Q.   In your time at Adobe, have you ever seen a license where

25   Adobe paid a running royalty for a feature incorporated in

1  Photoshop?

2  A.   Not in my tenure.

3  Q.   Have you ever seen a lump-sum license for a Photoshop

4  feature where the lump-sum amount was based on the present

5  value of a stream of running royalty payments?

6  A.   No, I have not.

7        MR. SCHERKENBACH:   Those are all the questions I have,

8  your Honor.

9        THE COURT:   All right.

10     Jurors, why don't we take the morning recess now, and then

11  we'll come back in 25 minutes for cross-examination.

12     All right.

13        THE CLERK:   All rise.

14    (Recess.)

15        (Resumed at 11:13 a.m.)

16        THE CLERK:   Court is in session, please be seated.

17        THE COURT:   All right, Mr. Airan.

18                    CROSS-EXAMINATION

19  BY MR. AIRAN:

11:13 20  Q.   Good morning, Mr. Hogarty.

21  A.   Good morning.

22  Q.   We've met before?

23  A.   Yes, we have.

24        (Pause.)

25  Q.   You testified at the deposition that was played for the

1    jury last week?

2    A.   That's correct.

3    Q.   And I asked you the questions?

4    A.   Yes.

5    Q.   And you're testifying today in a similar role, as Adobe's

6    corporate representative?

7    A.   That's correct.

8    Q.   And you've worked for Adobe since 2005?

9    A.   Yes.

11:14 10   Q.   And your current responsibility is for a product called

11   Lightroom?

12   A.   I have a number of different products I'm responsible for.

13   Q.   That's one of them?

14   A.   Yes.

15   Q.   Bridge is another one?

16   A.   Yes.

17   Q.   Okay.

18        Sorry, Bridge.

19        You showed us a demonstration earlier of a Spot

11:14 20   Healing tool.  Do you recall that?

21   A.   Yes, that's correct.

22   Q.   And that's not accused in this lawsuit in any way, is it?

23   A.   Not that I am aware of, no.

24   Q.   That has nothing to do with Vanishing Point?

25   A.   That's correct.

1   Q.   And you also mentioned Camera Raw, right?  You gave us a

2   demonstration of Camera Raw?

3   A.   Yes.

4   Q.   And that also is not accused in this lawsuit?

5   A.   That's my understanding.

6   Q.   It has nothing to do with Vanishing Point?

7   A.   Other than it was a feature introduced at the same time as

8   Vanishing Point in CS2.

9   Q.   Okay.

11:14  10        Of those features that were launched at the same time

11   in 2005, did Mr. Narayen mention either of those in his

12   statement to investors in 2012?

13   A.   Not the one that we reviewed.

14   Q.   I'm sorry?

15   A.   Not the one that we've reviewed as part of this case.

16   Q.   So not the Spot Healing tool and not the Camera Raw that

17   you showed here?

18   A.   That's correct.

19   Q.   And Vanishing Point is a tool within Photoshop; is that

11:15  20   correct?

21   A.   That is correct.

22   Q.   And you have not had responsibility for Photoshop since

23   2006?

24   A.   I wouldn't call myself directly responsible for it, but

25   there's a team of product managers who are responsible for all

1    digital imaging products.  I have some members of my team who

2    are responsible for components of Photoshop, and I have some

3    members of my team who are not.

4    Q.   And you testified in your deposition that you stopped

5    focusing on Photoshop specifically in 2006?

6    A.   That's correct.

7    Q.   You stand by that testimony, right?

8    A.   I do.

9    Q.   So you stopped focusing on Photoshop specifically in 2006.

11:15 10   A.   Correct.

11   Q.   Okay.

12            And you currently actually have no responsibility

13   relating either to Photoshop or Vanishing Point; is that

14   correct?

15   A.   That would not be accurate.

16   Q.   All right.

17            And I asked you this question, you gave this answer in

18   your deposition:

19            "Q.   Is Photoshop the responsibility of yours?

11:16 20            "A.   Not directly.  I'm on the team of product

21   managers responsible for Photoshop.

22            "Q.   You used the word 'directly' in your answer.  Do

23   you have some indirect responsibility for Photoshop?

24            "A.   Not indirect."

25            So your testimony in your deposition was that you had

1    neither direct nor indirect responsibility for Photoshop,

2    correct?

3    A.   I might have overlooked some of my responsibilities.  I do

4    manage customer advocacy and customer engagement across all

5    digital imaging products, which does include Photoshop.  It's

6    not direct product responsibility, it's the ecosystem around

7    the product.

8    Q.   Okay.

9         So you're changing your testimony a little bit from

10   the deposition?

11   A.   I'd have to reread it, but it's a nuanced -- it's a

12   nuanced approach.

13   Q.   Okay.

14        So you're adding a nuance to what you testified to.

15   A.   Yes.

16   Q.   All right.

17        You mentioned, I think just now, that the Photoshop

18   team includes product managers; is that right?

19   A.   That's correct.

20   Q.   And it also includes a director of product management; is

21   that correct?

22   A.   Yes, there are two -- there are actually three directors

23   of product management for digital imaging at Adobe.

24   Q.   Specifically for Photoshop, is there a director of product

25   management?

1    A.    I would consider Pam Clark to be kind of where the buck

2    stops when it comes to Photoshop-related decisions.

3    Q.    Her name is Pam Clark?

4    A.    That's correct.

5    Q.    And she's not going to testify here today?

6    A.    That's not my understanding.

7    Q.    All right.

8          And Ms. Clark has three product managers that report

9    to her?

11:17 10    A.    I'll have to tally them; I think it's five or six.

11    Q.    In your deposition you said three, but it could be as many

12    as five or six?

13    A.    Yeah, we did actually acquire some more head count since

14    that deposition.

15    Q.    And none of those people are going to testify here?

16    A.    That's correct.

17    Q.    All right.

18          And you testified that Ms. Clark reports to Maria Yap;

19    is that correct?

11:17 20    A.    Yes.

21    Q.    And Ms. Yap is not going to testify here?

22    A.    That's correct.

23    Q.    And Ms. Yap -- and in terms -- we're talking now just all

24    in Photoshop, right?  These are the people responsible for

25    Photoshop.

A.   They're members of the team responsible for digital

imaging.  We rarely get too specific about products.  We kind

of tag team.

     When I started, it was a group of five product

managers who had responsibility for all the digital imaging

products.  We kind of help each other out and work together and

whatever the problem is at the time.

Q.   As far as Ms. Clark goes, she's the one responsible for

Vanishing Point?

A.   I would consider her in the chain of approvals for

anything related to Vanishing Point.

Q.   Okay.

     And you're not in that chain of approval.

A.   I can lend opinion, but it's best to divide and conquer in

those kinds of things.

Q.   When you say "lend opinion," you're not in the chain of

approval.

A.   No.

Q.   Okay.  Thank you.

     And Ms. Clark reports to Ms. Yap and Ms. Yap reports

to someone else, Mr. Hendrickson, that's what you testified to.

A.   That's correct.

Q.   And he's not going to testify here, right?

A.   That's my understanding.

Q.   And Mr. Hendrickson reports to Mr. Wadhwani; is that

1   correct?

2   A.   Yes, that is correct.

3   Q.   And he's not going to testify in this case, right?

4   A.   Correct.

5   Q.   And Mr. Wadhwani reports to Mr. Narayen, the CEO?

6   A.   That's correct.

7   Q.   So none of these people we mentioned that have direct

8   reporting responsibility for Photoshop are going to testify in

9   this trial.

11:19  10   A.   That's my understanding.

11   Q.   Okay.

12        You joined Adobe in 2005, that's what I think you

13   said.

14   A.   Correct, July of 2005.

15   Q.   And at that point in time, Vanishing Point was already

16   launched, right?

17   A.   Yes, it had been in market for three or four months at

18   that point.

19   Q.   So the product had been integrated into Photoshop and it

11:19  20   was actually out there on the market at the time you joined the

21   company.

22   A.   That's correct.

23   Q.   All right.

24        As Adobe's corporate representative in this case,

25   you're aware of basic financial facts relating to the company,

1    right?

2    A.    Yes.

3    Q.    All right.

4          MR. AIRAN:  Your Honor, may I publish to the jury the

5    2008 Form 10-K from Adobe Systems Incorporated?

6          THE COURT:  Is that marked as --

7          MR. AIRAN:  It's not marked, your Honor.

8          THE COURT:  Are you offering it as an exhibit or just

9    want to show it?

11:20 10         MR. AIRAN:  Yes, I'm offering it as an exhibit.

11         THE COURT:  All right.  474.

12         (Exhibit 474 received into evidence.)

13   BY MR. AIRAN:

14   Q.    You've seen these before, Form 10-Ks?

15   A.    Rarely, but, yes.

16   Q.    You know what they are, right?

17   A.    Securities and Exchange Commission filing.

18   Q.    It's the government filing that Adobe makes on an annual

19   basis?

11:20 20   A.    I believe so, yes.

21   Q.    All right.

22         I want to direct your attention to -- actually, I

23   don't have that right page.  I'll have to come back to that.

24         Do you know what the earnings were for Adobe in 2008?

25   Do you have any idea?

```
 1   A.   Not off the top of my head, I'm sorry.

 2   Q.   Do you know what the current earnings for Adobe are?

 3   A.   Again, not off the top of my head.

 4   Q.   Would it surprise you to learn the number is in the four

 5   billion range?

 6   A.   In revenue?

 7   Q.   Yes.

 8   A.   Yes.

 9   Q.   That would seem about right to you?

10   A.   Yes, that's about right.

11   Q.   And that's roughly consistent with where you think it

12   would have been in 2008?

13   A.   Hopefully it has grown since 2008.

14   Q.   You're getting bigger, right?  The company is getting

15   bigger?

16   A.   Yes.

17   Q.   But it would have been in the three- to four-billion

18   dollar range probably?

19   A.   I don't want to speculate.

20   Q.   We can look that up, though, right?  We can look up the

21   Form 10-K, that's a matter of public record.

22   A.   Yes, yes.

23   Q.   I want to go back to some of your demonstrations about

24   Vanishing Point.

25            You no longer use Vanishing Point as part of your
```

1    employment responsibilities; is that correct?

2    A.   Well, my employment responsibilities include having a

3    working knowledge of all the digital imaging products.  So to

4    some extent, I need to be prepared at any time.  But,

5    typically, after we release a feature, we don't -- and we've

6    kind of explained it to the market, we don't spend a lot of

7    time going back to those features.

8    Q.   And you, actually, stopped using it probably in the 2007

9    to 2008 time frame; is that correct?

11:22 10   A.   That would be likely, because then a new version of

11   Photoshop comes out, and we focus on showing off some of the

12   other new features.

13   Q.   So you stopped using Vanishing Point in 2007-2008?

14   A.   Largely, yes.

15   Q.   Okay.

16        Now, you testified in response to Mr. Scherkenbach's

17   question that the Marquee tool does not use the clone stamp in

18   any way.  That was your testimony.

19   A.   You might want to read it back to me, but that sounds

11:22 20   appropriate, the Marquee tool --

21   Q.   I don't want to put words in your mouth.  Does the Marquee

22   tool use the Clone Stamp tool in any way?

23   A.   No, because when you have selected the Marquee tool, the

24   clone stamp is not selected, so it's one or the other.

25   Q.   Do you know if it uses any part of the same code base at

1    all?

2    A.    I'm not a technical expert that way.

3    Q.    You're not a code expert, are you?

4    A.    No, I'm not.

5    Q.    So you have no idea if the Marquee tool uses the same code

6    that powers the Clone Stamp tool?

7            MR. SCHERKENBACH:  Objection, relevance.

8            THE COURT:  Well, since he doesn't do source code, I

9    would think the answer is -- the objection is probably

11:23 10    appropriate.

11            MR. AIRAN:  Okay.

12    BY MR. AIRAN:

13    Q.    Now, you showed us a trick with using Marquee tool to do

14    the same kind of thing that Mr. Russell Preston Brown did with

15    his window washer video.  Do you recall that?

16    A.    I do.

17    Q.    Is there video produced by Mr. Brown that shows the

18    Marquee tool being used in that way that's available by Adobe?

19    A.    Not that I'm aware of.

11:23 20    Q.    No.  The one that's available is the Clone Stamp tool,

21    right?

22    A.    That's what we've looked at, yes.

23    Q.    And your demonstration is not available as a video.

24    A.    No, it's not.

25    Q.    You showed us a few more examples where -- like the dog on

1    the deck, where the Marquee tool is interchangeable with the

2    Clone Stamp tool, right?

3    A.   You can get the desired effect of removing unwanted

4    objects from that image, yes.

5    Q.   Okay.

6         And I want to direct your attention to Exhibit 61, if

7    we can.

8         MR. AIRAN:  If I can have that, if we can switch back,

9    please.

11:24 10         And, Mr. Carrillo, if we can go to page, I think it's

11    294.

12         No, actually, if you go to page 286, please.

13    Q.   Do you see that call-out?

14    A.   I do.

15    Q.   It says, "Using Vanishing Point you specify the planes in

16    an image and then apply edits such as painting, cloning,

17    copying or pasting, and transforming."  Do you see that?

18    A.   I do.

19    Q.   And then the next sentence says, "All of your edits honor

11:25 20    the perspective of the plane you're working in."  Do you see

21    that?

22    A.   I do.

23    Q.   So to use Vanishing Point, including the Clone Stamp tool,

24    you have to use the Create Plane tool?

25    A.   To use the clone stamp, yes, you need to use the Create

1    Plane tool.

2    Q.   So they're completely independent, the Create Plane tool

3    and the Clone Stamp tool?

4    A.   They're related in that you need to use the Create Plane

5    tool in order to use the Clone Stamp tool.

6    Q.   You can't use the Clone Stamp tool without the Create

7    Plane tool.

8    A.   Not in a workflow that I'm familiar with.

9    Q.   Okay.

11:25 10        As far as edit plane, the edit plane, you also use

11   that in connection with your clone stamp, right?

12   A.   You can, yes.

13   Q.   Those are two of the tools that Mr. Scherkenbach was

14   talking about on the left side of the Vanishing Point filter

15   window?

16   A.   That's correct.

17   Q.   All right.

18        Out of curiosity, Mr. Hogarty, does Adobe have any

19   data at all suggesting that Vanishing Point would be successful

11:26 20   without a clone brush?

21   A.   I'm not aware of any data like that.

22   Q.   Okay.

23        And you mentioned the traditional Clone Stamp tool,

24   right?  I think you mentioned that earlier.

25   A.   That's correct.

1    Q.    And that's a very valuable tool in Photoshop?

2    A.    Yes.

3    Q.    And Adobe would not want to pull out the regular Clone

4    Brush tool, would it?

5    A.    We rarely remove features from Photoshop.

6    Q.    I'm sorry?

7    A.    We rarely remove features from Photoshop.

8    Q.    Rarely remove features from Photoshop, okay.

9          The Transform tool that you showed, you also showed

11:26 10    that as one of your demonstrations?

11   A.    Yes.

12   Q.    And that's also used in conjunction with the Marquee tool.

13   Do I have that right?

14   A.    It can be used in conjunction with the Marquee tool or

15   with the -- if you're copying or pasting text into the image.

16   Q.    Okay.

17          But marquee -- it's used in conjunction with the

18   Marquee tool.

19   A.    It doesn't need to be.  Like I showed with the text on the

11:27 20    front of the courthouse, it can be used in conjunction with the

21   Marquee tool or it can be used with other content.

22   Q.    If you're doing image editing, you want to take apart the

23   image and then use the Transform tool, you have to use the

24   Marquee tool to do that?

25   A.    Yeah, if you would like to manipulate content in the image

1    and kind of shrink it or make it larger or rotate it or flip or

2    flop it, you would start with the Marquee tool.

3         MR. AIRAN:   If we can go back to Exhibit 61, please,

4    Mr. Carrillo.

5         And now I do want to go to page 294.

6    Q.   We're back on the plane aspect, setting up your planes?

7    A.   Okay.

8    Q.   You're familiar with what a red plane means?

9    A.   Yes, it's kind of a warning signal that the plane you've

11:28 10  created isn't valid.

11   Q.   Okay.

12        And according to the users' guide there, it says that

13   Vanishing Point cannot calculate the plane's aspect ratio when

14   the plane is red.  Do you see that?

15   A.   Yes, I see that.

16   Q.   Okay.

17        And do you know what the technology is that the

18   Vanishing Point code uses to determine that aspect ratio?

19   A.   I don't.

11:28 20  Q.   Mr. Troppoli explained that earlier, didn't he?

21   A.   Yes, he did talk quite a bit about the source code.

22   Q.   And aspect ratios?

23   A.   Yes.

24   Q.   So the users' guide is saying Vanishing Point cannot

25   calculate the plane's aspect ratio when the plane is red.

```
 1    A.    That's what the document says, yes.

 2    Q.    And as the corporate representative, you would agree with

 3    that statement?

 4    A.    Yes, I would.

 5    Q.    Okay.

 6          And it further says in that statement, the results

 7    will not be oriented properly.  Do you see that?

 8    A.    I do.

 9    Q.    And if the plane is red, the aspect ratio is not properly

11:28 10   computed, and the results will not be oriented properly, right?

11    A.    Yes.

12    Q.    And you agree with that as Adobe's corporate

13    representative.

14    A.    I do.

15          MR. AIRAN:  If we can have Exhibit 442, please.

16    Q.    That's the At A Glance document.  Do you see that?

17    A.    I do.

18    Q.    You're familiar with that document?

19    A.    I am.

11:29 20   Q.    Okay.

21          You've seen it before during this trial.

22    A.    Yes, yes, I have.

23    Q.    And it refers to Vanishing Point as revolutionary?

24    A.    It does.

25    Q.    It says, "Vanishing Point - nothing less than
```

1   revolutionary, Vanishing Point lets you effortlessly clone,

2   paint and transform with tools that automatically adjust to the

3   visual perspective of your images."  Do you see that?

4   A.    I do.

5   Q.    So it's specifically calling out the Clone Stamp tool as

6   being one of their revolutionary features, right?

7   A.    It's one of.  It's basically the Vanishing Point is

8   revolutionary.

9   Q.    And clone stamp is one of the ones that is specifically

11:29 10   called out as revolutionary?

11   A.    Yes, in this document.

12   Q.    And Adobe agrees with that?

13   A.    And I think I mentioned this in my deposition.  I don't

14   use a lot of these fluffy marketing words that are designed to

15   get people excited about the product, but I consider Vanishing

16   Point revolutionary.

17   Q.    And these fluffy words are designed to get people excited

18   about the product because you're trying to sell it, right?

19   You're trying to sell the product, is that what you're trying

11:30 20   to do?

21   A.    Absolutely.

22   Q.    Okay.

23          The next sentence, which is not highlighted, says,

24   "cutting hours off precision design and photo retouching

25   tasks."  Do you see that?

1    A.   Yes, I do.

2    Q.   So part of the marketing collateral also says you're going

3    to cut hours off the precision design and photo retouching

4    tasks.

5    A.   Yes.

6    Q.   So it's going to save time, the Clone Stamp tool will help

7    people save time.

8    A.   Vanishing Point will cut hours of precision design.

9    Q.   Specifically the Clone Stamp tool, right?

11:30 10   A.   Yes, clone, paint, and transform tools.

11   Q.   Switching topics, Adobe has known about EveryScape's

12   patent since they issued, that's correct, you understand that?

13   A.   That's my understanding, yes.

14   Q.   And that's February of 2008 when the '374 Patent issued?

15   A.   Yes, that's '374.

16   Q.   Right.  On February 5, 2008.

17        MR. AIRAN:  Can we have Exhibit 1 up, please,

18   Mr. Carrillo?  And page 2.

19        If you can show us the upper right-hand part.

11:31 20   Q.   The patent issued on February 5, 2008; is that correct?

21   A.   Yes.

22   Q.   And Adobe's known about this patent since that date,

23   right?

24   A.   That's correct.

25   Q.   All right.

1          And you know that Adobe actually infringes that

2    patent?

3    A.    That's my understanding of why we're here.

4    Q.    Okay.

5          And that's the decision of the Court?

6          MR. SCHERKENBACH:  Objection.

7          THE COURT:  Sustained.

8    BY MR. AIRAN:

9    Q.    And Adobe instructs users through videos how to use the

11:31 10   Clone Stamp tool of Vanishing Point, right?

11   A.    Yes, we do.

12   Q.    We saw that in the Russell Preston Brown video?

13   A.    Yes.

14   Q.    The window washer guy?

15   A.    Yes.

16   Q.    All right.

17         And when users follow the instructions of that video,

18   they're infringing the patent.

19   A.    That calls for maybe a little bit more legal expertise

11:32 20   than I'm comfortable with.

21   Q.    Okay.

22   A.    I'm not sure.

23   Q.    All right.

24         But you're not denying that here, are you?

25   A.    No, I'm not.

```
 1   Q.   All right.

 2        And Adobe instructs users through literature, in

 3   addition to the videos, as to how to use the Vanishing Point

 4   Clone Stamp tool?

 5   A.   Yes, we have many different kinds of material, videos,

 6   written tutorials, to help people understand how to use the

 7   product.

 8   Q.   The Clone Stamp tool particularly?

 9   A.   Yes, all of the tools within Vanishing Point.

10   Q.   And Adobe intends users to follow the instructions that it

11   puts out in its literature, right?

12   A.   The goal is to educate customers on how to use the

13   products, yes.

14   Q.   And you expect them, at least some portion of them, to

15   follow the instructions that Adobe is putting out?

16   A.   I hope so, otherwise we shouldn't put the time in to write

17   them.

18        MR. AIRAN:  I want to go to Exhibit 175, if we can

19   have that up, please.

20        Enlarge that.

21   Q.   You provided a lot of testimony about that in response to

22   Mr. Scherkenbach's questions earlier today?

23   A.   Yes, that's correct.  This is the Adobe product

24   improvement information.

25   Q.   Right.  And you were not very knowledgeable about that
```

11:32 (at line 10)

11:33 (at line 20)

1    chart during your deposition; is that fair to say?

2    A.   Well, certainly with 24 hours' notice to review it and ask

3    a couple of questions before the deposition, I was about as

4    familiar as I could be in that time frame.

5    Q.   Who gave you the 24 hours' notice?

6    A.   Counsel.

7    Q.   Your counsel, Adobe's counsel.

8    A.   Yes.

9    Q.   That's not our 24 hours' notice, that wasn't EveryScape's

11:33 10   24-hour notice, right?

11   A.   I don't know.  I'm not sure who was driving the timeline

12   at that point.

13   Q.   But, as far as you know, Adobe's counsel contacted you 24

14   hours before your deposition to testify about that document.

15   A.   I was contacted before that, but I think I only saw the

16   document for the first time 24 hours before the deposition.

17   Q.   And who showed you the document?

18   A.   Counsel.

19   Q.   That was the first time you ever saw that document,

11:33 20   Exhibit 175?

21   A.   That's correct.

22   Q.   Okay.

23        The only person you -- with whom you discussed that

24   chart was your attorney; is that right?

25   A.   No, I had a quick follow-up question for Stephen Nielson,

1    the product manager who pulled this information, I believe.

2    Q.    I'm talking about prior to your deposition now, right,

3    that's -- I want you to stay on the time frame.  I'm talking

4    specifically about the information that you gave to us during

5    your deposition.  You understand that?

6    A.    Yes.

7    Q.    All right.

8          So the only person you spoke with prior to the

9    deposition about that chart was Ms. Chen, your attorney?

11:34 10   A.    I believe that's my recollection.

11   Q.    Okay.

12         Well, we can have that up.

13         MR. AIRAN:  Can I have Mr. Hogarty's deposition

14   transcript, page 271, please, lines 18 through 21?

15   Q.    You see the question and answer there?

16   A.    I do.

17   Q.    "Q.  Okay.

18         Did you talk to anyone about this chart, other than

19   your clients -- or other than to your counsel?

11:35 20        "A.  I did not."

21         You stand by that testimony today?

22   A.    I do.

23   Q.    You don't know the dates --

24         MR. AIRAN:  If we can go back to Exhibit 175, please.

25   Q.    You don't know the dates for which that chart is actually

1    effective, do you?

2    A.   The author is indicating that they've -- what we call

3    deduplicated to make sure you're not double counting customers

4    over time across the CS5, CS5.5, and CS6 time frame, and it's

5    inclusive of those versions.

6    Q.   But you don't know the specifics of that document, do you?

7    A.   In what sense?

8    Q.   Any of the specifics?  That was your testimony, right?

9    A.   Well, I understand how to interpret the data.

11:35 10   Q.   Okay.

11         MR. AIRAN:  Can we have Exhibit -- or Mr. Hogarty's

12   deposition at page 272, please?

13         And if we could focus on lines 20 through 23.

14

15   Q.        "Q.  Are there earlier versions than are reported in

16   the spreadsheet?

17         "A.  I can't recall.  I don't know specifics of this

18   spreadsheet."

19         Do you see that?

11:36 20   A.   I do.

21   Q.   And that was the testimony you gave in your deposition in

22   this case?

23   A.   That's correct.

24   Q.   And you understand that the purpose of that deposition was

25   to give EveryScape information about that spreadsheet, right?

1   A.   Yes.

2   Q.   And you were the witness that they put up to testify about

3   that?

4   A.   Yes, and I interpreted it for you during the deposition.

5   Q.   You basically read the information that was on that sheet,

6   right, because you only had 24 hours to look at it, correct?

7   A.   Correct.  It's not a complex set of information.

8   Q.   You didn't prepare that exhibit, did you, Exhibit 175?

9   A.   No, like I said, we divide and conquer a lot within our

11:36 10   team, so some people are just more suited to pull the data than

11   others.

12   Q.   And you mentioned a name a few moments ago, Mr. Nielson, I

13   believe it is?

14   A.   Yes.

15   Q.   It's N-i-e-l-s-o-n?

16   A.   I can never remember whether it's e-n or o-n, sorry.

17   Q.   And Mr. Nielson prepared that chart for you, correct?

18   A.   That's my understanding.

19   Q.   And he also sent to you an e-mail, didn't he, explaining

11:36 20   the chart?

21   A.   Yes.

22   Q.   And that e-mail was not given over to EveryScape, was it?

23   A.   I don't know.

24   Q.   As far as you know, that e-mail that you used to prepare

25   for the deposition was never produced to EveryScape, was it?

1          MR. SCHERKENBACH:  Objection, your Honor.

2          THE COURT:  Sustained.

3    A.    I don't know.

4    Q.    Did you talk to Mr. Nielson prior to your deposition?

5    A.    If I said in my deposition that I hadn't spoken to anyone

6    other than Ms. Chen, then that was probably going to be the

7    most accurate memory, given that this was a couple of years ago

8    now.

9    Q.    Well, let's go to your deposition transcript.

11:37 10          MR. AIRAN:  Page 274, please.

11          If you can highlight lines 10 through 14.

12    Q.    "Q.  Did you talk to Mr. Nielson in connection with

13    your testimony here today?

14          "A.  I did not.  I do have an e-mail from him that

15    gives the context of this data, this data that he pulled."

16          Do you see that?

17    A.    I do.  So it looks like I got the history of the analysis

18    from an e-mail that was sent to me.

19    Q.    And you didn't talk to Mr. Nielson about that chart at

11:38 20    all, did you?

21    A.    No, I had everything I needed from the note and what's on

22    the document.

23    Q.    Just reading the document itself, that's all you needed to

24    know, right?

25    A.    Yes.

Q.   Okay.

Does Adobe know how many serialized users there are in total for all Photoshop?

A.   I've seen some analysis done in the past trying to evaluate the number of serialized customers in the universe. It takes a lot of work because of some of the structures of our volume licensing agreements and our sales channels and getting accurate reporting data.  It can take someone months to run a report on that.  But I haven't seen one specifically for Photoshop.

Q.   So you're not aware of any information that indicates the total number of serialized users that you can give to the jury today.

A.   Not that I could give to the jury today, although I would say that the 1.4 million serialized opt in, folks who were represented in that report, certainly should be a pretty good representative population, a good sample size for analysis.

Q.   But you don't know what the total number of serialized users are?

A.   Not right now, today, no.

Q.   And you weren't able to give that information to EveryScape either, were you ?

A.   No.

Q.   You would agree with me that the chart does not indicate all of the versions of Photoshop that are being measured in

1    that chart?

2    A.   Right.   The only versions I can identify are CS5, CS5.5,

3    and CS6.

4    Q.   Again, that's because that information specifically exists

5    on the chart that was prepared by someone else and that was

6    given to you 24 hours before you testified.

7    A.   That's correct.

8    Q.   Okay.

9         So you were reading that aspect of the information

11:39 10   right off the chart.

11   A.   Yes, it's a pretty straightforward chart.

12   Q.   And EveryScape, as far as you know, didn't have additional

13   information on that chart, other than what's on the chart

14   itself?

15   A.   Not that I'm aware of.

16   Q.   Okay.

17        Do you know when that customer approval program even

18   came into effect?   Did you know at the time you testified?

19   A.   I didn't.   It's unclear whether it was actually started in

11:40 20   CS4 or CS5.

21   Q.   So you just don't know?

22   A.   I don't.

23   Q.   All right.

24        Do you know the demographics of the users that are

25   represented in that chart?

1    A.    No.  We don't collect demographic information.  All the

2    reporting is anonymous based on people who opt in.

3    Q.    Okay.

4          I want to switch over to the PixelGenius license that

5    you testified about earlier.

6    A.    Okay.

7          MR. AIRAN:  I think it was Exhibit KN.

8    Q.    And this is a license that you said you negotiated?

9    A.    That's correct.

11:40  10    MR. AIRAN:  If we can focus in on Section 1.4.

11   Q.    Do you see that?

12         "Licensor data" means the data as further described in

13   Exhibit A."

14   A.    That's correct.

15   Q.    And this is the deal you did?

16   A.    Yes.

17   Q.    You said it was a pretty broad license?

18   A.    Yes.

19         MR. AIRAN:  If we can go to Exhibit A, please.  I

11:41  20    think that's the last page of that exhibit.

21         (Pause.)

22         MR. AIRAN:  It's KN 6, page 6.

23   Q.    Do you see Exhibit A there, sir?

24   A.    I do.

25   Q.    Can you describe for the jury what licensor data was

1   actually licensed?

2   A.   It's a set of information used to map the sharpening as

3   you perceive it on screen to an appropriate level of sharpening

4   for a printed image based on the type of paper, matte or

5   glossy, resolution of image, the size of the image, and so it

6   takes all those factors and defines an appropriate amount of

7   sharpening for that image automatically.

8   Q.   By reference to Exhibit A that's up on the screen, is any

9   of that set forth in Exhibit A?

11:42 10   A.   No, I don't see it there.

11   Q.   It's blank, Exhibit A is blank?

12   A.   Yes.

13   Q.   So the contract itself -- this was a legal document,

14   right?  It's a binding legal document between Adobe and

15   PixelGenius, right?

16   A.   That's correct.

17   Q.   And you negotiated it?

18   A.   I did.

19   Q.   All right.

11:42 20        And there's no licensor data specified in Exhibit A,

21   which is where the licensor data should be, right?

22   A.   Yeah, it's -- it's a big table of information that

23   wouldn't be represented well in the contract.

24   Q.   But the contract refers to Exhibit A, and Exhibit A is

25   blank?

1    A.   That's correct.

2    Q.   And you negotiated that agreement.  Did you have advice of

3    counsel in connection with that agreement as well?

4    A.   I typically have a legal team that reviews our contracts.

5    Q.   Okay.

6    A.   I'm a little surprised this one doesn't have a notation in

7    there.

8    Q.   All right.

9         And so you would agree that's not exactly a best

11:43 10   practice, to put a blank where the data that you're supposed to

11   be licensing is.

12   A.   Yeah, and I believe in 2007 this is the first technology

13   license agreement I had negotiated, so maybe I was a little

14   green.

15   Q.   Okay.

16        That's not a best practice by any means, to leave

17   blank the data you're supposed to be licensing.

18   A.   That's correct.

19   Q.   All right.

11:43 20        And Adobe doesn't make a habit of paying $300,000

21   without specifying exactly what it's getting, does it?

22   A.   I would say not.

23   Q.   And you didn't really cross the Ts or dot the Is on this

24   agreement, that's what it would appear here.

25   A.   I'd have to look in our licensing system.  It could have

1    been attached to our contract management system as a separate

2    file, that's where the repository of all our contracts live.

3    My guess is that it was delivered in a separate file, it's a

4    file in our contract system, and this is just a reference on

5    the paper copy to the data that we received.

6    Q.   And there's no reference to any of that in this exhibit,

7    right?

8    A.   No.

9    Q.   And that's the exhibit you represented was a true and

11:44 10   accurate copy of the Pixel licensing agreement, you testified

11   to that.

12   A.   Yes, absolutely.

13   Q.   And none of the information you're talking about, like

14   competitive internal tracking or something, is in that

15   contract, right?

16   A.   No, it's not.

17   Q.   It's fair to say that agreement was not very important to

18   Adobe in view of these glitches?

19   A.   Any revenue agreement, anything where we're paying money,

11:44 20   is important to Adobe.

21        Again, the contract management system we have

22   internally is the superset of all the information about the

23   deal.  This is just the contract that both parties signed.

24   Q.   Doesn't matter, it's just the paper contract that people

25   signed, not that important to Adobe.

1    A.    Oh, no, the signatures are important.

2    Q.    And the actual document is important as well, right?

3    A.    Yes.

4    Q.    Okay.

5          And it's just not complete, you would agree with that,

6    the document we're looking at, the contract we're looking at.

7    A.    Yes.  It looks incomplete, although I'd have to look in

8    our bigger contract management system to see -- follow a paper

9    trail or not a trail to see what else --

11:45 10   Q.    Does PixelGenius have access to that contract management

11   system you're talking about?

12   A.    No, they do not.

13   Q.    So as far as PixelGenius is concerned, this is what they

14   have?

15   A.    And the series of e-mails explaining what the deal is

16   about and the negotiations over e-mails.  We have a long

17   history and relationship with the individuals in that company.

18   Q.    Fair enough.  But as far as the legal contract goes, we're

19   looking at it from PixelGenius' standpoint?

11:45 20   A.    I believe this is what they signed, yes.

21   Q.    And you would agree that Adobe has hundreds of licenses

22   relating to the Photoshop product?

23   A.    I don't have an accurate count, but I imagine we have

24   quite a few.

25   Q.    Would you imagine it's in the hundreds?  Can you give us a

1  ballpark?

2  A.   I would say hundreds could be reasonable, given that it's

3  over 25 years old at this point.

4  Q.   Okay.

5       And you've testified as to one license.  Is that

6  specifically related to Photoshop, by the way?

7  A.   It is.  It allows for technology to be shipped within

8  Photoshop.

9  Q.   And that's one of hundreds of licenses that relate to

11:46 10  Photoshop, right?

11  A.   Yes, but this is one that I negotiated.

12  Q.   And you're not in any way representing that that's somehow

13  a representative license agreement involving Photoshop, right?

14  A.   The terms of our license and technology license agreements

15  are fairly common across all the technologies we license.

16  There's some boilerplate terminology that would be very

17  consistent.

18  Q.   Have you reviewed all of those hundreds of agreements

19  relating to Photoshop?

11:46 20  A.   No, I have not.

21  Q.   And you're not in a position to say either way on that,

22  are you?

23  A.   Either way --

24  Q.   Whether this is representative of the hundreds of

25  agreements that are out there relating to Photoshop.

1   A.   Not without reviewing those other agreements.  Again, we

2   use the same terminology and terms for most of our agreements.

3   Q.   And so this is representative, this blank licensor data,

4   of the type of agreements you entered into?

5   A.   I would say not.

6   Q.   This is not a representative agreement, at least this part

7   of it?

8   A.   No.  The lack of information in Exhibit A is definitely

9   not representative.  This looks like an oversight or there's

11:47 10  more information in our contract management system that would

11   explain why this page was specifically left blank.

12   Q.   Fair enough.

13        MR. AIRAN:  Can I have page 4, please, Mr. Carrillo?

14   Q.   You see Section 11.14 of that agreement, sir?

15   A.   I do.

16   Q.   It says, "no patent license."  Do you see that?

17   A.   I do.

18   Q.   "Nothing contained herein shall be construed as conferring

19   by implication estoppel or otherwise any license or right under

11:47 20  any patent."  Do you see that?

21   A.   I do.

22   Q.   And you would agree that that's not a patent license, the

23   PixelGenius agreement is not a patent license, right?  You

24   would agree with that.

25   A.   No, but the clause does allow for later-issued patents,

1    it's just at this time there is no patent involved in the

2    agreement.

3    Q.    So they paid -- you paid $300,000 and you did not get a

4    patent license.  That's what it says right there in Section

5    11.14.

6    A.    It doesn't exclude a future patent from my interpretation,

7    but I'm not a lawyer.  But at the time, there was no patent

8    involved in this technology.

9    Q.    Okay.

11:48 10         And you're not a lawyer, I know, but you can read

11    English, and it says, "nothing contained herein," that's the

12    whole document, right?

13    A.    I will take your legal advice on that, yes.

14    Q.    I'm just asking you the English language.  You're a

15    business guy, you said you negotiated this.  I'm asking what

16    you understood that to mean.  "Nothing contained herein shall

17    be construed as conferring by implication estoppel or otherwise

18    any license or right under any patent."  Right?

19    A.    That is what it says.

11:49 20    Q.    The plain English interpretation of that would be it's not

21    a patent license.

22    A.    Correct.  There was no patent being licensed at this time.

23    Q.    Fair enough.

24         Adobe has not taken a license under EveryScape's

25    patents, right?

A.    I'm sorry, could you rephrase that?  I'm not sure I
understood that question.

Q.    Sure.  Adobe has not taken a license under the two
patents-at-suit that are at issue, have they?  That's why we're
here today.

A.    Yes, there was never any approach from Mok3 or EveryScape
to negotiate a license agreement of any sort.

Q.    Okay.

      I want to go back to one thing before I forget about
it.

      The perspective crop that you showed earlier, that was
with the chessboard where you did kind of a Crop Tool thing and
you moved it around.  Do you recall that?

A.    That's correct.

Q.    And that's a product that -- explain to the jury when that
was made available to the public through Photoshop.

A.    Well, that was shipped as part of Photoshop in 2001.  It
was a little bit before my time, before I joined Adobe.

Q.    2001, right?

A.    Correct.

Q.    And do you know what technology is used to do that
perspective crop?

A.    I don't understand the underlying source code, so I'm not
sure what you mean by "technology."

Q.    Well, you understand that the Clone Stamp tool here uses

vanishing points, right?  You remember that testimony from

Dr. Oh and Dr. Durand?

A.    Yes, heard quite a bit of testimony on those topics.

Q.    It uses vanishing points, right, and then it does that to

transform from the image plane to the world plane, right?

A.    Again, it's a little over my head in terms of whether I

can concretely say yes or no, because that's math beyond my

skills.

Q.    But you do have an engineering degree from Duke, right?

A.    I do.

Q.    So it's not like you're completely unknowledgeable about

technology.

A.    My last math course was quite a long time ago.

Q.    But it would have been linear math, say, in engineering

school?

A.    Yeah.

Q.    So you understand how linear math and matrixes work.

A.    Basic principles, yes.

Q.    Okay.

        And so Dr. Oh and Dr. Durand talked about these

vanishing points, and that's how using linear math you

transform from the image plane to the world plane.

A.    I believe that's what I heard him testify.

Q.    Do you know if that same technology is used in the

Perspective Crop tool?

1    A.    I don't know.

2    Q.    No idea?

3    A.    I would prefer not to guess under oath.

4    Q.    Okay.

5          And Adobe has a number of software engineers, right?

6    A.    We do.

7    Q.    And you get lots of patents.  You've been testifying about

8    that, right?

9    A.    Yes.  I mean, Photoshop specifically has patents.

11:51 10   Q.    And they're inventive, the engineers at Adobe are

11    inventive, right?

12    A.    Yes.

13    Q.    And no one from Adobe ever thought to use that Crop tool

14    to invent a perspective clone brush that uses these vanishing

15    points, did they, as far as you know?

16    A.    I can't say for certain one way or another.

17    Q.    They didn't release a product, did they?

18    A.    No, they did not.

19    Q.    You would agree that there's a design that EveryScape

11:52 20   would also agree does not infringe its patents?  You heard

21    Mr. Schoonmaker testify earlier?

22    A.    I did.

23          Could you be a little more specific?  I'm not sure I

24    understand.

25    Q.    Sure.  Mr. Schoonmaker testified he would be happy if you

1    just took his technology out of your product, right?  Do you

2    recall that testimony?

3    A.    I don't recall specifically.

4    Q.    Do you know if there's a design, a redesign of Vanishing

5    Point, that could pull out the technology that's at issue here,

6    if that's even possible?

7    A.    That would be something I would have to ask an engineer

8    about.

9    Q.    Okay.

11:52 10          You don't know anything about that.

11   A.    No.

12   Q.    We've heard a lot about Painter 7, right?

13   A.    Yes.

14   Q.    So you know Adobe could adopt the Painter 7 approach,

15   right?

16   A.    I'm not entirely familiar with the Painter 7 approach.

17   Q.    And you've sat through this whole hearing, trial, and

18   you're not familiar with the Painter 7 approach.

19   A.    From an end-user perspective, I haven't tried it yet.

11:53 20   Q.    Okay.

21          MR. AIRAN:  I'll pass the witness.

22          THE COURT:  Anything further, Mr. Scherkenbach?

23          MR. SCHERKENBACH:  Briefly, your Honor.

24                    REDIRECT EXAMINATION

25   BY MR. SCHERKENBACH:

```
 1    Q.   Let's go in reverse order.

 2         Do you know whether or not Adobe is, in fact, using

 3    the Painter 7 approach in Vanishing Point?

 4    A.   I don't know.

 5    Q.   Okay.

 6         This PixelGenius agreement, Exhibit A, did Adobe pay

 7    $300,000 and get nothing?

 8    A.   No, no, I'd be in trouble.

 9    Q.   Was there any doubt between the parties as to what data

11:53 10   and technology was being licensed?

11    A.   There was no doubt about what was being licensed.

12    Q.   All right.

13         Exhibit 175.

14         MR. SCHERKENBACH:  Can we put that up, please?

15    Q.   Did you -- this is the Adobe product improvement data

16    relating to use of Vanishing Point.  Do you recall that?

17    A.   Yes.

18    Q.   Did you confer by e-mail in advance of your deposition

19    with the person who actually pulled this data?

11:54 20   A.   I didn't confer directly.  I received an e-mail chain that

21    had the context that I needed.

22    Q.   And did -- tell us at a high level what was in that e-mail

23    and what information you took from it.

24    A.   It was just --

25         MR. AIRAN:  Objection, your Honor.  That e-mail has
```

1  never been produced to EveryScape.

2      THE COURT:  Sustained.

3  BY MR. SCHERKENBACH:

4  Q.  Did you learn what you needed to learn from that e-mail

5  exchange about what the data in Exhibit 175 meant?

6  A.  Absolutely.  I mean, on the face of it, it's pretty easy

7  to interpret as is.

8  Q.  Are you satisfied that the data in Exhibit 175 is

9  accurate?

11:54 10  A.  I am.

11  Q.  Did you explain to EveryScape in deposition what the

12  headings meant and what the data meant?

13  A.  I did.

14  Q.  Is there any ambiguity in your mind as to what this data

15  means in Exhibit 175?

16  A.  No, none at all.

17  Q.  Create Plane and Edit Plane tools.  You were asked about

18  that, right?

19  A.  Yes.

11:55 20  Q.  And you said that the Create Plane and Edit Plane tools

21  can be used as a sort of preparation for using Clone Stamp

22  tool, fair?

23  A.  Yes.

24  Q.  Is that true of other tools within Vanishing Point as

25  well, that you would use create plane and edit plane before

1    using them also?

2    A.    Oh, yeah, I would use it before using the Marquee tool or

3    before moving text into it or transforming text.

4    Q.    So can the Create Plane and Edit Plane tools within

5    Vanishing Point be used without ever using the Clone Stamp

6    tool?

7    A.    Yes, I believe I demonstrated some of that earlier.

8    Q.    Finally, this -- the examination started with a litany of

9    all the people who know something about Photoshop who aren't

11:55 10   going to testify in the trial.  Do you recall that?

11   A.    I do.

12   Q.    How many Adobe employees have responsibility directly or

13   indirectly for Photoshop?

14   A.    That's a good question.  I would say it's probably about a

15   hundred, 120 people somehow related to the Photoshop team.

16             MR. SCHERKENBACH:  Nothing further.

17             MR. AIRAN:  Just one last question, your Honor.

18                       RECROSS-EXAMINATION

19   BY MR. AIRAN:

11:56 20   Q.    You were not one of those people, as you testified

21   earlier, that have direct or indirect responsibility for

22   Photoshop.

23   A.    For the software product, correct.

24   Q.    Yes.  You're not one of those 120.

25   A.    I guess I am.  My name is on the splash screen, so I do

1   have some level of connection to it at least because I'm on the

2   digital imaging team, but I tried in my deposition to be clear

3   about what kind of role and responsibility I have on the

4   Photoshop team on a day-to-day basis.

5   Q.   And in your deposition you said you were not directly or

6   indirectly responsible for Photoshop.

7   A.   That's correct.

8   Q.   Okay.

9        So you're not actually one of those 120 people.

11:56 10   A.   I do not claim to be one of those 120 people.

11        MR. AIRAN:   Thank you.

12        THE COURT:   Thank you very much, Mr. Hogarty.

13        Next witness, please.

14        MR. KESSEL:   Good morning ladies and gentlemen, your

15   Honor.   For its next witness, Adobe calls George Wolberg, a

16   professor at City University of New York, author of the Digital

17   Imaging Warping textbook.   He'll be testifying by deposition.

18   It's about 40 minutes.   You'll be hearing questions both from

19   me and from EveryScape counsel.

11:57 20        (From videotaped played deposition.)

21   Q.   Good morning, sir.

22   A.   Good morning.

23   Q.   Could you please introduce yourself to the jury.

24   A.   My name is George Wolberg.   I'm professor of computer

25   science at the City College of New York.

1    Q.    Why are you here today, Professor Wolberg?

2    A.    Well, my entire career has been devoted to digital

3    imaging, and in 1990, I published a book called "Digital Image

4    Warping," so I'm here to talk about my book and my experience

5    in the field of digital imaging.

6    Q.    Did you bring that book with you today?

7    A.    Yes, I did.

8    Q.    Can you show it?

9    A.    This is my book.

11:58 10    Q.    This is the "Digital Image Warping" book you referred to?

11    A.    Yes.

12    Q.    And I'd like to mark this as Exhibit 1.  We have a copy of

13    it that I'm going to put into the record.

14         Before we talk about your book, sir, tell us a little

15    bit about your background.  How long have been a professor of

16    computer science?

17    A.    I've been a professor since 1990.  So I started my career

18    at the City College of New York as an assistant professor, and

19    then I was tenured in 1994, and I became a full professor in

11:58 20    1998.

21    Q.    So that's 24 years in total?

22    A.    Yes, 24 years.

23    Q.    Can you briefly walk us through your background before you

24    started teaching at City College?

25    A.    Well, I got my bachelor's and master's in electrical

1    engineering at the Cooper Union in New York City.  Right after

2    the sophomore year at Cooper, I had a great job experience at

3    Bell Labs, and that's where I was first exposed to computer

4    graphics and digital imaging when I worked with Dr. Theo

5    Pavlidis.  And I worked in the UNIX group there, actually, the

6    group that invented UNIX and C.  So it was a very stimulating

7    environment.  That's what got me started in my career.

8    Q.    That brings us up to 1985; is that right?

9    A.    Yes.

11:59 10   Q.    What did you do next?

11   A.    Then I was a doctoral student at Columbia University

12   between 1985 and 1990.

13   Q.    What did you do in your doctoral program?

14   A.    Well, I did research on separable image warping, and I

15   also worked part time at a computer animation company in

16   Manhattan, so I did some consulting there as well during that

17   time.

18   Q.    What department were you in at Columbia?

19   A.    Computer science.

12:00 20   Q.    Approximately how many publications do you have, Professor

21   Wolberg?

22   A.    Over 60.

23   Q.    What's the general range of subject matter of your

24   publications?

25   A.    The subject matter is on image processing, computer

1   graphics, sort of computer vision also.  So it spreads the

2   gamut there.

3   Q.   Do you have any patents?

4   A.   Yes, I have about seven patents.

5   Q.   And just -- just at a very high level, what are the

6   subject matters of your various patents?

7   A.   Let's see.  Two patents are on image warping, two patents

8   are on the restoration of images that are scanned in the

9   presence of vibrations, and I have three patents on page

12:01 10   turning, mechanical solutions for automatic page turning.

11   Q.   Did you do any work as a doctorate student on perspective

12   transformation in particular?

13   A.   Well, my work in -- as a doctoral student involved

14   perspective transformations and more generally spatial

15   transformations, geometric transformations, that's really what

16   image warping is about, it's the geometric transformations of

17   images.  Perspective is one element of it.

18   Q.   Was there anything that got you interested in geometric

19   transformation in general?

12:01 20            Have you taught about perspective transformation?

21   A.   Yes, I've taught about perspective transformation in my

22   computer graphics courses.

23   Q.   When did you start teaching about perspective

24   transformation?

25   A.   When I first started teaching at City College of New York

1    back in 1990.

2    Q.   And have you taught perspective transformation ever since?

3    A.   Yes.  My teaching actually predates 1990, because as a

4    doctoral student at Columbia, we were required to teach courses

5    as well.  So I did teach image processing at Columbia before I

6    graduated, and that was in the late '80s.

7    Q.   What sort of students have you taught about perspective

8    transformation?

9    A.   Most of my students are computer science majors.  I also

12:02 10   have computer engineering majors and electrical engineering as

11   well.

12   Q.   Now, focusing in particular on the 2001-2003 time frame,

13   did you teach perspective transformation in those years?

14   A.   Yes, I did.

15   Q.   What courses?

16   A.   In image processing and computer graphics.

17   Q.   Did you use your textbook in those courses?

18   A.   Yes, I did.

19   Q.   By "your textbook," we're referring to the book right

12:02 20   there in front of you, sir?

21   A.   Right, it's this book, yes.

22   Q.   And do you still teach perspective transformation today?

23   A.   Yes, I do.

24   Q.   Let's turn now to the book that you discussed at the

25   outset.  Did you bring a copy of that book with you today?

1   A.   Yes, it's right here.

2   Q.   What's the title of the book?

3   A.   "Digital Image Warping."

4   Q.   How did you come up with that title?

5   A.   Well, originally the title was based on my survey paper,

6   because this book actually came from my survey paper that I was

7   required to write at Columbia as a doctoral student, and the

8   original title was long, it was "Geometric Transformation

9   Techniques For Digital Images, A Survey."  And while I was

12:03 10   working one summer at IBM research, Ed Catmull came by, and I

11   was showing him a draft of my book.  He said, Well, that title

12   has got to go, it's too long.  So I shortened it to "Digital

13   Image Warping," which is essentially what it is.  So that's

14   really where I got the title from, from my interaction with Ed

15   Catmull.

16   Q.   What year was this book published?

17   A.   It was published in 1990.

18   Q.   Can you open to the first page of the preface and just

19   read the first sentence for us?

12:04 20   A.   Okay.

21        "Digital Image Warping is a growing branch of image

22   processing that deals with geometric transformation

23   techniques."

24   Q.   What does that mean?

25   A.   Okay.

1         So image warping is a subset of image processing, and

2    it deals with the manipulation of pixels in an image.  By

3    "manipulation" I mean the geometric movement of it, its

4    physical locations in the image.

5         So we could scan something as simple as a rotation or

6    scale to something more complicated, as you can imagine an

7    image printed on a piece of rubber and then stretching or

8    squeezing that sheet of rubber, what happens to that printed

9    image on that rubber sheet.

12:04 10  Q.   Now, turning to the third paragraph in the preface --

11   A.   Okay.

12   Q.   -- can you read the first sentence of that third

13   paragraph?

14   A.   Okay.

15        "The purpose of this book is to introduce the

16   fundamental concepts of digital image warping and to lay a

17   foundation that can be used as the basis for further study and

18   research in this field."

19   Q.   Do you think you accomplished the purpose you set out to

12:05 20  do here?

21   A.   I think so.

22   Q.   How so?

23   A.   Well, just from -- well, anecdotal evidence, my

24   interactions with people in the field show that they've read

25   the book, it's made some impact, it has appeared in numerous

1    references of papers, other people's work.  So clearly it has

2    made some impact by virtue of its references and anecdotal

3    evidence of top researchers in the field who have read it.

4    Q.   Did you include a section in your book on perspective

5    transformations?

6    A.   Yes, I did.

7    Q.   Let's turn to that section.  Is that Chapter 3?

8    A.   Yes, Chapter 3.

9    Q.   I believe page 41.

12:05 10        Are you on Chapter 3 there?

11   A.   Yeah, I'm on Chapter 3.

12   Q.   What is the title of this chapter?

13   A.   It's called "Spatial Transformations."

14   Q.   What is a spatial transformation?

15   A.   A spatial transformation is a mapping function that

16   establishes correspondence between points in an input image and

17   an output image.

18   Q.   What was the purpose behind this Chapter 3?

19   A.   This chapter establishes the mathematical background of

12:06 20   transformations, of how do you go ahead and define the

21   relationships between pixels and input and output image.

22   Q.   Now, let's turn to the section on perspective

23   transformation.  Is that on page 52?

24   A.   Okay.  Yes.

25   Q.   Now, what is a perspective transformation?

A.    A perspective transformation is a projective mapping.  A
perspective transformation covers familiar things like rotation
and scale, skewing and translation, but, in addition, it allows
for perspective foreshortening of images.  So, for instance, if
you take an image and you tilt it, you're seeing it in
perspective.  So this perspective foreshortening effect that
you get is captured in the perspective transformation.

Q.    Now, there's a picture here on page 53.

A.    Yes.

Q.    Fig. 3.6.  What's depicted here on page 53 and Fig. 3.6?

A.    So here we have a picture of a colored checkerboard, seen
in perspective you can imagine that it's being tilted away from
you at the top.  Here that same checkerboard image is rotated
and tilted as well.  So it shows you what you would get if you
applied a perspective transformation on a regular checkerboard
image.  This is the effect you get with any standard camera.

Q.    Now, why did you use checkerboards in this example?

A.    I used a checkerboard because the checkerboard breaks up
the image into a collection of patches.  Each patch is
understood to be a tile, and by making a checkerboard, you can
see the impact of the transformation on the tile.  So in some
cases the tiles are bigger, in some cases they're smaller.  So
it more clearly demonstrates the effect.

       If I were to use another image, like someone's face or
a more homogeneous representation, more homogenous image, it

1    may not be so apparent, but by having this tiled image, it's

2    very clear what parts of the image are getting compressed, what

3    parts are getting expanded.

4    Q.   Now, let's turn to page 54 of your textbook.  There are

5    three cases that start on this page.  Can you walk us through

6    what each of these cases are?

7    A.   Okay.

8         Case 1 refers to the transformation of going from a

9    square to a quadrilateral.  So it basically describes the

12:09  10    mathematics in establishing the correspondence of all points in

11    a square to a quadrilateral shape.

12         And case 2 basically goes backwards.  It says how do

13    you go from a quadrilateral back to a square?

14         And case 3 pulls those two things together, and I can

15    show a picture here.  It shows going from a quadrilateral to a

16    square and then to another quadrilateral.  So if you want to

17    map one quadrilateral to another, you could go there in two

18    steps by going from quadrilateral to square and square to

19    quadrilateral, and that would achieve the effect of being able

12:09  20    to warp an image from this shape to that shape.

21    Q.   Now, sir, are you familiar with the term "homography"?

22    A.   Yes.

23    Q.   Sir, does your book discuss homographies?

24    A.   The Fig. 3.7 shows an example of that.

25    Q.   Did you come up with the idea of homographies?

1          Did you come up with the idea of using homographies to

2    perform perspective transformations?

3    A.    No.

4    Q.    What about using homographies to perform perspective

5    transformations on a digital image?

6    A.    No.

7    Q.    And just to an order of magnitude, how many copies have

8    been distributed of your work?

9    A.    Somewhere over 10,000.

12:10 10   Q.    How do you know that?

11   A.    From royalty statements from the publisher.

12   Q.    Do you know whether any colleges -- do you know whether

13   any colleges or universities have used your textbook as a

14   teaching reference?

15   A.    It's been used at Columbia, City College of New York,

16   Stanford, Cornell, various others.

17   Q.    When was that?

18   A.    That was early on when the book first came out in 1990.

19   Q.    Has the book been cited at all?

12:10 20   A.    Yes, the book has been cited in many places.  You could

21   find it in many references to papers and other people's books.

22   Even to this day people are citing it.

23   Q.    Now, outside of academia, are there any other uses of your

24   textbook that you're aware of?

25   A.    Well, people in industrial labs have used it, so I'm

1    familiar with people at Microsoft or some other companies

2    who -- you know, Apple, various other companies that have used

3    it as well.

4    Q.   Again, I'll try to be very specific.  You did not use the

5    word "homography" in Chapter 3.4 of your book?

6    A.   No, I did not use the word "homography."

7    Q.   Even though you knew that term "homography" at the time.

8    A.   Yes.

9    Q.   Dr. Wolberg, you're here testifying at the request of

12:11 10    Adobe's counsel, correct?

11   A.   Yes.

12   Q.   And you're doing that voluntarily?

13   A.   Yes.

14   Q.   You weren't subpoenaed to come here, for example?

15   A.   No, I was not subpoenaed.

16   Q.   Do you live in New York?

17   A.   Yes.

18   Q.   And your expenses were paid for -- to come to Boston for

19   this deposition?

12:12 20   A.   Yes.

21   Q.   And prior to today, you never discussed this case with

22   anyone who was representing EveryScape, right?

23   A.   No.

24   Q.   Dr. Wolberg, you've also provided some professional

25   services to Adobe for this case, right?

1    A.    Yes.

2    Q.    And Adobe retained you as a consulting expert for this

3    case, right?

4    A.    Yes.

5    Q.    So, Dr. Wolberg, let me be really specific about this

6    then.  My questions today are not directed to your consulting

7    services that you might have done to Adobe, I don't want to

8    know about that.  So if you feel that those questions are

9    related to your consulting services, I want you to let me know

12:12 10   that, okay?

11   A.    Okay.

12   Q.    So, for example, you reviewed Corel source code for this

13   litigation, right?

14   A.    Right.

15   Q.    And you're not here today to provide any testimony about

16   the Corel source code that you looked at, right?

17   A.    No, unless -- well, unless you ask.

18   Q.    And you're not here today to tell the jury anything about

19   that Corel source code, right?

12:13 20   A.    That's right.

21   Q.    Dr. Wolberg, in answering questions from Adobe's counsel,

22   you used words that are not in your book; is that right?

23   A.    You mean like the word "homography."

24   Q.    Like the word "homography," for example.

25   A.    "Homography" is not in the book.

1    Q.    And in providing explanations of things in your book, you

2    gave explanations that are also not themselves in the book,

3    right?

4    A.    Which words are you referring to?

5    Q.    Were you reading the words from your book?

6    A.    Yes.  When I was asked to read a certain sentence or

7    whatever, I read it from the book, I didn't make that up.

8    Q.    When you were describing perspective transformations, were

9    you reading from your book?

12:14 10    A.    Was I asked to read -- I was asked to read certain

11    sentences from the book that I read from the book, when I was

12    asked to paraphrase or summarize some other term, I wasn't

13    reading from my book at the time, I was just telling you what I

14    was thinking.

15    Q.    You agree that you were paraphrasing your book or parts of

16    your book?

17    A.    I was just trying to answer the question.

18    Q.    You agree that in answering the questions you were

19    paraphrasing or summarizing parts of your book?

12:14 20    A.    Well, the book is very carefully crafted, every word is

21    thought out, and then I've answered questions as, you know --

22    in a straightforward way when you asked me.  When I wasn't

23    reading from the book, I just answered the questions as I

24    saw --

25    Q.    And in doing that, you were paraphrasing the carefully

1    crafted words from your book?

2    A.    I was paraphrasing what I know, yeah.

3    Q.    Much of your testimony today in response to the questions

4    that Mr. Kessel, Adobe's lawyer, asked you related to Section

5    3.4 of your book, correct?

6    A.    Yes.

7    Q.    Did any of your testimony today in response to questions

8    from Adobe's counsel relate to any other parts of your book?

9    A.    No, it was just about Section 3.4, I believe.

12:15  10    Q.    Why did you specifically identify these equations?

11    A.    Well, first of all, I didn't invent these equations, they

12    were well-known, like what's the equation for a perspective

13    transformation, I didn't invent that.  Remember the source of

14    this book, it started out as a survey of what's out there

15    already, put it under one roof, explain it in one cohesive way,

16    that was my purpose in the book.  Of course there are novel

17    elements in the book.  Those novel elements actually came

18    later, but this material here was already in the public domain.

19    I'm just trying to explain it clearly.

12:15  20           So these equations are there because they are part of

21    the history of perspective transformations.

22    Q.    So you mentioned that this book came out in a survey paper

23    that you wrote; is that right?

24    A.    Yes.

25    Q.    Do these equations appear in the survey paper?

```
 1    A.    I'd have to check.  It's been about 25 years or so, so I'd
 2    have to check.
 3    Q.    Dr. Wolberg, you talked earlier about a man named Paul
 4    Heckbert?
 5    A.    Yes.
 6    Q.    Do you know Dr. Heckbert?
 7    A.    I know him, yes.
 8    Q.    Is it Professor Heckbert?
 9    A.    I don't think he's currently a professor.  I'm not sure
10    that he's affiliated with an academic institution at the time
11    now.
12    Q.    He had been a professor at Carnegie Mellon?
13    A.    At CMU, Carnegie Mellon University in Pittsburgh.
14    Q.    And we've established that Professor Heckbert's master's
15    thesis is something that you're familiar with, yes?
16    A.    Yes.
17    Q.    And the date on Professor Heckbert's master's thesis is
18    1989, right?
19    A.    Yes.
20    Q.    And your book was published in --
21    A.    1990.
22    Q.    1990.
23          In fact, Dr. Heckbert's master's thesis played an
24    important role in Section 3.4 of your book, right?
25    A.    Yes, that's why I cited it.
```

Q.    In fact, the master's thesis plays a bigger role than just

those two citations with respect to Section 3.4, doesn't it?

A.    I cited it.  I certainly gave him credit for elements of

this work here, you know, which are directly relevant.

Q.    Well, let's look at the five enumerated equations, for

example.  Isn't it true that each of those five equations

appears directly in Professor Heckbert's master's thesis?

A.    Right, but they also appear in every other textbook on

computer graphics.  They're so fundamental, they appear

12:17  everywhere.  It's not like Heckbert invented that either.  He's

also citing things from the past.

Q.    Dr. Wolberg, can you just hold up your book with that

page, the 8-by-8 matrix, and hold up Heckbert as well, the

8-by-8 matrix that you just identified, so the jury can see

them?

A.    Right, and you can also see the citation to Heckbert here

as well.

Q.    Right, in your book, I understand.

      So each of the five equations that are enumerated in

12:18  Section 3.4 of your book actually also appear in Heckbert,

right?

A.    Right, that's why I cited him.

Q.    In fact, all of the math, not just the ones that are

enumerated, but the rest of the math also appears in Heckbert,

right?

A.   Well, it's all touching on the same subject, yes.  And
that's why that figure also, Fig. 3.7, which is over here, I
also cite Heckbert right in the caption.  I don't know if you
can see that.

Q.   So you agree there's no new math in Section 3.4 of your
book.

A.   Well, new math, it's not like I'm trying to invent
mathematics, but I'm trying to present it in a cohesive manner
with every other subject in the book, common language running
throughout, common thread, and so I didn't invent new math
there, no.

Q.   In fact, you duplicated the math that was in Heckbert,
didn't you?

A.   Duplicate, well, with citation, yeah.

Q.   So, Dr. Wolberg, just to be clear, all of the math that is
included in Section 3.4 of your book also appears in Heckbert,
yes?

A.   Yes, the math is there.

Q.   So you can't identify for the jury any specific
mathematical formula or equation in Section 3.4 of your book
that's not in Heckbert, right?

A.   It's written differently, but it covers the same material.

Q.   Let me turn to, in your book, Section 3.4.2.1 on page 54.

A.   Right.

Q.   Can you hold up Heckbert as well so we can see the

1  resemblance?

2  A.   I'm not taking credit for it, I'm just saying I'm giving

3  Heckbert credit for it.

4  Q.   Dr. Wolberg, I just want to be clear, did you literally

5  copy Dr. Heckbert's figure to be put in your book with

6  contribution?

7  A.   I don't know if it's a literal copy or if it's just

8  redrawn; it's probably not literal.

9  Q.   So, again, at least as to the math, Section 3.4 of your

12:20 10  book doesn't contribute anything new that Heckbert had already

11  described to the world; is that right?

12  A.   Right, and some of the things he described were also known

13  before.

14  Q.   So -- and I'll just read this for the record, quote, The

15  shortcomings of a point-to-point mapping are avoided by using a

16  four-corner mapping paradigm, end quote.

17  A.   Yes.

18  Q.   Do you stand by those statements?

19  A.   Yes.

12:21 20  Q.   Dr. Wolberg, can you look at Heckbert page 19, please?

21  A.   Okay.

22  Q.   And there's a section there that's entitled "Inferring

23  Projective Mappings."  Do you see that?

24  A.   Yes.

25  Q.   And the first paragraph begins, quote, In an interactive

1  image warper one might specify the four corners of source and

2  destination quadrilaterals with a tablet or mouse, and wish to

3  warp one area to the other.

4  A.   Right.

5  Q.   That's what it says there?

6  A.   Yes.

7  Q.   And Heckbert then provided a generalized equation for

8  computing a quadrilateral-to-quadrilateral mapping, right?

9  A.   Right.

12:21 10  Q.   And that's the large equation that in your book was

11  labeled 3.4.5, correct?

12  A.   Let me see.

13       Yes.

14  Q.   And by solving that system of equations, the 8-by-8 matrix

15  that's 3.4.5, it's possible to find the mapping from a first

16  quadrilateral directly to a second quadrilateral, correct?

17  A.   Yes.

18  Q.   3.4.5 shows that.

19  A.   Yes.

12:22 20  Q.   Now, in your text, where you use the same three cases that

21  Heckbert uses --

22  A.   Mm-hmm.

23  Q.   -- you indicate that computation of that general equation

24  can be speeded up by using a unit square, right?

25  A.   Yes.

Q.   So it's a two-step solution of the single set of equations

of 3.4.5 for computing a quadrilateral-to-quadrilateral

projective mapping?

A.   Correct.  They're equivalent to each other, it's just a

matter of speed.

Q.   So the purpose of the unit square in case 3 is to speed up

the computation --

A.   Yes.

Q.   -- of the general quad-to-quad projective mapping?

A.   Right.  It shows a faster way of getting the solution.

Q.   And in fact, both you and Heckbert both specifically

mention that speed is the reason for going through that unit

square, right?

A.   Yes.

Q.   Dr. Wolberg, does your text describe any purpose for that

unit square other than speeding up the single-step calculation?

A.   No.

Q.   So according to your text, the only purpose for that unit

square is to speed up the calculation of the

quadrilateral-to-quadrilateral projective mapping, right?

A.   Yes.

Q.   Dr. Wolberg, Heckbert included source code and you

included this computational table that's included on page 68,

yes?

A.   Yes.

```
 1   Q.   So as a result of that, it's fair to say that Heckbert is

 2   more complete on this subject than your text?

 3   A.   I would say that he made an entire dissertation on this

 4   narrow subject.  My text is broader.

 5   Q.   So on this particular subject of perspective

 6   transformation, Heckbert is more complete than your text?

 7   A.   Well, I devoted fewer pages to it because I had other

 8   things to cover as well.

 9   Q.   So Heckbert's a more detailed exposition than what's in

10   your text?

11   A.   For this particular narrow branch, yes.

12   Q.   And that's the detailed exposition of Section 3.4?

13   A.   Yes.

14   Q.   Dr. Wolberg, I'd also like you to look at Heckbert, page

15   18.

16   A.   Yes.

17   Q.   Can you turn to that page?

18        And there's a figure at the top of that page, or two

19   figures, right, Fig. 22.7 (a) and (b)?

20   A.   Yes.

21   Q.   You did not copy those figures into your text, did you?

22   A.   No.

23   Q.   And in the caption for that figure, you note that it's --

24   do you see the term "vanishing points"?  Do you see that?

25   A.   Yes.
```

1   Q.   The last words?

2   A.   Yes.

3   Q.   It says, "note the vanishing points," right?

4   A.   Right.

5   Q.   Does your text reference the term "vanishing points"?

6   A.   No.   That was not my focus here.   There's a lot -- you can

7   write a whole textbook just on material in this section if you

8   wanted to, but that was not my goal.

9   Q.   But the quadrilateral-to-quadrilateral projective mappings

12:25 10   that you described, for example, in 3.4.5, that equation, do

11   you see that?

12   A.   Yes.

13   Q.   The purpose of solving that equation is not specifically

14   to correct a perspective foreshortening, right?

15   A.   The purpose is to achieve a perspective transformation,

16   that's why.   So the very first equation in that section shows a

17   matrix with nine unknown numbers in there, and the purpose of

18   equation 3.4.5 is to solve for those unknown numbers, that's

19   it.

12:26 20   Q.   And it's defined a mapping from one quadrilateral to

21   another quadrilateral right?

22   A.   Yes.

23   Q.   Dr. Wolberg, let's look at Fig. 3.7 of your text, which is

24   on page 56.

25   A.   Okay.

1  Q.   And from left to right, there's a first quadrilateral,

2  then there's the unit square, and then there's a second

3  quadrilateral, right?

4  A.   Yes.

5  Q.   And in that first quadrilateral on the left-hand side

6  could be perceived as four points on a plane that has -- is

7  distorted due to perspective foreshortening; is that fair?

8  A.   Yes, it's fair.

9  Q.   And you would agree that the unit square is not an

12:27 10  undistorted projection of that first quadrilateral, right?

11  A.   It's just an intermediate proxy.

12  Q.   And you'd also agree that that unit square, intermediate

13  unit square, is not an undistorted projection of the second

14  quadrilateral.

15  A.   Right.

16  Q.   And let me just ask again because I'm not sure it was

17  answered clearly.  The first -- the unit square is not an

18  undistorted projection of the first quadrilateral, right?

19  A.   It's just -- in fact, this is rather arbitrary, to go from

12:28 20  a quadrilateral to a square.  You don't even have to be

21  referring to images that are distorted and not distorted.

22  That's irrelevant.  From a purely mathematical point of view,

23  the only thing this is addressing is how you go from one

24  four-point -- one quadrilateral to another quadrilateral, in

25  which case the target quadrilateral here happens to be unit

square.  But this issue of distortion is irrelevant here at the

moment.  This is addressed purely from a mathematical point of

view.

Q.   And that's just to speed up the computation, that's why

it's used?

A.   Right.  At the end of the day, what we're trying to do is

solve for unknown coefficients necessary to get you from four

corner here in this polygon to the four corners over there.

And we just have these data unknown coefficients, and this way

is a fast way for solving for those unknown coefficients.

Q.   Dr. Wolberg, at the time or before you wrote your book,

were you familiar with the term "world of plane"?

A.   There are many terms -- well, it depends what the context

is.  There are many terms about from taking things from the

world coordinate system to another coordinate system.

Q.   So let me be specific.  I'm not asking about anything you

might have learned after you wrote your book, but before you

wrote your book or at that time you were familiar with the term

"world plane" or "world coordinate system"?

A.   Yes, it was in every computer graphics textbook.

Q.   Your book doesn't use the term "world plane" or "world

coordinate system," does it?

A.   Well, my book isn't strictly computer graphics, it's image

warping, which is really a subfield of image processing, so I

may have used different words, different terms.

1    Q.   Again, it doesn't use the term "world plane," right?

2    A.   I don't recall.

3    Q.   Or "world coordinate system," that doesn't appear in your

4    book either, right?

5    A.   I don't recall, no.

6    Q.   Can you -- do you recall if it appears in Section 3.4 of

7    your book, the term "world plane" or "world coordinate system"

8    appears in Section 3.4?

9    A.   I don't believe so.

12:30 10    Q.   Do you want to take a quick look and confirm?

11    A.   In 3.4?

12        (Pause.)

13    A.   No, I don't see it.

14    Q.   And so your book also doesn't describe the calculation of

15    a world plane or world plane coordinates using homography,

16    right?

17    A.   No, but it doesn't use those words, it doesn't mean that

18    the essential operations aren't there.  You know, you could

19    open up many different textbooks and get different words here

12:31 20    and there, but sometimes there are many ways of saying the same

21    thing.  Ultimately, the equations that are shown here are all

22    that's necessary in going from a quadrilateral to a

23    quadrilateral, achieving planar mapping, and that's what

24    homography is anyway, whether the word "homography" is used or

25    not.  If it's the effect you're after, the answer is here,

1    whether you use the word or not doesn't matter.

2    Q.   Dr. Wolberg, I was talking more specifically about

3    calculating a world plane.  That's not described in Section 3.4

4    of your book, right?

5    A.   Right.

6    Q.   And your book also doesn't describe any homographies being

7    calculated using vanishing points that are on a plane, right?

8    A.   Right.

9    Q.   And your book doesn't describe using the homography to

12:32 10   remove perspective distortion images?

11   A.   Well, it doesn't use the word "homography," but

12   implementing these equations will achieve the effect you just

13   mentioned.  With or without the word "homography" thrown in, it

14   still achieves the effect.

15   Q.   But your book doesn't actually describe using a homography

16   or perspective transformation to remove distortion from an

17   image, right?  That does not specifically describe the

18   distortion correction, right?

19   A.   I don't even have to use the word "distortion" here.

12:32 20   Q.   Dr. Wolberg, your book doesn't describe that intermediate

21   unit square as a world plane, right?

22   A.   No, I don't use that term explicitly.

23   Q.   And your book doesn't describe the unit square as

24   something which is defined or calculated by using vanishing

25   points on a plane, right?

1  A.    Right.

2  Q.    When did you start consulting with Adobe for this

3  litigation?

4  A.    I was retained in 2011.

5  Q.    August 2011, is that about right?

6  A.    It was the summer, I don't remember the exact date.

7  Q.    Summer of 2011?

8  A.    Right.

9  Q.    And you were paid for your work?

12:33 10  A.    Yes.

11  Q.    What was the basis for your compensation?

12        Let me rephrase.  Were you paid an hourly rate?

13  A.    Yes, I was paid an hourly rate.

14  Q.    What was your hourly rate?

15  A.    Three hundred.

16  Q.    Three-hundred dollars an hour?

17  A.    Yes.

18  Q.    And are you being paid that hourly rate today?

19  A.    Yes.

12:33 20  Q.    And you were paid to meet -- you were paid $300 an hour to

21  meet with Adobe's counsel yesterday?

22  A.    Yes.

23  Q.    Since you first started consulting with Adobe in summer of

24  2011, how much in total have you been paid by Adobe?

25  A.    Maybe around $10,000.

1    Q.    So, Dr. Wolberg, you've been consulting with Adobe for

2    this litigation for about three-and-a-half years; is that

3    right?

4    A.    Yes.

5    Q.    And you've been paid about $10,000?

6    A.    Quite obviously it wasn't full time.  There was work to be

7    done in 2011, maybe a little bit in 2012, nothing until now.

8    Q.    And you're not offering any opinion in this litigation as

9    to the validity of EveryScape's patents, correct?

12:34 10    A.    No.

11    Q.    Is that -- let me ask the question again.

12    A.    Ask the question again.

13    Q.    Dr. Wolberg, are you offering any opinion in this

14    litigation as to the validity of EveryScape's patents?

15    A.    No, I'm not.

16    Q.    And Mr. Feigelson also asked you whether -- I think the

17    words -- a question along the lines of whether the words

18    "removing perspective distortion" were in your book.  I'm going

19    to ask you whether that concept is present in your book.

12:35 20    A.    We're talking about four corners.  The four corners of the

21    quadrilateral is shown here.  If you consider this a distorted

22    image, you could always correct for it by making those four

23    corners move onto a square to which the original checkerboard

24    image belonged to.  It was a square.

25            So the mathematics in the book show you how to go from

one quadrilateral to another with the target quadrilateral

being possibly just an ordinary rectangle or a square.  And so

those concepts are here.  Whether or not the words "perspective

distortion" were used, the concepts are there.

Q.    More specifically, you said the math is there.  Where is

the math in your book that would be used for removing

perspective distortion?

A.    Well, the math is in Section 3.4.2.  Basically the title

of that section is called "Inferring Perspective

Transformations," and what that means is that if you tell me

the location of the four corners of the quadrilateral and

specify where they should go to, then that section gives you

the equations so that you can fulfill this perspective

transformation.  Those unknown coefficients in this equation

3.4.1 will be determined by solving the equations in Section

3.4.2.

        That's also why I didn't provide the source code in

this section because it so straightforward because the

equations are there.  You can almost translate it immediately

to code.  So it didn't take a great leap of imagination to do

that, so I didn't provide source code there for that purpose.

        There are other places in the book where I do provide

the source code where it's not obvious.  So given the finite

number of pages I can devote in the book, I chose to allocate

source code where it belonged.  But these equations and the

1    concepts here are straightforward.

2    Q.   The reporter is handing you what's been designated as

3    Exhibit 9.

4    A.   Right.

5    Q.   And it is paper entitled "Geometric Transformation

6    Techniques For Digital Images, A Survey"?

7    A.   Right.

8    Q.   It's dated December 1988?

9    A.   Yes.

12:37 10   Q.   And it is a technical report, CUCS-390-88, yes?

11   A.   Right.

12   Q.   And do you understand this to be the survey paper that you

13   have been referring to throughout this morning that led to your

14   book?

15   A.   Yes.

16        By the way, interestingly here, you mentioned that my

17   expressions for perspective transformation matched those of

18   Heckbert, but my publication in 1988, which predates his

19   thesis, had it there first.

12:38 20   Q.   3.2.7 is perspective transformation, correct?

21   A.   Correct.

22   Q.   And that Section 3.2.7 consists of a single paragraph?

23   A.   Right.  It just basically says that the affine matrix in

24   3.2.6 which has two zeros in there, if you replace those zeros

25   with non-zero numbers, it becomes a perspective transformation.

1    Q.    And I'll turn your attention to page 28.

2    A.    And by the way, the terminology of "vanishing point" is

3    there, in 3.2.7.

4          Anyway, you want page 28?

5    Q.    Yes, page 28.

6    A.    Yes.  Right.

7    Q.    Section 3.5.3.2.  Do you see that?

8    A.    Yes.

9    Q.    It talks about perspective projection?

12:38 10   A.    Right.

11   Q.    In going from survey paper to the book, that's when you

12   looked at Heckbert's master's thesis, right?

13   A.    In the interim, yes.

14   Q.    And that's where all of the math in Section 3.4 came from,

15   right?  It came from Heckbert's master's thesis, not from your

16   survey paper, right?

17   A.    Which I cited.  Which I cited.

18   Q.    You agree with me that the math that's in Section 3.4 is

19   not found in your survey paper from 1988, right?

12:39 20   A.    Some of the math is, but many of the equations that you're

21   referring to are not.  Some of them are.

22   Q.    Any of the five equations that we looked at?

23   A.    The first ones.

24   Q.    The first --

25   A.    The first one, 3.2.7 in my survey paper is matching the

 1  first equation 3.4.

 2  Q.   But the other four equations are not there?

 3  A.   Right, right.

 4  Q.   And the quad-to-unit-square to quad cases are also not in

 5  your survey paper, right?

 6  A.   Correct.

 7  Q.   And your survey paper also doesn't describe the use of a

 8  homography calculated from vanishing points on a plane that

 9  allow for the removal of perspective distortion in an image,

12:40 10  right?

11  A.   It doesn't refer to vanishing points, no.

12  Q.   And neither that survey paper nor your book describe any

13  homographies that are calculated from vanishing points on a

14  plane, right?

15  A.   No, but the concept is in the book.  The concept is there

16  in the book.

17  Q.   Your survey paper and the book do not actually describe

18  using vanishing points on a plane to compute homography, right?

19  A.   No.

12:40 20  Q.   And neither your survey paper nor the book describe the

21  unit square that's used in the quad-to-quad mapping as

22  something that's defined or calculated by vanishing points on a

23  plane.

24          So you stand by your earlier testimony that there's no

25  computations disclosed in 3.4 that involve the use of vanishing

1 points, right?

2 A.   They weren't necessary because you could achieve the same

3 effect by just solving those equations whether or not you imbue

4 it with the notion of vanishing points or not.  If you simply

5 want to go from four-corner-to-four-corner mapping, that

6 concept, that effect is achievable using the content in my

7 book.

8 Q.   If that's your goal, then you don't need to use vanishing

9 points to achieve it, right?

12:41 10 A.   I don't have to do anything more than what those equations

11 tell me to do.

12 Q.   Right.  So for quad-to-quad mapping, that's correct,

13 right?

14 A.   That's correct.

15       MR. KESSEL:  Your Honor, Adobe calls its next witness,

16 this is Christopher Tremblay, who was the Corel Corporation's

17 corporate designee.  This is going to be read, rather than

18 played, by people reading the transcript.

19       Your Honor, I believe we can finish by 1:00, but maybe

12:41 20 with just a couple of minutes over, I wanted to ask if it's

21 okay to do that.

22       THE COURT:  I'm certain the jury will indulge you on

23 that.

24       MR. KESSEL:  Thank you.

25       READER:  May I proceed, your Honor?

```
 1              THE COURT:  You may.
 2    Q.    Can you state your full name for the record, please?
 3    A.    My full name is Christopher Tremblay.
 4    Q.    Can you spell it, the last name?
 5    A.    Tremblay, T-r-e-m-b-l-a-y.
 6    Q.    And, Mr. Tremblay, by whom are you employed?
 7    A.    Corel.
 8    Q.    Are you employed here in Ottawa?
 9    A.    Yes.
10    Q.    What is your title?
11    A.    My title is principal software developer.
12    Q.    Are you responsible for any particular product or all of
13    them?
14    A.    Currently I work on Painter.
15    Q.    How long have you worked on Painter?
16    A.    Several years.
17    Q.    Do you understand you're here to testify on behalf of
18    Corel in this matter?
19    A.    Yes.
20    Q.    Where did you go to university?
21    A.    Ottawa, Ottawa U.
22    Q.    And what was your degree in?
23    A.    Computer engineering.
24    Q.    How long after Corel acquired Painter were you assigned to
25    a team whose responsibilities included Painter?
```

1    A.    Well, I was on that team when Painter was acquired.

2    Q.    Do you remember when Corel acquired Painter?

3    A.    I don't remember the exact date.  I believe it was early

4    2000.

5    Q.    At some point you were on a team whose responsibilities

6    included, among other things, Painter 7; is that right?

7    A.    Yeah, yes.

8    Q.    Did I get it right that your title is principal software

9    developer?

12:43 10    A.    Yes.

11    Q.    What are your responsibilities as the principal software

12    developer for Painter?

13    A.    Well, there's feature development, coding, there's

14    planning the technology research.  So leading the sort of

15    research and the sort of math and physics of the Painter engine

16    and you know --

17    Q.    Do you know what language, programming language, Painter

18    is written in?

19    A.    Yes.

12:43 20    Q.    What language is that?

21    A.    There's more than one.

22    Q.    Which languages?

23    A.    C, C++, Objective-C.  You can also consider that there's

24    XML, XAML.  I think that covers the source code.

25    Q.    Can you read the source code in all those languages?

```
 1   A.    I'm familiar with all those languages.

 2   Q.    When you first began working on Painter, do you recall

 3   what version number Painter was on?

 4   A.    When Corel acquired Painter, that was Painter 6.

 5   Q.    And was 6 already released when Corel acquired it?

 6   A.    I think there was a Metacreation of Painter 6 already

 7   available for sale.

 8   Q.    Metacreation was the company from whom Corel purchased

 9   Painter?

12:44 10   A.    Yes.

11   Q.    Was Painter 6 released as a Corel product?

12   A.    We rebranded it under the Corel name.  I'm not sure if it

13   was 6 or maybe 6.1 or something like that, but something of

14   that nature.

15   Q.    But at least the number to the left of the decimal would

16   have been 6.

17   A.    Yes.

18   Q.    Are you familiar with a feature called "Cloning With

19   Perspective"?

12:44 20   A.    Yes.

21   Q.    Is there source code for the Cloning With Perspective

22   feature?

23   A.    There's source code for the Cloning With Perspective tool

24   in Painter.

25   Q.    Do you know which language it's written in?
```

1    A.   Yes.

2    Q.   Which language?

3    A.   That would be considered C and C++.

4    Q.   And C and C++ are two of the programming languages you

5    have programmed in?

6    A.   Yes.

7    Q.   Have you ever looked at the source code for the Cloning

8    With Perspective tool?

9    A.   Yes.

12:45 10   Q.   Do you know if the Cloning With Perspective tool was in

11   Painter when Corel acquired it?

12   A.   Yes, I know that.

13   Q.   It was, in fact, in the product?

14   A.   It was available in Painter 6.

15   Q.   While were you at Corel, were you aware of a version of

16   Painter that did not have the Cloning With Perspective tool?

17   A.   No.

18   Q.   As far as you know, did every version of Painter

19   distributed by Corel have the Cloning With Perspective tool?

12:45 20   A.   Looking at Painter 6 per se, I looked at Painter 7.  That

21   was the earliest version I looked at, and it has Cloning With

22   Perspective in it.

23   Q.   What was the first version of Painter sold under the Corel

24   brand?

25   A.   Painter 6.

1    Q.    Have there been subsequent versions of Painter sold under

2    the Corel brand?

3    A.    As in incremental version numbers?

4    Q.    Yes.

5    A.    Painter 7, Painter 8, yes, there have been other versions

6    of Painter sold under the Corel brand.

7    Q.    Do you know if Painter 7 had the Cloning With Perspective

8    tool?

9    A.    Procreate Painter 7 had the Cloning With Perspective tool.

12:46 10   Q.    As far as you know, has the functionality of the Cloning

11   With Perspective tool changed in Painter since you began

12   working on the product?

13   A.    Do you have any specific areas of the tool that you're

14   referring to?

15   Q.    Well, first, I guess generally, and then I'll get

16   specific.

17   A.    As far as I know, the functionality hasn't changed.

18   Q.    You used the term "perspective cloning mode."  What do you

19   mean by "perspective" in that term?

12:46 20   A.    That's the name that's used in our user interface.  You

21   can choose that option in the user interface.

22   Q.    When you choose that option, what does the product allow

23   you to do?

24   A.    The product basically allows you to set a source area in

25   the image and that becomes your source pixels.  The source

1  pixels, you know, you can copy to another area in the image.

2  Q.  And when you do so, are the pixels literally copied

3  exactly from one area to the other?

4  A.  There -- they can be transformed.

5  Q.  And how can they be transformed?

6  A.  If you set up your source in such a way that a

7  transformation would be applied, you can set up your source and

8  your destination in such a way that the pixels would be copied

9  using a transformation.

12:47 10  Q.  What do you mean by a "transformation"?

11  A.  The pixels will be different in the destination.  They'll

12  look different in the destination than they will in the source.

13  Q.  What do you mean by "different"?

14  A.  They may be, um, well, it won't look exactly the same.

15  They may be stretched in this way or some other type of

16  transformation.

17  Q.  Do you understand that the term "perspective" is being

18  used in that description to describe the transformation?

19  A.  Yes.

12:47 20  Q.  Was Painter 7 offered for sale in the United States?

21  A.  Yes.

22  Q.  Was it offered for sale in the July of 2001?

23  A.  I believe it was the summer of 2001.

24  Q.  Do you have any reason to believe that the source code was

25  different from one version of Painter 7 to another?

1   A.   I have no reason to believe that the functionality of the

2   Cloning With Perspective would be different from one version,

3   from the English to the French version.

4   Q.   Do you know whether the source code that implemented the

5   Cloning With Perspective tool in Painter 7 was different from

6   one language version to another?

7   A.   I don't know that, no.  I don't know that, sorry.

8   Q.   Based on your experience at Corel, would you expect they

9   would be the same or different?

12:48 10   A.   Based on my experience, I would say it's likely that the

11   functionality would be the same between the languages.

12   Q.   Other than the UI elements, is it your best belief that

13   the source code which implemented the Cloning With Perspective

14   tool was the same across different language versions of Painter

15   7?

16   A.   Other than the UI elements, it's my belief that the

17   functionality would be the same.  So the code related to the

18   functionality specifically, it's my belief it would be the same

19   across languages.

12:48 20   Q.   In connection with your duties at Corel, were you asked at

21   some point to provide source code related to Painter to

22   somebody?

23   A.   Yes.

24   Q.   Okay.

25        And did you?

A.   Yes.

Q.   So I'm not now going to mark as Exhibit 3 a multipage document that starts with an unBates stamped -- you're familiar with that term, unBates stamped, one-page letter that has a blank page and then has what appears to be pages marked Corel source code and production number or Bates numbers CRL 0011 through CRL 0669.  And I will represent to you that these numbers at the bottom are sometimes referred to as Bates numbers or production numbers and were put on presumably for

12:49   purposes of producing the source code.

The question is:  Do you recognize that as source code for Painter 7?

A.   It looks like source code for Painter.  I haven't read this line by line, but it looks like the source code for Painter.

Q.   Do you know if -- you testified earlier that Corel Painter 7 was offered for sale in the United States in July or August of 2001, if I recall your testimony.

A.   Yes, summer 2001, July or August.

12:50   Q.   Is this the source code for the version of Corel Painter 7 that was offered for sale in the United States in the summer of 2001?

A.   No.

Q.   Okay.

What is it?

A.   I retrieved this source code from the localized French

version.

Q.   Why didn't you give Ms. Merkadeau the source code for the

version of Painter 7 offered for sale in the United States?

A.   I was not able to find the source code for the English

version of Painter 7.

Q.   Okay.

     And is there some way as a Corel software development

engineer that you can tell when source code was last modified?

A.   Yes.

Q.   How is that?

A.   You can look at the history.

Q.   Okay.

     And did you look at the history for this French

version you provided Ms. Merkadeau?

A.   Yes.

Q.   And what did the history tell you?

A.   There were no changes since the release of the French

version.

Q.   I'm going to mark as Exhibit 5 this enormous, heavy I can

testify to document which purports to be a Procreate Corel

Painter 7 user guide with a copyright dated 2001 bearing the

production numbers of AD 49088 and ending 49546.  I'll

represent to you, unless there was a copying error, these are

consecutive numbers.

1          I've handed you a rubber-banded collection of pages

2     which says that is the Corel Painter 7 user guide, presumably

3     distributed in some form other than this one.  Have you seen a

4     user guide for Corel Painter 7 before?

5     A.    Yes.

6     Q.    Does this look like a copy of that?

7     A.    Yes.

8     Q.    You were testifying earlier from a user perspective,

9     right?  And you know the software does certain things from a

12:51 10    user perspective, right?

11    A.    Um, yeah.

12    Q.    And there's source code that makes that happen, correct?

13    A.    Yes.

14    Q.    Are you able to tell just from the user experience how the

15    transformation happens?

16    A.    How the transformation happens?

17    Q.    Yes.

18    A.    How from, like, a mathematical model or how from a visual

19    perspective?

12:52 20    Q.    From a mathematical perspective.

21    A.    From a users' point of view?

22    Q.    Right.

23    A.    No, I need to look at the code to be precise on the math

24    that's used to apply the transformation.

25    Q.    Yeah, and that's, I guess, what I'm asking you.  Do you

1   know what formula is being applied to make the transformation

2   associated with Cloning With Perspective from just the user

3   experience?

4   A.   I don't think you can be sure of the math just by using

5   software.  You can guess, but you cannot be sure what math is

6   being used just by using the software.

7   Q.   You just gave some testimony about what source control is,

8   right?

9   A.   Yes.

12:52 10   Q.   And source control is a software?

11   A.   Yeah, it's software.

12   Q.   And does source control -- source control software is what

13   allows the tracking of changes to source code as it's

14   developed?

15   A.   Yes.

16   Q.   Was there source control software associated with Painter

17   7?

18   A.   Yes.

19   Q.   And have you reviewed that source control software in

12:53 20   connection with your testimony today?

21   A.   I used it to retrieve the Painter 7 source code.

22   Q.   Okay.

23        In earlier testimony I think you referred to history?

24   A.   Yes.

25   Q.   And that's how you were certain that it had the code, the

1  source code, for Painter 7 had not been modified for -- the

2  French version of Painter 7 had not been modified, correct?

3  A.   Yes.

4  Q.   Is there a source control for the French version of

5  Painter 7?  What I'm getting at is, when you went to get the

6  French localized version of source code for Painter 7, what

7  software did you use to retrieve that?

8  A.   Okay.

9       The software I used was Visual SourceSafe.

12:53 10  Q.   So the best of your knowledge, Corel maintains its source

11  code as confidential then; is that correct?

12  A.   Which source code?

13  Q.   Let's be specific.  The source code identified in Exhibit

14  3.

15  A.   Mm-hmm, the question is?

16  Q.   To the best of your knowledge, is this source code

17  maintained as confidential to Corel?

18  A.   To the best of my knowledge, it's confidential to Corel.

19  Q.   The original version of Painter 7 source code is not

12:54 20  available, correct?

21  A.   You mean the English version?

22  Q.   Yes.

23  A.   Yes, I -- I can tell you why I'm only available to go back

24  to the French version.

25  Q.   Okay, please.

A.    As far as I know.

Q.    Yes.

A.    So after we released the English version, we switched source control systems, and we no longer use the original source control system.

Q.    I see.  So this Visual SourceSafe system only archived the French version?

A.    Yes.  We're using a different source control product which is a commercial, like, not a free product, so we no longer have licenses for that or whatever, something like that.

Q.    Are you able to confirm personally that the file you retrieved pertaining to the localized French version of Painter 7 was actually compiled?

A.    Was compiled?

Q.    Yes.

A.    I don't know that I can confirm that.  As far as I know, there's history in SourceSafe to determine if the code was compiled outside of SourceSafe.

Q.    And you haven't personally confirmed that it was compiled, correct?

A.    I have not looked at it, if we've released the French version.  I've never gone out to look for the French version of Painter 7, the commercial product.

          (End of reading deposition.)

          THE COURT:  Anything productive to do in five minutes?

1        MR. SCHERKENBACH:  I don't think so with the jury,

2   your Honor.  I think we should probably end.  Our next witness

3   is long.

4        THE COURT:  All right.

5        Jurors, why don't we then suspend.  We'll start at the

6   usual time tomorrow, perhaps a little earlier.  I think we're

7   on schedule.  We've gone through roughly two-thirds, actually

8   almost three-quarters of the witnesses that were designated to

9   testify, so I'm confident we're going to get this to you in the

12:55 10   next couple of days.

11        All right.  We'll be adjourned then until tomorrow

12   morning at 9:00.

13        THE CLERK:  All rise.

14        (Court adjourned at 12:55 p.m.)

15                  - - - - - - - - - - - -

16                      CERTIFICATION

17        We certify that the foregoing is a correct transcript

18   of the record of proceedings in the above-entitled matter to

19   the best of our skill and ability.

20

21

22   /s/Debra M. Joyce                    January 20, 2015
     Debra M. Joyce, RMR, CRR            Date
23   Official Court Reporter

24

25

1

2  /s/James P. Gibbons          January 20, 2015
   James P. Gibbons, RMR        Date
3  Official Court Reporter

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

3    WITNESS                                              PAGE

4    DAVID YURKERWICH (resumed)
          Cross-Examination
5          By Mr. Scherkenbach                              2
          Redirect Examination
6          By Mr. Airan                                    36

7    TOM HOGARTY
        Direct Examination
8         By Mr. Scherkenbach                              41
        Cross-Examination
9         By Mr. Airan                                     71
        Redirect Examination
10        By Mr. Scherkenbach                             110
        Recross-Examination
11        By Mr. Airan                                    113

12      GEORGE WOLBERG (via videotaped deposition)
                                                          115
13      CHRISTOPHER TREMBLAY (via deposition)
                                                          148
14

15

16                            E X H I B I T S

17
        Exhibit No.          Description            Received
18

19       472           Transcript of Narayen conference call      9

20       473           Adobe-PixelGenius license agreement       72

21       474           Adobe 2008 10-K                           79

22

23

24

25